IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
(SYRACUSE DIVISION)

-------------------------------------------------------------x

In re:                                        :
                                              :
THE NEW YORK CHOCOLATE                        :        Case No.  10-_____ - (____)
& CONFECTIONS COMPANY                         :        Chapter 11 Case
                                              :
Debtor.                                       :
-------------------------------------------------------------x

**DEBTOR'S MOTION PURSUANT TO
SECTIONS 105(a), 363(b), 507(a)(4) AND 507(a)(5)
OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER AUTHORIZING
PAYMENT OF WAGES, COMPENSATION AND EMPLOYEE BENEFITS**

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves this Court (the "Motion"), pursuant to sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order: (A) authorizing, but not requiring, the Debtor to (i) pay, in its sole discretion, wage obligations, expense reimbursements, payroll taxes, and employee benefits, (ii) maintain and continue to honor its practices, programs, and policies for its employees as they were in effect on the Petition Date (as defined herein), and as such may be modified, amended, or supplemented from time to time in the ordinary course, and (B) authorizing the Debtor's financial banking institution (the "Bank") to receive, honor, process, and pay any and all checks or wire transfers drawn on the Debtor's accounts in satisfaction of employee obligations and employee benefits.  In support of the Motion, the Debtor respectfully states as follows:

**JURISDICTION**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

## BACKGROUND

3.     On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in this case.

4.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     The factual background relating to the Debtor's commencement of this chapter 11 case and the facts and circumstances supporting the relief requested herein are set forth in greater detail in the Declaration of Richard F. McCormick, the Debtor's Chief Restructuring Officer, in Support of First Day Motions (the "McCormick Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## GENERAL BACKGROUND

**A.     Formation of New York Chocolate**

6.     The Debtor, The New York Chocolate & Confections Company ("New York Chocolate"), is a Delaware corporation with its principal place of business in Fulton, New York.  New York Chocolate's primary asset is its 39 acre chocolate production facility located at 555 South Fourth Street in Fulton (the "Chocolate Plant").  The Comité de Gestion de la Filière Café-Cacao (the "Comité"), a quasi governmental agency, is the 100% shareholder of the Debtor.  The Comité was formed by the President of the Republic of Côte d'Ivoire in September 2008 to, among other things, succeed to the shareholder interests of the then sole shareholder of

NYK 1277663-3.085280.0011

New York Chocolate – Fonds de Régulation et de Controle Café-Cacao (the "FRC") – after certain of the FRC's members were accused of mismanagement, among other allegations.

7.      Côte d'Ivoire is a West African nation that is the world's leading producer and exporter of the cocoa beans used in the manufacture of chocolate.  In general, West Africa collectively supplies nearly 70% of the world's cocoa crop, with Côte d'Ivoire leading production at 1.3 million tons.  Historically, large chocolate producers such as Cadbury, Hershey's and Nestlé buy Ivorian cocoa futures and options through Euronext where world prices for cocoa beans are set.

8.      The description of New York Chocolate's corporate history and the ownership of the Chocolate Plant reflects the difficulties encountered by the Debtor since its creation, but is integral to understanding the Debtor's decision to enter Chapter 11.  The Chocolate Plant was initially owned and operated by Nestlé USA, Inc. ("Nestlé"); it was Nestlé's first United States chocolate production facility and was built in the late 1800's.  In March 2003, Nestlé made the decision to close the Chocolate Plant.  Jean Claude Amon ("Amon"), a special advisor to the President of the Republic of the Côte d'Ivoire, learned of the planned closing and commissioned Lion Capital Management, LLC ("LCM"), with the aid of its President and Chief Executive Officer, Hausmann-Alain Banet ("Banet"), to conduct an economic analysis on the feasibility of acquiring the Chocolate Plant.  Amon and other representatives of the Côte d'Ivoire toured the Chocolate Plant and later met with LCM, through Banet, to discuss the economic study and the possible acquisition of the Chocolate Plant.

9.      Despite at least one offer to purchase the Chocolate Plant,  Nestlé ultimately decided against selling the Chocolate Plant, but rather, decided to auction the equipment located at the Chocolate Plant (the "Equipment") and donated the factory and land to

the County of Oswego Industrial Development Agency (the "IDA"). In September and October 2003, LCM purchased substantially all of the Equipment at the auction or, subsequently, from other successful bidders after the auction. To purchase the Equipment, LCM used funds provided by the FRC and some of its own funds, which were later reimbursed by the FRC. In December, 2003, New York Chocolate acquired the factory and land from the IDA.

10.     LCM incorporated New York Chocolate on October 30, 2003, and thereafter transferred the Equipment to it. LCM was the initial sole shareholder until November 17, 2003, when it transferred 80% of the shares in New York Chocolate to the FRC. The FRC was a quasi governmental agency formed under the laws of the Côte d'Ivoire and represented the interests of a collection of farmers' cooperatives in the Côte d'Ivoire that grew cacao. The goal of the FRC was to operate the Chocolate Plant so as to provide the farmers' cooperatives with an outlet for their cacao production. An initial board of directors was selected, which included Banet.

**B.     The County Loan**

11.     On April 21, 2005, New York Chocolate and Operation Oswego County, Inc., as subrecipient of Oswego County (the "County"), entered into a loan agreement (the "County Loan"). The County Loan was in the principal amount of $850,000 and was to be used to purchase certain equipment for the Chocolate Plant. Pursuant to the County Loan, New York Chocolate granted the County a security interest in certain of its equipment. The Debtor is obligated to make payments on the County Loan on a monthly basis of $8,207.66 through April 1, 2015.[1]

---

[1]     In connection with the County Loan, New York Chocolate and the County also entered into a Loan Servicing Agreement dated April 21, 2005, pursuant to which New York Chocolate agreed to pay servicing

(continued…)

12.     On or about February 9, 2006, the County loaned the Debtor an additional $40,000, which was secured by certain items of office equipment.  On or about March 2006, the County loaned the Debtor an additional $35,000.  On or about March 27, 2006, the County was granted a lien on certain equipment and a blanket lien on all the Debtor's personal property.  As of the Petition Date, only the County Loan remains outstanding.

## C.      Litigation Involving New York Chocolate

### (i).      The FCA Action

13.     Fulton Cogeneration Associates, LP ("FCA"), which was owned and operated indirectly by Banet since September 2004, provided steam to New York Chocolate through June 2005.  New York Chocolate fell behind in making its payments to FCA and, in July 2005, FCA sued New York Chocolate in New York state court for payments and other obligations owed.  FCA won partial summary judgment against New York Chocolate in the amount of $1,332,874.40 plus interest (the "FCA Judgment").  The remainder of the claims asserted by FCA were dismissed with prejudice.  In April 2009, the FCA Judgment was satisfied by New York Chocolate making a payment to the IDA, which had attached the FCA Judgment. The United States District Court for the Northern District of New York approved the settlement with the IDA and entered an order extinguishing the FCA Judgment.

### (ii).      The FRC Action

14.     In 2005, a dispute arose between the FRC and LMC over the ownership of New York Chocolate.  In July 2005, the FRC filed an action in the Court of Chancery of the State of Delaware (the "Court of Chancery") seeking a declaration as to the respective equity ownership interests of the FRC and LCM (the "FRC Action").  On January 22, 2007, the Court

---

fees to Operation Oswego County, Inc. in the amount of one-half of one percent of the outstanding principal balance due under the County Loan in two semi-annual installments.

of Chancery issued an opinion in which it found that the FRC owned 800 of the 1,000 issued then-outstanding shares of New York Chocolate, and LCM owned the remaining 200 shares.

    (iii).   <u>The California Superior Court Action</u>

    15.   In 2006, New York Chocolate filed an action in the Superior Court of California for the County of San Francisco (the "California Superior Court") against Banet and LCM, alleging that Banet and LCM had converted a tax refund check belonging to New York Chocolate. On September 17, 2007, judgment was entered in the California Superior Court in favor of New York Chocolate and against both LCM and Banet in the amount of $606,299.00 (the "Tax Judgment"). After domesticating the Tax Judgment in Delaware, on May 23, 2008, the 200 shares of New York Chocolate stock owned by LCM were sold to New York Chocolate at a sheriff's sale in partial satisfaction of the Tax Judgment against LCM. As a result, the FRC became the 100% shareholder of New York Chocolate.

    (iv).   <u>The Banet Action</u>

    16.   On May 6, 2008, Banet filed a lawsuit in the Court of Chancery (the "Banet Action") in his capacity as an alleged stockholder and an alleged director of New York Chocolate against the FRC, the current and former directors and officers of New York Chocolate, and against New York Chocolate (collectively, the "Defendants"). New York Chocolate was named only as a nominal defendant. On October 19, 2008, Banet filed an amended complaint that added FCA and LCM as plaintiffs (collectively, the "Plaintiffs"), asserting claims in their capacity as creditors and LCM as an alleged former shareholder. The Banet Action alleged seven counts, including the following: a request for appointment of a receiver or custodian for New York Chocolate; breach of fiduciary duties, both derivative and direct; a demand for inspection of books and records; and requests to compel the holding of an

annual meeting of stockholders and a meeting of the board of directors on New York Chocolate. On November 26, 2008, Plaintiffs filed a motion for judgment on the pleadings, or, in the alternative, for summary judgment on their request for a receiver, which was denied. New York Chocolate subsequently filed a counterclaim seeking declarations that neither FCA nor LCM were creditors of New York Chocolate (Banet did not claim to be a creditor) and that neither LCM nor Banet was a stockholder of New York Chocolate. In August 2009, New York Chocolate filed a motion for summary judgment on the counterclaim.

17.     On March 12, 2010, the Court of Chancery granted New York Chocolate's motion for summary judgment and found that (1) LCM is not a stockholder of New York Chocolate; (2) Banet is not a stockholder of New York Chocolate; (3) Banet is not a director of New York Chocolate; (4) FCA is not a creditor of New York Chocolate; and (5) LCM is not a creditor of New York Chocolate.

**D.     Current Ownership and Management**

18.     On September 19, 2008, the Comité replaced the FRC as the 100% shareholder of New York Chocolate by Ordinance No. 2008-259 and Decrees Nos. 2008-260 and 2008-261 of the President of the Côte d'Ivoire. On November 20, 2008, the Comité acted by written consent to remove all members of the board of directors of New York Chocolate. By separate written consent of the same date, the Comité elected the following new directors of New York Chocolate: Illa Ginette Donwahi, Léa Claudine Yapobi, N'Guessan Célestin and Atsé Kouassi Propser. At a meeting of the new board of directors on November 24, 2008, all officers of New York Chocolate were removed from office and Mike Malash was appointed President and Patrick Haney was appointed Secretary and Treasurer of New York Chocolate.

NYK 1277663-3.085280.0011

**E.     Events Leading to Chapter 11 Filing**

19.     The litigations against New York Chocolate, and the allegations against certain members of its prior board and management, saddled New York Chocolate with a significant financial burden right from the start.  Partly because of such difficulties, the Debtor has not produced any products at the Chocolate Plant in over three years.  Since the Comité took over for the FRC, it has funded all of New York Chocolate's expenses.   After careful consideration and study of the realistic market opportunities for an independent manufacturer of chocolate products, projected capital requirements to restart New York Chocolate's operations, and faced with the accumulation of certain debts and other obligations, and the financial drain related to the numerous litigations, New York Chocolate determined that the most efficient way to preserve value for the creditors and other stakeholders was to commence an orderly wind down of its business under the protection of Chapter 11.

20.     The Debtor is intent on working cooperatively with the Debtor's creditors, the City of Fulton and County officials to ensure an efficient and orderly Chapter 11 process.

**RELIEF REQUESTED**

21.     In order to minimize the personal hardship that the Debtor's employees will suffer if prepetition employee-related obligations are not paid when due or as expected, and in order to maintain positive morale among the Debtor's employees, by this Motion, the Debtor seeks authority to, subject to the limits prescribed by the Bankruptcy Code, (i) pay, in its sole discretion, Wage Obligations, Expense Reimbursements, Payroll Taxes and Employee Benefits (each as defined below, and collectively, the "Employee Obligations"), (ii) maintain and continue to honor its practices, programs, and policies for its employees as they were in effect on the Petition Date, and as such may be modified, amended, or supplemented from time to time in

the ordinary course, and (iii) authorize the Bank[2] to receive, honor, process, and pay any and all checks or wire transfers drawn on the Debtor's accounts in satisfaction of the Employee Obligations.

22.     In addition, to the extent it is outside of the ordinary course of business, the Debtor seeks the right to modify, change and/or discontinue any of the Employee Obligations and to implement new Employee Obligations in the ordinary course of business during this chapter 11 case in its sole discretion without the need for further Court approval.

### The Debtor's Prepetition Employee Obligations

23.     The Debtor incurs payroll and employee benefits obligations for its employees.  As of the Petition Date, the Debtor employs three individuals including (i) one hourly employee, who is a part-time hourly employee (the "Hourly Employee") and (ii) two full-time salaried employees (the "Salaried Employees" and, together with the Hourly Employee, the "Employees").

24.     The Debtor has incurred obligations with respect to the Employees relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding, due and payable, while others will become due and payable in the ordinary course of the Debtor's business after the Petition Date.

25.     The Debtor submits that any delay in the process of regular payment to Employees would cause harm to the Debtor.

---

[2]     As of the Petition Date, the Debtor's cash was held on deposit at Fulton Saving Bank, which is not on the United States Trustee's list of approved financial institutions.  Accordingly, the Debtor is in the process of opening new accounts at an approved institution.  The Debtor intends to work closely with the United States Trustee to facilitate a smooth transfer of the Debtor's banking needs.

**(i)**     **Wages And Salaries**

26.     Prior to the Petition Date, the Debtor typically paid wages and salaries on a weekly basis to its Hourly Employee and on a bi-weekly basis for its Salaried Employees (the "Wage Obligations"), by check delivered by hand to each specific Employee.  The Debtor's current estimated gross payroll for its Employees is approximately $500 on a weekly basis for the Hourly Employee and $6,400 on a bi-weekly basis for the Salaried Employees.

27.     As to the Hourly Employee, payments are made one week in arrears and on a weekly basis.  Thus, as an example, on April 14, 2010, the Debtor paid its Hourly Employee for services rendered for the period of April 5, 2010, through April 11, 2010.  As such, the Hourly Employee is owed monies for services rendered from April 12, 2010, through the Petition Date.  The amount outstanding to the Hourly Employee is approximately $1,000.  The next payroll date for Hourly Employee is April 22, 2010.  Salaried Employees, on the other hand, receive their payroll check on a bi-weekly basis and are paid for current work performed.  Thus, the Salaried Employees were paid on April 14, 2010, and were paid for all services rendered from April 5, 2010, through April 14, 2010.  As such, the Salaried Employees are not owed any prepetition wages.  The next payroll pay date for Salaried Employees is April 29, 2010.  Thus, as of the Petition Date, the Debtor has accrued Wage Obligations to its Employees in the aggregate amount of approximately $1,000.

**(ii)**     **Payroll Taxes**

28.     The Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  The Debtor uses the services provided by Intuit QuickBooks Payroll Services, Inc. ("Intuit QuickBooks") to remit Withholding Taxes.

NYK 1277663-3.085280.0011

Intuit QuickBooks receives a transfer in the amount of the Withholding Taxes from the Debtor's payroll account at the Bank and transfers the Withholding Taxes directly to the Taxing Authorities. In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). The Debtor estimates it has liability for Payroll Taxes in the approximate amount of $100 as of the Petition Date.

29. The Debtor pays Intuit QuickBooks a monthly processing fee of $60 (the "Processing Fee") for services performed in connection with the Payroll Taxes. The Processing Fee is paid on the first payroll date of each month and covers services for that month. Intuit-Quick Books also generates the Debtor's payroll checks. The Debtor pays Intuit QuickBooks a fee of $1 per check on each payroll date for all checks issued on such date. The Debtor intends to continue using Intuit QuickBooks to satisfy its Wage Obligations and Payroll Taxes for its Employees. As of the Petition Date, the Debtor does not believe that any fees owed to Intuit-Quick Books are outstanding, or accrued and unpaid.

**(iii)** **Reimbursement Expenses**

30. The Debtor's Employees may incur various expenses in the discharge of their ordinary duties, such as travel, automobile expenses or meal expenses. Because these expenses are incurred as part of their official duties and in furtherance of the Debtor's business, the Employees are reimbursed in full for such expenses (the "Expense Reimbursements"). The Debtor does not have a written policy for Expense Reimbursements. Typically, most expenses are paid with a corporate "debit/credit" card issued by the Bank and tied to the Debtor's petty

11

cash account located at the Bank. Only two Employees have been issued "debit/credit" card by the Bank. Occasionally, business expenses are paid by the Employees directly. For such expenses, the practice of the Debtor has been to reimburse the Employee for 100% of the expense incurred upon submission of a receipt. Such Expense Reimbursements are not made through payroll. Instead, the Debtor pays Expense Reimbursements with a check upon request. The Debtor does not believe that there are any Expense Reimbursements outstanding, or accrued and unpaid, as of the Petition Date.

**The Debtor's Prepetition Employee Benefits**

31.     The Debtor has established the following benefit plans and policies for its Employees: (i) paid time off benefits, including vacation days, sick days and paid holidays (collectively, the "PTO Plans"), (ii) medical health insurance, disability insurance and workers' compensation insurance (collectively, the "Health and Welfare Plans"), and (iii) a 401(k) plan (the "401(k) Plan", together with the PTO Plans and the Health and Welfare Plans, the "Employee Benefits").

**(i)      Paid Time Off Benefits**

32.     Under the PTO Plans, Employees, in certain circumstances, receive their full wages for, among other things, vacation, sick days, and holidays. Employees accrue paid time off and related benefits based on the following calculations:

(a)     Vacation and Sick Days

33.     Employees accrue vacation for the time worked during the previous year. Hourly Employees receive 6.75 hours of vacation per month worked for a total allowable amount of 80 vacation hours for any given year. After ten years of service, Hourly Employees receive 10 hours of vacation per month worked, for a total allowable amount of 120 vacation hours for any given year. For example, an Hourly Employee who worked during the month of January

2010 would accrue 6.75 vacation hours for the year of 2011.  The Debtor believes that the

Hourly Employee is not owed any amount for vacation hours earned prior to the Petition Date.

Salaried Employees receive 10 hours of vacation per month worked, for a total allowable amount

of 120 vacation hours for any given year.  For example, a Salaried Employee that worked during

the month of January 2010 accrued 10 vacation hours for the year of 2011.  The Debtor estimates

that it owes approximately $36,000 for vacation hours earned prior to the Petition Date by

Salaried Employees.   Thus, the Debtor owes Employees approximately $36,000 for vacation

hours earned prior to the Petition Date, of which $4,500 is owed in the aggregate for vacation

hours earned within 180 days prior to the Petition Date.

34.     While the Debtor does not have an official sick day policy, its past

practice has been that Employees may take sick days as long as proper notice is given.

(b)     Holiday Pay

35.     Full time Employees are allowed 10 paid holidays during the calendar

year.   Part time Employees are not allowed any paid holidays during the calendar year.

**(ii)     Health And Welfare Plans**

36.     The Debtor sponsors several Health and Welfare Plans to provide benefits

to its Employees, including, without limitation, (a) medical health insurance and (b) disability

insurance and workers' compensation.

(a)     The Health Insurance Plan

37.     The Debtor provides health insurance for its Employees through Excellus-

Blue Cross/Blue Shield of Central New York (the "Health Insurance Plan").   The Debtor

contributes approximately 70% of the cost of the Health Insurance Plan.  The Debtor pays its

portion for the Health Insurance Plan on the first day of each month, covering all obligations for

that month.   The Debtor estimates that it pays approximately $650 a month for the Health

Insurance Plan. COBRA benefits are also offered to certain qualifying Employees. As of the Petition Date, the Debtor does not believe that any obligations are outstanding, or accrued and unpaid, on account of the Health Insurance Plan.

(b)     Disability and Workers' Compensation Insurance

38.     The Debtor provides its Employees with disability insurance through National Benefit Life Company (the "Disability Insurance"). The Debtor paid an annual premium of $338.90 for the Disability Insurance for the year 2010. Such amount was paid on December 28, 2009.

39.     The Debtor maintains workers' compensation insurance through Chartis Insurance, Inc. (the "Workers' Compensation Insurance"). The Debtor's current coverage under the Workers' Compensation Insurance runs through May 25, 2010. The Debtor paid 15% down for coverage on May 21, 2009, followed by ten monthly payments of $1,461.00 on the 25th of each month. As of the Petition Date, the Debtor does not owe any amount with respect to Workers' Compensation Insurance.

40.     Because of the manner in which expenses are incurred and claims are processed under the Health and Welfare Plans, it is difficult for the Debtor to determine the accrued obligations under the Health and Welfare Plans outstanding at any particular time. At this juncture, the Debtor does not believe it owes any monies on account of the Health and Welfare Plans.

**(iii)     401(k) Plan**

41.     The Debtor maintains the 401(k) Plan through McDonald Financial Group. Omega, Inc. ("Omega") is the third party administrator of the 401(k) Plan. Only one Employee actively contributes in the 401(k) Plan. The Debtor does not believe that any prepetition obligations are owed on account of the 401(k) Plan.

## The Chief Restructuring Officer

42.     Pursuant to a letter dated January 1, 2010, Richard F. McCormick was engaged by New York Chocolate as its Chief Restructuring Officer (the "CRO"). The CRO earns $20,000 per month which is paid in advance on the first of each month. The CRO was last due payment on April 1, 2010, but, as of the Petition Date, the CRO has not received payment from New York Chocolate for any portion of the services rendered in April. As of the Petition Date, on a prorated basis, the CRO is owed 14/30ths of his monthly compensation – or $9,333.33 (the "CRO Salary"). The CRO does not participate in any of New York Chocolate's Employee Benefits.

## BASIS FOR RELIEF

43.     Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, claims against the Debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $11,725 per individual. Similarly, section 507(a)(5) of the Bankruptcy Code provides that Employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status to the extent of $11,725 per Employee covered by such plan, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.

44.     The Debtor believes that substantially all, if not all, of the Employee Obligations, Employee Benefits and the CRO Salary relating to the period prior to the Petition Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, these obligations must be paid in full before any general unsecured obligations of the Debtor may be satisfied. Accordingly, the relief requested may affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors or other parties in interest.

45.     Furthermore, section 363(b)(1) of the Bankruptcy Code provides, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

46.     A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  "Under Section 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at 177).

47.     Any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, and cooperation, and would adversely impact the Debtor's relationship with its Employees at a time when the Employees' support is critical to the Debtor's chapter 11 case.  The Debtor simply cannot risk the substantial damage that would inevitably attend any decline in its Employees' morale.

48.     Absent an order granting the relief requested herein, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the Employees to meet their own personal financial obligations.  Without the requested relief, the stability of the Debtor will be undermined by the

distinct possibility that otherwise loyal Employees will seek other employment alternatives. In addition, it would be inequitable to require the Employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtor, with the understanding that they would be reimbursed.

49.     With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtor's estate, as the relevant Taxing Authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code with respect to such obligations. Moreover, the portion of the Payroll Taxes withheld from an Employee's wages on behalf of the applicable Taxing Authority are held in trust by the Debtor. As such, these Payroll Taxes are not property of the Debtor's estate under section 541 of the Bankruptcy Code. See, e.g., Begier v. IRS, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estate).

50.     In addition, the Debtor believes it is necessary to continue payment of administrative fees to the administrators of the Debtor's Employee Obligations and the administrators of programs related to Employee Benefits. Without the continued services of these administrators, the Debtor would be unable to continue to honor its Wage Obligations and Employee Benefits obligations in an efficient and cost-effective manner.

51.     The Debtor does not seek to alter any of its Employee Benefits at this time. This Motion is intended only to permit the Debtor, in its discretion, to make payments consistent with the Debtor's existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtor, in its discretion, to continue to honor its practices, programs, and policies with respect to its Employees, as such practices, programs, and policies

were in effect as of the Petition Date. Payment of all employment obligations in accordance with the Debtor's prepetition practices is in the best interests of the Debtor's estate, its creditors and all parties in interest and will enable the Debtor to focus on this Chapter 11 without disruption. As explained more fully above, Employees are central to the Debtor's reorganization. A significant deterioration in employee morale at this time undoubtedly would have a devastating impact on Debtor, and the value of its assets.

52.     Payment of the amounts requested in this Motion is in the interest of all parties because such payment will facilitate the Debtor's chapter 11 case. In other chapter 11 cases, courts in this district and other districts have approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described herein.[3] See, e.g., In re Northeast Biofuels, LP, Case No. 09-30057 (MCR) (Bankr. N.D.N.Y. 2009); In re Lincoln Logs Ltd., Case No. 08-13079 (REL) (Bankr. N.D.N.Y. 2008); In re Auburn Memorial Hospital, et al., Case No. 07-31126 (MCR) (Bankr. N.D.N.Y. 2007); In re Zappala Farms, LLC, Case No. 07-31842 (MCR) (Bankr. N.D.N.Y. 2007); In re Silicon Graphics, Inc., et al., Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. 2006); In re Footstar, Inc., et al., Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. 2004), In re Parmalat USA Corp., et al., Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. 2004); In re Acterna Corp., et al., Case No. 03-12837 (Bankr. S.D.N.Y. 2003); In re Adelphia Bus Solutions, Inc., et al., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002).

53.     Accordingly, by this Motion, the Debtor seeks authority, in its sole discretion, pursuant to sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code to pay Employee Obligations as they become due and owing during the pendency of this case

---

[3]     Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion. Copies of these orders are available upon written request of the undersigned counsel.

and to continue, uninterrupted, its practices, programs and policies with respect to its Employees, as such practices, programs and policies were in effect as of the Petition Date.

54.     By this Motion, the Debtor also seeks an order clarifying that the administrators of the Debtor's Employee Obligations and the administrators of programs related to Employee Benefits, including but not limited to Intuit QuickBooks, can continue to perform their services for the benefit of the Debtor in the ordinary course of business.

55.     Furthermore, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**The Bank Should Be Authorized To Honor And
Pay Checks Issued And Make Other Transfers To Pay
Employee Obligations and Employee Benefits**

56.     The Debtor further requests that the Court authorize the Bank to receive, process, honor, and pay all prepetition and postpetition checks issued or to be issued, and electronic fund transfers requested or to be requested, by the Debtor in respect of the Employee Obligations and Employee Benefits.  The Debtor also seeks authority to issue new postpetition checks, or effect new electronic fund transfers, on account of the Employee Obligations and Employee Benefits to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected.

57.     As a result of the commencement of this chapter 11 case, and in the absence of an order of the Court providing otherwise, the Debtor's checks, wire transfers and direct deposit transfers in respect of the Employee Obligations and Employee Benefits compensation may be dishonored or rejected by the Bank.

58.     The Debtor represents that each of these checks or transfers is or will be drawn on specific accounts that can be readily identified as relating directly to payment of

Employee Obligations compensation. Accordingly, the Debtor believes that prepetition checks and transfers other than those for Employee Obligations and Employee Benefits compensation will not be honored inadvertently.

59. Authorization to pay all amounts on account of Employee Obligations and Employee Benefits compensation shall not be deemed to constitute postpetition assumption or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy Code. The Debtor is in the process of reviewing these matters and reserves all of its rights under the Bankruptcy Code with respect thereto. Moreover, authorization to pay all amounts on account of Employee Obligations and Employee Benefits compensation shall not affect the Debtor's right to contest the amount or validity of any such claims, including without limitation the Payroll Taxes that may be due to any Taxing Authority.

60. For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of all parties in interest.

61. The Debtor is not requesting the assumption of any agreement in this Motion and, therefore, nothing contained in this Motion shall constitute a request for authority to assume any policy, procedure or executory contract that may be described or referenced herein.

## NOTICE

62. No trustee, examiner, or creditors' committee has been appointed in the Debtor's chapter 11 case. The Debtor has served notice of this Motion on (i) the United States Trustee for the Northern District of New York, (ii) Oswego County, (iii) Operation Oswego County, Inc., and (iv) all known unsecured creditors in this chapter 11 case. In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

63. Additionally, within five (5) business days of the entry of the order, notice of the order will be given to the Bank.

## **NO PRIOR REQUEST**

64.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

NYK 1277663-3.085280.0011

WHEREFORE, the Debtor respectfully requests the entry of an order, substantially in the form attached hereto as Exhibit A, authorizing, but not requiring, the Debtor to (a) pay, in its sole discretion, wage obligations, expense reimbursements, payroll taxes, and employee benefits, (b) maintain and continue to honor its practices, programs, and policies for its employees as they were in effect on the Petition Date (as defined herein), and as such may be modified, amended, or supplemented from time to time in the ordinary course, and (c) authorizing the Bank to receive, honor, process, and pay any and all checks or wire transfers drawn on the Debtor's accounts in satisfaction of employee obligations and employee benefits.

Dated: New York, New York
      April 14, 2010

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

By:   /s/     Geoffrey T. Raicht
          Geoffrey T. Raicht
          Bar No. 2916203
          Nava Hazan
          Bar No. 3064409
          340 Madison Avenue
          New York, New York 10173-1922
          Telephone:  (212) 547-5400
          Facsimile:  (212) 547-5444

*Proposed Counsel for the Debtor and Debtor in Possession*

NYK 1277663-3.085280.0011