**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
(SYRACUSE DIVISION)**

```
---------------------------------------------------------------x
In re:                                     :
                                           :
THE NEW YORK CHOCOLATE                     :      Case No.  10 -_____ - (___)
& CONFECTIONS COMPANY                      :      Chapter 11 Case
                                           :
Debtor.                                    :
---------------------------------------------------------------x
```

**EMERGENCY MOTION FOR ORDER PURSUANT
TO 11 U.S.C. §§ 105, 364(c)(1), (2) & (3), AND 364(e),
FED. R. BANK. P. 2002, 4001 AND 9014, AND LOCAL BANKRUPTCY RULE 4001-3
(I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING ON
SUPERPRIORITY AND SECURED BASIS, (II) GRANTING INTERIM RELIEF,
AND (III) SCHEDULING A FINAL HEARING UNDER FED. R. BANKR. P. 4001(c)**

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves this Court, pursuant to sections 105, 364(c)(1), (2) & (3), and 364(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-3 of the Local Bankruptcy Rules for the Northern District of New York (the "Local Bankruptcy Rules") for interim and final orders to obtain postpetition financing on a secured and superpriority basis (the "Motion"). A concise statement of the relief requested, as required by Bankruptcy Rule 4001(c)(1)(B), is set forth below. In support of the Motion, the Debtor respectfully states as follows:

**JURISDICTION**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105, 364(c)(1), (2) & (3), and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Bankruptcy Rule 4001-3.

## BACKGROUND

3. On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in this case.

4. The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. The factual background relating to the Debtor's commencement of this chapter 11 case and the facts and circumstances supporting the relief requested herein are set forth in greater detail in the Declaration of Richard F. McCormick, the Debtor's Chief Restructuring Officer, in Support of First Day Motions (the "McCormick Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## GENERAL BACKGROUND

**A.      Formation of New York Chocolate**

6. The Debtor, The New York Chocolate & Confections Company ("New York Chocolate"), is a Delaware corporation with its principal place of business in Fulton, New York. New York Chocolate's primary asset is its 39 acre chocolate production facility located at 555 South Fourth Street in Fulton (the "Chocolate Plant"). The Comité de Gestion de la Filière Café-Cacao (the "Comité"), a quasi governmental agency, is the 100% shareholder of the Debtor. The Comité was formed by the President of the Republic of Côte d'Ivoire in September 2008 to, among other things, succeed to the shareholder interests of the then sole shareholder of New

2

York Chocolate – Fonds de Régulation et de Controle Café-Cacao (the "FRC") – after certain of the FRC's members were accused of mismanagement, among other allegations.

7.	Côte d'Ivoire is a West African nation that is the world's leading producer and exporter of the cocoa beans used in the manufacture of chocolate. In general, West Africa collectively supplies nearly 70% of the world's cocoa crop, with Côte d'Ivoire leading production at 1.3 million tons. Historically, large chocolate producers such as Cadbury, Hershey's and Nestlé buy Ivorian cocoa futures and options through Euronext where world prices for cocoa beans are set.

8.	The description of New York Chocolate's corporate history and the ownership of the Chocolate Plant reflects the difficulties encountered by the Debtor since its creation, but is integral to understanding the Debtor's decision to enter Chapter 11. The Chocolate Plant was initially owned and operated by Nestlé USA, Inc. ("Nestlé"); it was Nestlé's first United States chocolate production facility and was built in the late 1800's. In March 2003, Nestlé made the decision to close the Chocolate Plant. Jean Claude Amon ("Amon"), a special advisor to the President of the Republic of the Côte d'Ivoire, learned of the planned closing and commissioned Lion Capital Management, LLC ("LCM"), with the aid of its President and Chief Executive Officer, Hausmann-Alain Banet ("Banet"), to conduct an economic analysis on the feasibility of acquiring the Chocolate Plant. Amon and other representatives of the Côte d'Ivoire toured the Chocolate Plant and later met with LCM, through Banet, to discuss the economic study and the possible acquisition of the Chocolate Plant.

9.	Despite at least one offer to purchase the Chocolate Plant, Nestlé ultimately decided against selling the Chocolate Plant, but rather, decided to auction the equipment located at the Chocolate Plant (the "Equipment") and donated the factory and land to the County of

Oswego Industrial Development Agency (the "IDA"). In September and October 2003, LCM purchased substantially all of the Equipment at the auction or, subsequently, from other successful bidders after the auction. To purchase the Equipment, LCM used funds provided by the FRC and some of its own funds, which were later reimbursed by the FRC. In December, 2003, New York Chocolate acquired the factory and land from the IDA.

10.      LCM incorporated New York Chocolate on October 30, 2003, and thereafter transferred the Equipment to it. LCM was the initial sole shareholder until November 17, 2003, when it transferred 80% of the shares in New York Chocolate to the FRC. The FRC was a quasi governmental agency formed under the laws of the Côte d'Ivoire and represented the interests of a collection of farmers' cooperatives in the Côte d'Ivoire that grew cacao. The goal of the FRC was to operate the Chocolate Plant so as to provide the farmers' cooperatives with an outlet for their cacao production. An initial board of directors was selected, which included Banet.

## B.      The County Loan

11.      On April 21, 2005, New York Chocolate and Operation Oswego County, Inc., as subrecipient of Oswego County (the "County"), entered into a loan agreement (the "County Loan"). The County Loan was in the principal amount of $850,000 and was to be used to purchase certain equipment for the Chocolate Plant. Pursuant to the County Loan, New York Chocolate granted the County a security interest in certain of its equipment. The Debtor is obligated to make payments on the County Loan on a monthly basis of $8,207.66 through April 1, 2015.[1]

---

[1]      In connection with the County Loan, New York Chocolate and the County also entered into a Loan Servicing Agreement dated April 21, 2005, pursuant to which New York Chocolate agreed to pay servicing fees to Operation Oswego County, Inc. in the amount of one-half of one percent of the outstanding principal balance due under the County Loan in two semi-annual installments.

12.     On or about February 9, 2006, the County loaned the Debtor an additional $40,000, which was secured by certain items of office equipment.  On or about March 2006, the County loaned the Debtor an additional $35,000.  On or about March 27, 2006, the County was granted a lien on certain equipment and a blanket lien on all the Debtor's personal property.  As of the Petition Date, only the County Loan remains outstanding.

13.     The Debtor, with the agreement of the Lender, intends to continue to make the monthly payments under the County Loan and to pay the servicing fee under the Loan Servicing Agreement during the pendency of this case.

14.     Since the shutdown of the Chocolate Plant, the Comité has funded the Debtor to maintain the Chocolate Plant in its current state.

**C.     Litigation Involving New York Chocolate**

(i).     <u>The FCA Action</u>

15.     Fulton Cogeneration Associates, LP ("FCA"), which owned and operated indirectly by Banet since September 2004, provided steam to New York Chocolate through June 2005.  New York Chocolate fell behind in making its payments to FCA and, in July 2005, FCA sued New York Chocolate in New York state court for payments and other obligations owed. FCA won partial summary judgment against New York Chocolate in the amount of $1,332,874.40 plus interest (the "FCA Judgment").  The remainder of the claims asserted by FCA were dismissed with prejudice.  In April 2009, the FCA Judgment was satisfied by New York Chocolate making a payment to the IDA, which had attached the FCA Judgment.  The United States District Court for the Northern District of New York approved the settlement with the IDA and entered an order extinguishing the FCA Judgment.

NYK 1278355-4.085280.0011

(ii). <u>The FRC Action</u>

16.     In 2005, a dispute arose between the FRC and LMC over the ownership of New York Chocolate.  In July 2005, the FRC filed an action in the Court of Chancery of the State of Delaware (the "Court of Chancery") seeking a declaration as to the respective equity ownership interests of the FRC and LCM (the "FRC Action").  On January 22, 2007, the Court of Chancery issued an opinion in which it found that the FRC owned 800 of the 1,000 issued then-outstanding shares of New York Chocolate, and LCM owned the remaining 200 shares.

(iii).     <u>The California Superior Court Action</u>

17.     In 2006, New York Chocolate filed an action in the Superior Court of California for the County of San Francisco (the "California Superior Court") against Banet and LCM, alleging that Banet and LCM had converted a tax refund check belonging to New York Chocolate.  On September 17, 2007, judgment was entered in the California Superior Court in favor of New York Chocolate and against both LCM and Banet in the amount of $606,299.00 (the "Tax Judgment").  After domesticating the Tax Judgment in Delaware, on May 23, 2008, the 200 shares of New York Chocolate stock owned by LCM were sold to New York Chocolate at a sheriff's sale in partial satisfaction of the Tax Judgment against LCM.  As a result, the FRC became the 100% shareholder of New York Chocolate.

(iv).     <u>The Banet Action</u>

18.     On May 6, 2008, Banet filed a lawsuit in the Court of Chancery (the "Banet Action") in his capacity as an alleged stockholder and an alleged director of New York Chocolate against the FRC, the current and former directors and officers of New York Chocolate, and against New York Chocolate (collectively, the "Defendants").  New York Chocolate was named only as a nominal defendant.  On October 19, 2008, Banet filed an

amended complaint that added FCA and LCM as plaintiffs (collectively, the "Plaintiffs"), asserting claims in their capacity as creditors and LCM as an alleged former shareholder. The Banet Action alleged seven counts, including the following: a request for appointment of a receiver or custodian for New York Chocolate; breach of fiduciary duties, both derivative and direct; a demand for inspection of books and records; and requests to compel the holding of an annual meeting of stockholders and a meeting of the board of directors on New York Chocolate. On November 26, 2008, Plaintiffs filed a motion for judgment on the pleadings, or, in the alternative, for summary judgment on their request for a receiver, which was denied. New York Chocolate subsequently filed a counterclaim seeking declarations that neither FCA nor LCM were creditors of New York Chocolate (Banet did not claim to be a creditor) and that neither LCM nor Banet was a stockholder of New York Chocolate. In August 2009, New York Chocolate filed a motion for summary judgment on the counterclaim.

19.     On March 12, 2010, the Court of Chancery granted New York Chocolate's motion for summary judgment and found that (1) LCM is not a stockholder of New York Chocolate; (2) Banet is not a stockholder of New York Chocolate; (3) Banet is not a director of New York Chocolate; (4) FCA is not a creditor of New York Chocolate; and (5) LCM is not a creditor of New York Chocolate.

D.     **Current Ownership and Management**

20.     On September 19, 2008, the Comité replaced the FRC as the 100% shareholder of New York Chocolate by Ordinance No. 2008-259 and Decrees Nos. 2008-260 and 2008-261 of the President of the Côte d'Ivoire. On November 20, 2008, the Comité acted by written consent to remove all members of the board of directors of New York Chocolate. By separate written consent of the same date, the Comité elected the following new directors of New York

Chocolate: Illa Ginette Donwahi, Léa Claudine Yapobi, N'Guessan Célestin and Atsé Kouassi Propser. At a meeting of the new board of directors on November 24, 2008, all officers of New York Chocolate were removed from office and Mike Malash was appointed President and Patrick Haney was appointed Secretary and Treasurer of New York Chocolate.

## E.    Events Leading to Chapter 11 Filing

21.    The litigations against New York Chocolate, and the allegations against certain members of its prior board and management, saddled New York Chocolate with a significant financial burden right from the start. Partly because of such difficulties, the Debtor has not manufactured any products at the Chocolate Plant in over three years. Since the Comité took over for the FRC, it has funded all of New York Chocolate's expenses. After careful consideration and study of the realistic market opportunities for an independent manufacturer of chocolate products, projected capital requirements to restart New York Chocolate's operations, and faced with the accumulation of certain debts and other obligations, and the financial drain related to the numerous litigations, New York Chocolate determined that the most efficient way to preserve value for the creditors and other stakeholders was to commence an orderly wind down of its business under the protection of Chapter 11.

22.    The Debtor is intent on working cooperatively with the Debtor's creditors, the City of Fulton and County officials to ensure an efficient and orderly Chapter 11 process.

## RELIEF REQUESTED

23.    The filing for bankruptcy relief has created an immediate need for the Debtor to obtain postpetition financing. As of the Petition Date, the Debtor will have a very limited amount of cash and therefore needs to immediately access the funds to be provided by the Lender through the postpetition financing. Among other things, the Debtor must fund a payroll for its employees. In addition, the Debtor must continue to pay essential costs to preserve the

value of its estate, including utilities and supplies to ensure that all equipment at the Chocolate Plant remains in the same condition. Failure to fund these critical expenses would result in substantial, irreparable harm to the Debtor's estate and its creditors.

24.     Accordingly, the Debtor hereby seeks interim and final orders:

(a)     under Bankruptcy Code sections 105, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), Bankruptcy Rules 2002, 4001(c) and 9014, and Local Bankruptcy Rule 4001-3 authorizing the Debtor:

    (i)     to obtain secured postpetition financing (the "DIP Facility"), up to an aggregate principal amount not to exceed $1.54 million, from the Comité de Gestion de la Filière Café Cacao (the "Lender"), pursuant to the "Debtor in Possession Loan and Security Agreement," substantially in the form attached hereto as <u>Exhibit A</u>, (as amended, supplemented, or otherwise modified from time to time, the "DIP Loan Agreement");[2] and

    (ii)     to grant the Lender, in order to secure the Debtor's obligations under the DIP Facility, (A) priority in payment with respect to such obligations over any and all administrative expenses, including of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject to the Carve-Out (as defined below), (B) pursuant to Section 364(c)(2) of the Bankruptcy Code, a fully perfected first priority lien on the Collateral consisting of property that was unencumbered by any lien as of the Petition Date, and (C) pursuant to Section 364(c)(3) of the

---

[2]     Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the DIP Loan Agreement.

Bankruptcy Code, a fully perfected junior lien on the Collateral consisting of property that was subject to valid, perfected and unavoidable liens as of the Petition Date. The Collateral includes any and all rights, claims, and other causes of action of the Debtor's estate (including any actions asserted by the Debtor or any subsequently appointed trustees or representatives of the Debtor's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting therefrom, excluding avoidance actions under chapter 5 of the Bankruptcy Code.

(b) under Fed. R. Bankr. P. 4001(c) and Local Bankruptcy Rule 4001-3, and after a preliminary hearing on this Motion, authorizing the Debtor to borrow from the Lender under the DIP Loan Agreement up to an aggregate of $350,000, all upon the terms and conditions set forth in the DIP Loan Agreement and such entry of an interim order substantially in the form of Exhibit B attached hereto (the "Interim Order") pending the Final Hearing (as defined below); and

(c) scheduling a final hearing (the "Final Hearing") and establishing notice procedures in respect of the Final Hearing, by this Court, to consider entry of a final order (the "Final Order") authorizing, on a final basis, the DIP Facility.

## CONCISE STATEMENT OF RELIEF REQUESTED[3]

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| Borrower | The Debtor. | Agreement p. 1 Order p. 2 |
| Lender | Comité de Gestion de la Filière Café Cacao. | Agreement p.1 Order p. 2 |
| Regular Interest Rate for the Loan | 12% per annum. | Agreement pp. 3, 7 |
| Default Interest Rate for the Loan | 15% per annum. | Agreement pp. 3, 7 |
| Fees And Expenses | No fees, however the Debtor shall pay the expenses of the Lender including, without limitation, the reasonable fees and disbursements of all legal and other consultants incurred in connection with the preparation and negotiation of the DIP Facility and any amendments thereto. | Agreement pp. 24 to 25 |
| Maturity | Debtor shall repay any outstanding advances and loans under the DIP Facility on the earliest to occur of (i) August 14, 2010; (ii) the effective date of a plan of reorganization in the Case; (iii) the termination of the DIP Loan Agreement and of the commitment to make Advances by Lender upon the occurrence of an Event of Default; and (iv) the date on which the Obligations are fully and finally paid in full. | Agreement pp. 4, 7 |
| Liens, Collateral, And Priority (Bankruptcy Rule 4001(c)(1)(B)(i), | Lender will receive (A) pursuant to Section 364(c)(2) of the Bankruptcy Code, a fully perfected first priority lien upon the Collateral consisting of property that was unencumbered by any lien as of the Petition Date, and (B) pursuant to Section 364(c)(3) of the Bankruptcy Code, a fully perfected junior lien on the Collateral consisting of property that was subject to valid, perfected and | Agreement pp. 9 to 10 Order pp. 4, 5 |

---

[3]      This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B). This is a summary only and the terms of the DIP Loan Agreement shall control.

NYK 1278355-4.085280.0011

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| (vii) & (xi)) | unavoidable liens as of the Petition Date.<br><br>The Collateral includes any and all rights, claims, and other causes of action of the Debtor's estate (including any actions asserted by the Debtor or any subsequently appointed trustees or representatives of the Debtor's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting therefrom, excluding avoidance actions under chapter 5 of the Bankruptcy Code. | |
| | "Collateral" shall also include (a) all of Debtor's accounts; (b) all of Debtor's books and records; (c) all of Debtor's chattel paper and, in any event, including tangible chattel paper and electronic chattel paper; (d) all of Debtor's right, title and interest with respect to any deposit account; (e) all of Debtor's equipment and fixtures; (f) all of Debtor's inventory; (g) all of Debtor's investment property; (h) all of Debtor's letter of credit rights, instruments, promissory notes, drafts and documents; (i) all of Debtor's general intangibles, including intellectual property; (j) all of Debtor's right, title and interest in respect of supporting obligations, including letters of credit and guaranties issued in support of accounts, chattel paper, documents, general intangibles, instruments, or investment property; (k) all of Debtor's money, cash, cash equivalents, securities and other property held directly or indirectly by Lender; (l) all of Debtor's right, title and interest in all owned or leased real properties; and (m) all of the proceeds, products, accessions or substitutions, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering or relating to any of the foregoing. | Agreement pp. 9 to 10 |
| | All obligations of the Debtor under and with respect to the DIP Facility (the "DIP Obligations") shall also receive and be entitled to, pursuant to section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim (the "Superpriority Claim") over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy | Agreement p. 11 |

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| | Code, subject only to the Carve Out (as defined below). | |
| | All the above-described security interests shall be deemed created and fully perfected and effective upon entry of the Interim Order to the extent of Advances made pursuant to it, and upon entry of the Final Order to the extent of Advances thereafter, without the need for any additional documentation, provided that the Debtor shall cooperate with Lender to execute and record further documentation satisfactory to the Lender of the security interests created and authorized in the Collateral. | Agreement pp. 10-11<br><br>Order p. 5 |
| Events of Default | An Event of Default under the DIP Facility shall occur if: (a) Debtor (i) fails to make any payment of principal of, or interest on, the Loan or any of the other Obligations when due and payable, or (ii) fails to pay or reimburse Lender for any expense reimbursable under the DIP Loan Agreement or under any other Loan Document within 10 days following Lender's demand for such reimbursement or payment of expenses;<br>(b) Debtor fails or neglects to perform, keep or observe any provision of the DIP Loan Agreement, the Note, or any other Loan Document;<br>(c) any representation or warranty made by Debtor in the DIP Loan Agreement or in any of the Loan Documents, any financial statement, or any statement or representation made in any other certificate, report or opinion delivered in connection therewith proves to have been incorrect or misleading in any material respect when made;<br>(d) there occurs any uninsured damage to or loss, theft or destruction of any portion of the Collateral that could reasonably be expected to have a Material Adverse Effect;<br>(e) Debtor breaches or violates any term of the Interim Order or the Final Order;<br>(f) Debtor uses Advances for purposes not authorized under the Budget (subject to the Permitted Variance);<br>(g) Any of the economic or voting rights associated with the Stock of Debtor is no longer owned and controlled by the Person with such ownership and control as of the Petition Date;<br>(h) the creation, existence or allowance of any Indebtedness, whether recourse or nonrecourse, and | Agreement pp. 17 to 19 |

NYK 1278355-4.085280.0011

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| | whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except (i) Indebtedness to Lender arising under or as a consequence of the DIP Loan Agreement or the other Loan Documents and (ii) Indebtedness existing on the Petition Date or otherwise expressly permitted under the DIP Loan Agreement, the Interim Order, the Final Order or the other Loan Documents; | |
| | (i) the creation, existence or allowance of any Liens on any of Debtor's properties or assets except the Liens existing as of the Petition Date and the Liens created or permitted under the DIP Loan Agreement, the Interim Order, the Final Order or the other Loan Documents; or | |
| | (j) The occurrence of any of the following in the Case: | |
| | (i) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by Debtor: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Agreement; (x) to grant any Lien upon or affecting any Collateral; or (y) any other action adverse to Lender or its rights and remedies hereunder or its interest in the Collateral; | |
| | (ii) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Loan Agreement or any of the other Loan Documents, the Interim Order or the Final Order without the written consent of Lender, or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order; | |
| | (iii) the Final Order is not entered immediately following the expiration of the Interim Order; | |
| | (iv) the payment of, or application for authority to pay, any prepetition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under the DIP Loan Agreement; | |
| | (v) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any of the Collateral; | |
| | (vi) the appointment of an interim or permanent | |

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| | trustee in the Case or the appointment of a receiver or an examiner in the Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Debtor;<br><br>(vii) the dismissal of the Case, or the conversion of the Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or the filing of a motion or other pleading by Debtor seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise;<br><br>(viii) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a Lien on any Collateral;<br><br>(ix) the commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than Debtor or a subsidiary, officer or employee of Debtor, the continuation thereof without dismissal for 30 days after service thereof on Lender, that asserts by or on behalf of Debtor, the Environmental Protection Agency, any state environmental protection or health and safety agency, or any official committee in the Case, if any, any claim or legal or equitable remedy which seeks subordination of the claim or Lien of Lender;<br><br>(x) the failure of a plan of reorganization in form and substance satisfactory to Lender to be filed in the Case on or before the 120th day following the Petition Date;<br><br>(xi) the failure of the plan of reorganization in form and substance satisfactory to Lender to be confirmed in the Case on or before August 14, 2010; or<br><br>(xii) the entry of an order in the Case granting any other superpriority administrative claim or Lien equal or superior to the claims and Liens granted to Lender. | |
| Automatic Stay (Bankruptcy Rule 4001 (c)(l)(B)(iv)) | Although the Liens granted to Lender by the DIP Loan Agreement are perfected by operation of law upon execution of the Interim Order by the Court and Lender is not required to file financing statements, mortgages or any other document in any jurisdiction or to take any other action in order to validate or perfect the Liens as granted, if Lender shall choose to file financing statements, | Agreement pp. 10 to 11<br>Order p. 5 |

NYK 1278355-4.085280.0011

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| | mortgages or other documents, or otherwise confirm perfection of such liens, the automatic stay of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit the filing of all such financing statements, mortgages or similar documents.<br><br>In addition, the automatic stay of Bankruptcy Code section 362 shall be vacated and modified to the extent necessary to permit Lender to take, upon the occurrence and during the continuance of any Event of Default, any or all of the following actions: (a) cease making any loans under the DIP Loan Agreement; (b) declare all obligations under the Loan Documents to be immediately due and payable; and (c) charge the default rate of interest as provided for under the DIP Loan Agreement.<br><br>In addition, so long as Lender has provided 10 days' prior written notice to Debtor (with a copy to counsel for any Official Creditors' Committee appointed in the Case (or to Debtor's 20 largest creditors in the event no such committee has been appointed or is in existence) and the United States Trustee, Lender may take any other action or exercise any other right and remedy available to it under the Loan Documents or otherwise available at law or in equity. | |
| Limitation On Use Of Proceeds (Bankruptcy Rule 4001(c)(1)(B)(viii)) | No portion of the DIP Facility, the Collateral securing the same, or the Carve-Out are to be used by any party or professional to assert causes of actions against the Lender, including but not limited to with respect to Lender's rights and remedies under the DIP Facility. | Agreement p. 7<br>Order p. 7 |
| Professional And Statutory Fee Carve-Out | The Carve-Out (the "Carve-Out") shall consist of (a) the fees of the United States Trustee pursuant to 28 U.S.C. § 1930, (b) in the event of a conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, the fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $30,000, and (c) any unpaid fees, costs and expenses that were accrued or incurred, following the occurrence and during the continuance of an | Agreement pp. 2 to 3<br>Order p. 4 |

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| | Event of Default, by the professionals retained by Debtor or the professionals retained by any official unsecured creditors' committee, if any, in each case to the extent allowed by an order of this Court, in an aggregate amount not to exceed $100,000, provided that any payments actually made to such professionals by order of the Bankruptcy Court after the occurrence of an Event of Default on account of fees and expenses actually incurred after the occurrence of such Event of Default shall reduce such $100,000 amount on a dollar-for-dollar basis. | |
| Waiver (Bankruptcy Rule 4001(c)(1)(B)(viii)) | To the full extent permitted by law, Debtor irrevocably and unconditionally waives and releases (i) all benefit that might accrue to the Debtor by virtue of any present or future law exempting the Collateral from attachment, levy or sale on execution or providing for the appraisal, evaluation, stay of execution, exemption from civil process, redemption or extension of time for payment, (ii) except as specifically provided for herein, all notices of any Default or Event of Default or of any trustee's or the Lender's election to exercise or his or their actual exercise of any right, remedy or recourse provided for under the Loan Documents, (iii) any right to a marshalling of assets with respect to the Note or any of the Collateral or any Debt of the Debtor, or a sale in inverse order of alienation and (iv) except as specifically provided for is the DIP Loan Agreement, any and all right to receive demand, grace, notice, presentment for payment, protest, notice of intention to accelerate the Obligations or notice of acceleration of the Obligations.<br><br>Debtor confirms that there are no existing defenses, claims, counterclaims or rights of offset against the Lender in connection with the negotiation, preparation, execution, performance or any other matters related to the DIP Loan Agreement or any of the other Loan Documents executed as of the date hereof and any of the transactions contemplated thereby, and the Debtor hereby expressly releases and discharges the Lender, and its officers and representatives, from any and all such claims, known or unknown. The Debtor further confirms that the Lender has not made any agreements with, or commitments or | Agreement pp. 21, 24 |

NYK 1278355-4.085280.0011

| Material Provision | Brief Summary | Pages In Agreement & Proposed Order |
|---|---|---|
| | representations to, the Borrower (either in writing or orally) other than as expressly stated herein or in the other Loan Documents executed as of the date of the DIP Loan Agreement. | |
| Indemnification (Bankruptcy Rule 4001(c)(1)(B)(ix)) | Debtor shall indemnify and hold harmless the Lender, and Lender's directors, officers, employees, affiliates, attorneys and agents in connection with the DIP Facility. | Agreement p. 25 |

## STATEMENT OF FACTS

25.     The filing for bankruptcy relief has created an immediate need for the Debtor to obtain postpetition financing.   As of the Petition Date, the Debtor will have a very limited amount of cash and therefore the Debtor needs to immediately access the funds to be provided through the postpetition financing.   Among other things, the Debtor has a payroll that is due and must be funded.   Moreover, the Debtor must continue to fund essential expenses, including utilities and deposits that may be required under Bankruptcy Code section 366 and other suppliers.

26.     The Debtor's employees are essential to administering its assets postpetition and preserving the value of the Debtor's assets for the estate and its creditors.   The Debtor's employees are intimately knowledgeable about its affairs, and their retention is necessary to assure a timely and efficient reorganization.   Without its employees, the Debtor will not be able to maintain the value of its assets, thereby preventing the maximization of value of the Debtor's estate.

NYK 1278355-4.085280.0011

27. Failure to fund these expenses would be nothing short of disastrous. Among other things, the Debtor would be unable to protect its assets. Without a payroll, the Debtor's employees would likely quit. Not only would this have terrible short term implications, but it would also have severe long-term consequences for the Debtor's ability to maximize value for creditors. Also, without the ability to pay for its utility services, the Debtor's equipment would likely fall into disrepair, which would severely diminish the value of the Debtor's estate. Finally, without the ability to pay for its security system, the Debtor will not be able to protect the Chocolate Plant.

28. The Debtor does not have access to any other source of cash to fund its postpetition expenses such that it must be able use the DIP Facility for its postpetition expenses. Accordingly, the Debtor must obtain financing on an immediate basis.

29. In light of the Debtor's critical need for first day financing, the Debtor was not able to obtain any other financing source to pay for its immediate needs. Accordingly, through this Motion, the Debtor is proposing to borrow up to $1.54 million from Lender to fund the Debtor's costs during the pendency of the Case. On an interim basis, through this Motion, the Debtor is proposing to borrow up to $350,000 from Lender. The Debtor believes that the DIP Facility represents the only available source of essential operating funds. Absent such funds, the Debtor will be forced to immediately liquidate its business, which will result in a significantly diminished return for the Debtor's estate and its creditors.

30. The Lender owns one hundred percent of the shares of the Debtor. The Debtor believes that the terms proposed by the Lender are fair and reasonable, and that the Debtor would not be able to obtain an alternative financing source on an immediate basis to satisfy its cash needs (including payroll).

NYK 1278355-4.085280.0011

31.     Attached to the Motion is a monthly operating budget for the period of April 14 through August 14, 2010 (the "DIP Budget").  As set forth in the DIP Budget, absent the DIP Facility, the Debtor is not projected to generate any revenues to finance the Debtor's expenses. Since the Debtor does not have access to cash, absent authorization to enter into the DIP Loan Agreement, the Debtor will have insufficient cash available to maintain and preserve the value of the Debtor's estate.

32.     The Debtor believes that the disbursements identified in the initial 25-day period covered by the DIP Budget are necessary to avoid irreparable harm to the Debtor and that all of the disbursements reflected in the DIP Budget are reasonable and necessary expenses that must be paid in order to maintain the value of the Debtor's assets.  If the Debtor is not allowed to obtain the DIP Facility on terms acceptable to the Lender, the Debtor would suffer immediate, irreparable injury.

## ARGUMENT

**A.      Emergency Consideration of this Motion is Appropriate**

33.     Pursuant to Bankruptcy Code section 364(c), the Debtor requests that this Court authorize and approve its obtaining of debtor in possession financing from the Lender, on the terms and conditions set forth in the DIP Loan Agreement, for the payment of the costs of administration of this chapter 11 case.

34.     Bankruptcy Rule 4001(c) governs the procedure for consideration of motions to obtain postpetition financing.  Rule 4001(c)(2) provides for an expedited consideration of the motion:

> If the motion so requests, the court may conduct a hearing before [14 days after service of the motion], but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

35.    Courts have recognized that immediate interim relief may be crucial to the success of a corporate reorganization:

> We realize that in certain circumstances, the entire reorganization effort may be thwarted if emergency leave is withheld and that reorganization under the Bankruptcy Code is a perilous process, seldom more so than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund a central business operation.

Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Center Wholesale. Inc.), 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (citing In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr. D. Me. 1980)).

36.    The DIP Facility is needed to pay the essential operating expenses of the Debtor, including critical expenditures to be made in the first 25 days of its case.  The Debtor must borrow under the DIP Loan Agreement immediately, as those funds are necessary to pay critical expenses, including payroll, utilities (and utility deposits that may be required by Bankruptcy Code section 366), and other essential expenses.  The Debtor does not have access to another source of cash to fund its postpetition expenses, such that it must be permitted to use the DIP Facility for all postpetition expenses.  Thus, the cash needs of the Debtor are immediate and cannot be delayed.  Indeed, employees may terminate their employment if the regular payroll due each week for the hourly employee and on April 29, 2010 for the salaried employees, is not paid on time.  Absent satisfying payroll and other essential expenses, the Debtor may be forced to completely shutdown the Chocolate Plant, which will destroy the Debtor's assets' value.  There is no question that the Debtor has demonstrated that there will be "immediate and irreparable harm to the estate" absent emergency consideration of the relief requested in this Motion.

NYK 1278355-4.085280.0011

37. Unless the Debtor can promptly assure its employees that the Debtor will meet its obligations on schedule, the Debtor believes that its employees will terminate their employment. This disintegration will lead to a substantial decline in the value of the Debtor's assets.

38. By this Motion, the Debtor seeks approval of a $1.54 million DIP Facility, of which $350,000 is needed during the next 25 days. Accordingly, the Debtor seeks (1) immediate, interim approval of $350,000 in financing, and (2) final approval of the full $1.54 million in financing following the requisite 14-day notice period in Bankruptcy Rule 4001(c)(2). The interim relief requested by the Debtor is precisely what is contemplated by Bankruptcy Rule 4001(c)(2) and should be granted to avoid immediate and irreparable harm to the Debtor's estate. The Debtor will be serving notice of this Motion via overnight courier or other expedited means on: (a) the United States Trustee for the Northern District of New York, (b) all known unsecured creditors of the Debtor, (c) Operation Oswego County, Inc., and (d) Oswego County, and their respective counsel, if known.

**B.     Approving The DIP Loan Agreement is Appropriate Under Section 364 of the Bankruptcy Code**

39. As debtor in possession, the Debtor is authorized to operate its business under Bankruptcy Code section 1108. As part of that operation, the debtor in possession may incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a). The Bankruptcy Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot obtain such credit on unsecured terms. Bankruptcy Code section 364 provides a progression of various protections to induce a postpetition lender to extend credit to a debtor in possession.

40. The necessity for obtaining the DIP Facility from the Lender has been fully described above and is contained in the McCormick Declaration filed concurrently herewith and

will not be repeated here. As a condition to extending the amount of credit the Debtor required, the Lender required several of the protections contained in Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3). Bankruptcy Code section 364(c) provides:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

The DIP Loan Agreement provides for the types of protections contemplated in Bankruptcy Code section 364(c)(1), (2) and (3), which the facts in this case clearly support.

41. The DIP Loan Agreement provides the Lender the following protections for the DIP Obligations:

a. Superpriority administrative claim status pursuant to section 364(c)(1), subject to the Carve Out.

b. A fully perfected first priority lien on the Collateral consisting of property that was unencumbered by any lien as of the Petition Date, pursuant to Section 364(c)(2) of the Bankruptcy Code. These unencumbered assets include, among other things, any property that the estate acquires postpetition that is not subject to the liens of the Debtor's prepetition secured lender under Bankruptcy Code section 552 and the Debtor's real property.

c.     A fully perfected junior lien on the Collateral consisting of property that was subject to valid, perfected and unavoidable liens as of the Petition Date, pursuant to Section 364(c)(3) of the Bankruptcy Code.

42.     The Debtor has been unable to locate any lender that would infuse the type of capital the Debtor requires on an unsecured or even administrative priority basis. Absent the protections available under Bankruptcy Code sections 364(c)(1), (2) and (3) and section 364(e), the Lender was unwilling to enter into the DIP Loan Agreement, nor was the Debtor able to identify any potential lending source that would be willing to make the loan required under the DIP Loan Agreement without these protections.

43.     Section 364(c) does not impose upon a debtor-in-possession the onerous duty to seek credit from every possible lender before concluding that such credit is available. See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986). This is true especially when time is of the essence. See, e.g., id.; In re Reading Tube Indus., 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987); In re Stacy Farms, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987).

**C.     Approval of the DIP Facility is Supported By The Exercise of Sound Business Judgment**

44.     The fact that the Debtor has satisfied the requirements of Bankruptcy Code section 364 does not end the inquiry, as this section is permissive, not mandatory. See 11 U.S.C. § 364(c)(1) ("after notice and a hearing," the court "may authorize the obtaining of credit or the incurring of debt") (emphasis added). Generally, however, courts give broad deference to business decisions of a debtor in possession. See, e.g., Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, a bankruptcy court generally will respect

a debtor in possession's business judgment regarding the need for and the proposed use of funds.

As the Court noted in In re Ames Dep't Stores, Inc.,

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

45.     The power of the debtor in possession to incur secured debt follows necessarily from the general power of the debtor in possession to operate its business in the exercise of its business judgment. 11 U.S.C. § 1108. Without the ability to incur secured debt, the debtor in possession would be placed at a significant competitive disadvantage and its efforts to reorganize could be seriously impaired.

46.     In the present case, the Debtor's decision to obtain the DIP Facility represents an exercise of sound business judgment to preserve the value of its assets and allow the consummation of a reorganization plan. Like most business decisions, the Debtor's decision to enter into the DIP Loan Agreement will both confer a number of benefits on the Debtor and impose several tradeoffs. However, the DIP Loan Agreement should provide the Debtor with sufficient capital to preserve the value of its assets and permit it to pursue the goals of this case.

47.     In sum, the substantial benefits the Debtor will derive from the proposed financing amply justify the Debtor's decision to enter into the DIP Loan Agreement, a decision that the Court should ratify as being in the best interests of the Debtor and its estate.

**D.     Notice With Respect To Final Hearing**

48.     The Debtor respectfully requests that the Court set a Final Hearing on the Motion as soon as practicable and permitted by applicable law and an objection deadline on or before _:__ am/pm, at least 5 business days prior to the date of the Final Hearing, and authorize the

Debtor to serve a copy of this Motion and any interim order which fixes the time and date for filing objections to this Motion, by first class mail upon the Service List and all other parties ordered by the Court. The Debtor requests that the Court deem such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001. The Debtor respectfully requests that the Court set the Final Hearing date for or about May [__], 2010 at _:___ am/pm, or as soon thereafter as the Court's schedule can accommodate, and an objection deadline of May [__], 2010, 5 business days prior to the Final Hearing on this Motion.

## CONCLUSION

WHEREFORE, the Debtor respectfully moves the Court for entry of an order, substantially in the form of the Interim Order: (1) authorizing the Debtor to obtain the DIP Facility on an interim basis from the Lender pursuant to the terms of the DIP Loan Agreement, and to borrow $350,000 pending entry of the Final Order; (2) granting the Lender (a) administrative priority under Bankruptcy Code section 364(c)(1) with respect to the Obligations, subject to the Carve Out, (b) a perfected first priority, non-voidable lien on all otherwise unencumbered property pursuant to Bankruptcy Code section 364(c)(2) to secure the Obligations and (c) perfected junior lien on the Collateral consisting of property that was subject to valid, perfected and unavoidable liens as of the Petition Date, pursuant to Bankruptcy Code section 364(c)(3); (3) setting a hearing on the final approval of the DIP Facility for May [__], 2010 at _:___ am/pm, or as soon thereafter as the Court's schedule can accommodate, and an objection deadline of May [__], 2010 at _:___ am/pm; (4) following such Final Hearing, approving the DIP Facility on a final basis; and (5) authorizing the Debtor to execute any and all documents and take such other actions as necessary to effectuate the transactions set forth in the DIP Loan Agreement.

Dated: New York, New York
April 14, 2010

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

By:     /s/      Geoffrey T. Raicht
        Geoffrey T. Raicht
        Bar No. 2916203
        Nava Hazan
        Bar No. 3064409
        340 Madison Avenue
        New York, New York 10173-1922
        Telephone:  (212) 547-5400
        Facsimile:  (212) 547-5444

*Proposed Counsel for the Debtor and Debtor in
Possession*

NYK 1278355-4.085280.0011