**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**(SYRACUSE DIVISION)**

------------------------------------------------------------x

In re:                      :

                             :

THE NEW YORK CHOCOLATE    :    Case No. 10-_____ - (___)

& CONFECTIONS COMPANY     :    Chapter 11 Case

                             :

Debtor.                   :

------------------------------------------------------------x

## DECLARATION OF RICHARD F. McCORMICK PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1007 AND LOCAL BANKRUPTCY RULE 2015-6 IN SUPPORT OF FIRST DAY MOTIONS

I, Richard F. McCormick, declare pursuant to section 1746 of title 28 of the United States Code, that:

1.     I am the Chief Restructuring Officer of The New York Chocolate & Confections Company ("New York Chocolate" or the "Debtor"), a corporation incorporated in the state of Delaware. In that capacity, I am familiar with the Debtor's day-to-day business and financial affairs.

2.     I submit this declaration (the "Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2015-6 of the Local Bankruptcy Rules for the Northern District of New York (the "Local Bankruptcy Rules") in support of the Debtor's First Day Motions (as defined below), to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case.

3.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management, my review of relevant documents, or my opinion based upon experience,

knowledge, and information concerning the Debtor's financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

**I.**
**The Debtor's History, Business and Capital Structure**

**A.     Formation of New York Chocolate**

4.     The Debtor, New York Chocolate, is a Delaware corporation with its principal place of business in Fulton, New York. New York Chocolate's primary asset is its 39 acre chocolate production facility located at 555 South Fourth Street in Fulton (the "Chocolate Plant"). The Comité de Gestion de la Filière Café-Cacao (the "Comité"), a quasi governmental agency, is the 100% shareholder of the Debtor. The Comité was formed by the President of the Republic of Côte d'Ivoire in September 2008 to, among other things, succeed to the shareholder interests of the then sole shareholder of New York Chocolate – Fonds de Régulation et de Controle Café-Cacao (the "FRC") – after certain of the FRC's members were accused of mismanagement, among other allegations.

5.     Côte d'Ivoire is a West African nation that is the world's leading producer and exporter of the cocoa beans used in the manufacture of chocolate. In general, West Africa collectively supplies nearly 70% of the world's cocoa crop, with Côte d'Ivoire leading production at 1.3 million tons. Historically, large chocolate producers such as Cadbury, Hershey's and Nestlé buy Ivorian cocoa futures and options through Euronext where world prices for cocoa beans are set.

6.     The description of New York Chocolate's corporate history and the ownership of the Chocolate Plant reflects the difficulties encountered by the Debtor since its creation, but is integral to understanding the Debtor's decision to enter Chapter 11. The

- 2 -

Chocolate Plant was initially owned and operated by Nestlé USA, Inc. ("Nestlé"); it was Nestlé's first United States chocolate production facility and was built in the late 1800's. In March 2003, Nestlé made the decision to close the Chocolate Plant. Jean Claude Amon ("Amon"), a special advisor to the President of the Republic of the Côte d'Ivoire, learned of the planned closing and commissioned Lion Capital Management, LLC ("LCM"), with the aid of its President and Chief Executive Officer, Hausmann-Alain Banet ("Banet"), to conduct an economic analysis on the feasibility of acquiring the Chocolate Plant. Amon and other representatives of the Côte d'Ivoire toured the Chocolate Plant and later met with LCM, through Banet, to discuss the economic study and the possible acquisition of the Chocolate Plant.

7.    Despite at least one offer to purchase the Chocolate Plant, Nestlé ultimately decided against selling the Chocolate Plant, but rather, decided to auction the equipment located at the Chocolate Plant (the "Equipment") and donated the factory and land to the County of Oswego Industrial Development Agency (the "IDA"). In September and October 2003, LCM purchased substantially all of the Equipment at the auction or, subsequently, from other successful bidders after the auction. To purchase the Equipment, LCM used funds provided by the FRC and some of its own funds, which were later reimbursed by the FRC. In December, 2003, New York Chocolate acquired the factory and land from the IDA.

8.    LCM incorporated New York Chocolate on October 30, 2003, and thereafter transferred the Equipment to it. LCM was the initial sole shareholder until November 17, 2003, when it transferred 80% of the shares in New York Chocolate to the FRC. The FRC was a quasi governmental agency formed under the laws of the Côte d'Ivoire and represented the interests of a collection of farmers' cooperatives in the Côte d'Ivoire that grew cacao. The goal of the FRC was to operate the Chocolate Plant so as to provide the farmers' cooperatives with an

- 3 -

outlet for their cacao production. An initial board of directors was selected, which included Banet.

**B.  The County Loan**

9.      On April 21, 2005, New York Chocolate and Operation Oswego County, Inc., as subrecipient of Oswego County (the "County"), entered into a loan agreement (the "County Loan"). The County Loan was in the principal amount of $850,000 and was to be used to purchase certain equipment for the Chocolate Plant. Pursuant to the County Loan, New York Chocolate granted the County a security interest in certain of its equipment. The Debtor is obligated to make payments on the County Loan on a monthly basis of $8,207.66 through April 1, 2015.[1]

10.      On or about February 9, 2006, the County loaned the Debtor an additional $40,000, which was secured by certain items of office equipment. On or about March 2006, the County loaned the Debtor an additional $35,000. On or about March 27, 2006, the County was granted a lien on certain equipment and a blanket lien on all the Debtor's personal property. As of the Petition Date, only the County Loan remains outstanding.

**C.  Litigation Involving New York Chocolate**

(i).  The FCA Action

11.      Fulton Cogeneration Associates, LP ("FCA"), which was owned and operated indirectly by Banet since September 2004, provided steam to New York Chocolate through June 2005. New York Chocolate fell behind in making its payments to FCA and, in July 2005, FCA sued New York Chocolate in New York state court for payments and other

---

[1]      In connection with the County Loan, New York Chocolate and the County also entered into a Loan Servicing Agreement dated April 21, 2005, pursuant to which New York Chocolate agreed to pay servicing fees to Operation Oswego County, Inc. in the amount of one-half of one percent of the outstanding principal balance due under the County Loan in two semi-annual installments.

NYK 1278044-3.085280.0011

obligations owed. FCA won partial summary judgment against New York Chocolate in the amount of $1,332,874.40 plus interest (the "FCA Judgment"). The remainder of the claims asserted by FCA were dismissed with prejudice. In April 2009, the FCA Judgment was satisfied by New York Chocolate making a payment to the IDA, which had attached the FCA Judgment. The United States District Court for the Northern District of New York approved the settlement with the IDA and entered an order extinguishing the FCA Judgment.

(ii).   The FRC Action

12.     In 2005, a dispute arose between the FRC and LMC over the ownership of New York Chocolate. In July 2005, the FRC filed an action in the Court of Chancery of the State of Delaware (the "Court of Chancery") seeking a declaration as to the respective equity ownership interests of the FRC and LCM (the "FRC Action"). On January 22, 2007, the Court of Chancery issued an opinion in which it found that the FRC owned 800 of the 1,000 issued then-outstanding shares of New York Chocolate, and LCM owned the remaining 200 shares.

(iii).   The California Superior Court Action

13.     In 2006, New York Chocolate filed an action in the Superior Court of California for the County of San Francisco (the "California Superior Court") against Banet and LCM, alleging that Banet and LCM had converted a tax refund check belonging to New York Chocolate. On September 17, 2007, judgment was entered in the California Superior Court in favor of New York Chocolate and against both LCM and Banet in the amount of $606,299.00 (the "Tax Judgment"). After domesticating the Tax Judgment in Delaware, on May 23, 2008, the 200 shares of New York Chocolate stock owned by LCM were sold to New York Chocolate at a sheriff's sale in partial satisfaction of the Tax Judgment against LCM. As a result, the FRC became the 100% shareholder of New York Chocolate.

NYK 1278044-3.085280.0011

(iv).  The Banet Action

14.  On May 6, 2008, Banet filed a lawsuit in the Court of Chancery (the "Banet Action") in his capacity as an alleged stockholder and an alleged director of New York Chocolate against the FRC, the current and former directors and officers of New York Chocolate, and against New York Chocolate (collectively, the "Defendants"). New York Chocolate was named only as a nominal defendant. On October 19, 2008, Banet filed an amended complaint that added FCA and LCM as plaintiffs (collectively, the "Plaintiffs"), asserting claims in their capacity as creditors and LCM as an alleged former shareholder. The Banet Action alleged seven counts, including the following: a request for appointment of a receiver or custodian for New York Chocolate; breach of fiduciary duties, both derivative and direct; a demand for inspection of books and records; and requests to compel the holding of an annual meeting of stockholders and a meeting of the board of directors on New York Chocolate. On November 26, 2008, Plaintiffs filed a motion for judgment on the pleadings, or, in the alternative, for summary judgment on their request for a receiver, which was denied. New York Chocolate subsequently filed a counterclaim seeking declarations that neither FCA nor LCM were creditors of New York Chocolate (Banet did not claim to be a creditor) and that neither LCM nor Banet was a stockholder of New York Chocolate. In August 2009, New York Chocolate filed a motion for summary judgment on the counterclaim.

15.  On March 12, 2010, the Court of Chancery granted New York Chocolate's motion for summary judgment and found that (1) LCM is not a stockholder of New York Chocolate; (2) Banet is not a stockholder of New York Chocolate; (3) Banet is not a director of New York Chocolate; (4) FCA is not a creditor of New York Chocolate; and (5) LCM is not a creditor of New York Chocolate.

- 6 -

## D.    Current Ownership and Management

16.    On September 19, 2008, the Comité replaced the FRC as the 100% shareholder of New York Chocolate by Ordinance No. 2008-259 and Decrees Nos. 2008-260 and 2008-261 of the President of the Côte d'Ivoire.  On November 20, 2008, the Comité acted by written consent to remove all members of the board of directors of New York Chocolate.  By separate written consent of the same date, the Comité elected the following new directors of New York Chocolate: Illa Ginette Donwahi, Léa Claudine Yapobi, N'Guessan Célestin and Atsé Kouassi Propser.  At a meeting of the new board of directors on November 24, 2008, all officers of New York Chocolate were removed from office and Mike Malash was appointed President and Patrick Haney was appointed Secretary and Treasurer of New York Chocolate.

## II.
## Events Leading to The Chapter 11 Case

17.    The litigations against New York Chocolate, and the allegations against certain members of its prior board and management, saddled New York Chocolate with a significant financial burden right from the start.  Partly because of such difficulties, the Debtor has not produced any products at the Chocolate Plant in over four years.  Since the Comité took over for the FRC, it has funded all of New York Chocolate's expenses.  After careful consideration and study of the realistic market opportunities for an independent manufacturer of chocolate products, projected capital requirements to restart New York Chocolate's operations, and faced with the accumulation of certain debts and other obligations, and the financial drain related to the numerous litigations, New York Chocolate determined that the most efficient way to preserve value for the creditors and other stakeholders was to commence an orderly wind down of its business under the protection of Chapter 11.

NYK 1278044-3.085280.0011

18.     The Debtor is intent on working cooperatively with the Debtor's creditors, the City of Fulton and County officials to ensure an efficient and orderly Chapter 11 process.

### III.
### Summary of First Day Motions

19.     Contemporaneously with the filing of the bankruptcy petitions, the Debtor filed the motions and applications listed on Exhibit A (collectively, the "First Day Motions"). I submit this Declaration in support of the First Day Motions. I have reviewed each of the First Day Motions (including the exhibits and schedules) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such a representation is based upon information and belief, though my review of various materials and other information, and my experience and knowledge of the Debtor's operations and financial condition. If called to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

20.     As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtor's officers, and discussions with outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtor to continue to maintain the value of its assets; and (c) the negative impact upon the Debtor of not obtaining the relief sought in the First Day Motions.

21.     As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the chapter 11 case on the Debtor and ensure that the Debtor's efforts to maintain the value of its assets will proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate as a debtor in possession.

NYK 1278044-3.085280.0011

22.     Capitalized terms not defined herein shall have the meaning ascribed to them in their corresponding motions.

**A.    Emergency Motion For Order Pursuant To 11 U.S.C. §§ 105, 364(c)(1), (2) & (3), And 364(e), Fed. R. Bank. P. 2002, 4001 And 9014, And Local Rule 4001-3 (I) Authorizing Debtor To Obtain Postpetition Financing On Superpriority And Secured Basis, (II) Granting Interim Relief, And (III) Scheduling A Final Hearing Under Fed. R. Bankr. P. 4001(c) (the "DIP Motion")**

23.     The filing for bankruptcy relief has created an immediate need for the Debtor to obtain postpetition financing in order to reorganize successfully.  As of the Petition Date, the Debtor will have a very limited amount of cash and therefore needs to immediately access the funds to be provided by the Comité, as Lender, through the postpetition financing. Among other things, the Debtor must fund payroll for its employees as well as other obligations as approved by this Court.  In addition, the Debtor must continue to pay essential costs to preserve its estate, including utilities and supplies to ensure that all equipment at the Chocolate Plant remains in the same condition.  Failure to fund these critical expenses would result in substantial, irreparable harm to the Debtor's estate and its creditors.

24.     Accordingly, by the DIP Motion, the Debtor seeks interim and final orders: (a) (i) to obtain secured postpetition financing (the "DIP Facility"), up to an aggregate principal amount not to exceed $1,540,000, from the Comité, pursuant to the "Debtor in Possession Loan and Security Agreement"; and (ii) to grant the Lender, in order to secure the Debtor's obligations under the DIP Facility, (A) priority in payment with respect to such obligations over any and all administrative expenses subject to the Carve-Out, (B) a fully perfected first priority lien on the Collateral consisting of property that was unencumbered by any lien as of the Petition Date, and (C) a fully perfected junior lien on the Collateral consisting of property that was subject to valid, perfected and unavoidable liens as of the Petition Date, and

NYK 1278044-3.085280.0011

(b) after a preliminary hearing on this Motion, authorizing the Debtor to borrow from the Lender under the DIP Facility up to an aggregate of $350,000.

25.    The Debtor does not have access to any other source of cash to fund its postpetition expenses such that it must be able use the DIP Facility for its postpetition expenses. The Debtor believes that funds from another source are not available on an unsecured basis or on commercially better terms.    Accordingly, the Debtor must obtain financing on an immediate basis.

**B.    Debtor's Motion Pursuant to Sections 105(a) And 366 Of The Bankruptcy Code For Entry Of An Order (I) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Service; (II) Deeming Utility Providers Adequately Assured Of Future Payment; And (III) Establishing Procedures For Determining Adequate Assurance Of Payment (the "Utility Motion")**

26.    In connection with the management of the Chocolate Plant and to preserve the value of its assets, the Debtor obtains electricity, natural gas, sewage, water, telephone, internet and/or other similar services (collectively, the "Utility Services"), from various utility companies (the "Utility Providers").    Annexed to the Utility Motion as <u>Exhibit A</u> is a list of all, or substantially all, of the Utility Providers providing services to the Debtor as of the Petition Date.  The relief requested in the Utility Motion is requested with respect to all Utility Providers and is not limited to those listed on such <u>Exhibit A</u>.    The Debtor estimates its cost for Utility Services during the next thirty (30) days will be approximately $35,000.

27.    The Debtor intends to pay all post-petition obligations owed to the Utility Providers in a timely manner. The Debtor expects that availability under the Debtor's proposed postpetition financing will be more than sufficient to pay all postpetition obligations for Utility Services.

28.    Uninterrupted Utility Services are essential to the success of the Debtor's chapter 11 case.  Should any Utility Provider refuse or discontinue service, even for a brief

NYK 1278044-3.085280.0011

period, the integrity of Chocolate Plant and all property and equipment located therein may be jeopardized, thereby diminishing the overall value of the estate. It is therefore critical that Utility Services continue uninterrupted.

29. Thus, by the Utility Motion, the Debtor seeks entry of an interim order (i) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving the Debtor's proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (iv) determining that the Debtor is not required to provide any additional adequate assurance beyond what is proposed by this Motion; and (v) establishing procedures for the Utility Providers to seek to opt-out of the Debtor's proposed adequate assurance procedures, if necessary.

**C.      Debtor's Motion Pursuant To Sections 105(a), 363(b), 507(a)(4) And 507(a)(5) Of The Bankruptcy Code For Entry Of An Order Authorizing Payment Of Wages, Compensation And Employee Benefits (the "Wage Motion")**

30. To minimize the personal hardship that the Debtor's employees will suffer if prepetition employee-related obligations are not paid when due or as expected, and to maintain the morale of the Debtor's employees during this time, the Debtor, by the Wage Motion, seeks authority, in its sole discretion, to (A) (i) pay Wage Obligations, Expense Reimbursements and Payroll Taxes, (ii) maintain and continue to honor its practices, programs, and policies for its employees (the "Employee Benefits") as they were in effect on the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course, and (B)

- 11 -

authorize the Bank[2] to receive, honor, process, and pay any and all checks or wire transfers drawn on the Debtor's accounts in satisfaction of Employee Obligations and Employee Benefits.

31.     In addition, the Debtor requests the right to modify, change and discontinue any of the Employee Obligations and Employee Benefits and to implement new Employee Obligations and Employee Benefits in the ordinary course of business during this chapter 11 case in its sole discretion without the need for further Court approval.

32.     Pursuant to a letter dated January 1, 2010, Richard F. McCormick was engaged by New York Chocolate as its Chief Restructuring Officer (the "CRO"). The CRO earns $20,000 per month which is paid in advance on the first of each month. The CRO does not participate in any of New York Chocolate's Employee Benefits.

33.     The dedicated and active participation of the Debtor's employees is not only integral to the Debtor's continued, uninterrupted management, but also is essential to the orderly administration of this chapter 11 case. Without the requested relief, the stability of the Debtor will be undermined by the possibility that otherwise loyal Employees will seek other employment alternatives. In addition, it would be inequitable to require the Employees to personally bear the cost of any business expenses they incurred prepetition, for the benefit of the Debtor, with the understanding that they would be reimbursed.

34.     Payment of all Employee Wages and Employee Benefits in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor's estate, its creditors and all parties in interest and will enable the Debtor to continue to manage its business without disruption.

---

[2]     As of the Petition Date, the Debtor's cash was held on deposit at Fulton Saving Bank, which is not on the United States Trustee's list of approved financial institutions. Accordingly, the Debtor is in the process of opening new accounts at an approved institution. The Debtor intends to work closely with the United States Trustee to facilitate a smooth transfer of the Debtor's banking needs.

NYK 1278044-3.085280.0011

**D.   Debtor's Motion Pursuant To Sections 105(a), 363, 1107 And 1108 Of The Bankruptcy Code For Entry Of An Order (I) Authorizing, But Not Directing, Debtor To Continue To Administer Insurance Coverage And (II) Authorizing Financial Institutions To Honor All Related Checks And Electronic Payment Requests (the "Insurance Motion")**

35.    In connection with the maintenance of the Chocolate Plant, the Debtor maintains certain insurance policies that provides coverage related to, among other things, property and commercial liability, general liability and automobile liability (collectively, the "Insurance Programs"). A detailed list of the Debtor's policies in effect under the Insurance Programs is attached to the Insurance Motion (collectively, the "Policies"). The annual premiums for the Debtor's Policies, together with the associated taxes and fees (the "Insurance Premiums") total approximately $238,000. The Insurance Programs are essential to the preservation of the value of the Debtor's property, equipment and assets.

36.    As of the Petition Date, the Debtor owes $104,000 with respect to its property and commercial insurance policy. The Debtor seeks by the Insurance Motion entry of an order authorizing, in its discretion, to pay prepetition Insurance Premium obligations necessary or appropriate to maintain insurance coverage in current effect and, at its sole discretion, to amend, extend, renew or terminate insurance coverage in current effect if and when necessary.

**IV.**

**Information Required by Local Bankruptcy Rule 2015-6**

37.    Local Bankruptcy Rule 2015-6 requires certain information related to the Debtor, which is set forth below and in the attached schedules.

38.    In accordance with Local Bankruptcy Rule 2015-6(a)(2), <u>Schedule 1</u> hereto provides a summary of the Debtor's assets and liabilities in the form of a Balance Sheet as

- 13 -

of April 14, 2010.  As of the Petition Date, New York Chocolate asserts that the value of its assets is 2,556,780.91.

39.     In accordance with Local Bankruptcy Rule 2015-6(a)(3), <u>Schedule 2</u> hereto is a list of New York Chocolate's property not in its possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

40.     In accordance with Local Bankruptcy Rule 2015-6(a)(4), <u>Schedule 3</u> hereto is a list of the premises owned, leased, or held under other arrangement, from which New York Chocolate will operate its business.

41.     In accordance with Local Bankruptcy Rule 2015-6(a)(5), <u>Schedule 4</u> hereto provides the location of the Debtor's substantial assets, and the location of its books and records.  To the best of my knowledge, information, and belief, the Debtor does not hold any assets outside the territorial limits of the United States that are of more than de minimis value.

42.     In accordance with Local Bankruptcy Rule 2015-6(b)(1), <u>Schedule 5</u> hereto is the estimated amount of the payroll to employees of New York Chocolate (exclusive of officers, directors, consultants and stockholders) for the 30-day period following the commencement of the Debtor's chapter 11 case.

43.     In accordance with Local Bankruptcy Rule 2015-6(b)(2), <u>Schedule 6</u> hereto lists the amounts to be paid for services for the 30 day period following the filing of the chapter 11 petition to the officers, stockholders and directors of the Debtor.

44.     In accordance with Local Bankruptcy Rule 2015-6(b)(3), <u>Schedule 7</u> hereto contains the estimated cash receipts and disbursements and net cash gain or loss for the 30-day period following the commencement of the Debtor's chapter 11 case.

NYK 1278044-3.085280.0011

43.     In accordance with Local Bankruptcy Rule 2015-6(b)(2), <u>Schedule 6</u> hereto lists the amounts to be paid for services for the 30 day period following the filing of the chapter 11 petition to the officers, stockholders and directors of the Debtor.

44.     In accordance with Local Bankruptcy Rule 2015-6(b)(3), <u>Schedule 7</u> hereto contains the estimated cash receipts and disbursements and net cash gain or loss for the 30-day period following the commencement of the Debtor's chapter 11 case.

45.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Accordingly, I respectfully request that the Court grant all of the relief requested in the First Day Motions and such other and further relief as may be just.

Dated:  April 14, 2010

By: _____
        Richard F. McCormick

NYK 1278044-3.085280.0011

# EXHIBIT "A"

1. Emergency Motion For Order Pursuant To 11 U.S.C. §§ 105, 364(c)(1), (2) & (3), And 364(e), Fed. R. Bank. P. 2002, 4001 And 9014, And Local Rule 4001-3 (I) Authorizing Debtor To Obtain Postpetition Financing On Superpriority And Secured Basis, (II) Granting Interim Relief, And (III) Scheduling A Final Hearing Under Fed. R. Bankr. P. 4001(c)

2. Debtor's Motion Pursuant to Sections 105(a) And 366 Of The Bankruptcy Code For Entry Of An Order (I) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Service; (II) Deeming Utility Providers Adequately Assured Of Future Payment; And (III) Establishing Procedures For Determining Adequate Assurance Of Payment

3. Debtor's Motion Pursuant To Sections 105(a), 363(b), 507(a)(4) And 507(a)(5) Of The Bankruptcy Code For Entry Of An Order Authorizing Payment Of Wages, Compensation And Employee Benefits

4. Debtor's Motion Pursuant To Sections 105(A), 363, 1107 And 1108 Of The Bankruptcy Code For Entry Of An Order (I) Authorizing, But Not Directing, Debtor To Continue To Administer Insurance Coverage And (II) Authorizing Financial Institutions To Honor All Related Checks And Electronic Payment Requests

# SCHEDULE 1

## <u>DEBTOR'S BALANCE SHEET</u>

# New York Chocolate and Confection Co
## Preliminary Balance Sheet
### As of April 14, 2010

|  | Apr 14, 10 |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1111 · Petty Cash FSB | 966.20 |
| 1141 · Payroll FSB (Payroll Account) | 25,530.33 |
| 1101 · Corporate Checking Account (Fulton Savings Bank) | 327.28 |
| **Total Checking/Savings** | 26,823.81 |
| **Other Current Assets** | |
| 1197 · Due from LCM_Banet | 131,780.71 |
| 1198 · Allowance for Doubtful Account | -131,780.71 |
| **Total Other Current Assets** | 0.00 |
| **Total Current Assets** | 26,823.81 |
| **Fixed Assets** | |
| 1710 · Land | 7,000.00 |
| 1720 · Building | 131,921.41 |
| 1730 · Building Improvements | 450,626.47 |
| 1770 · Machinery and Equipment | 12,851,195.60 |
| 1780 · Furniture & Fixtures | 78,194.00 |
| 1790 · Vehicles | 62,573.46 |
| 1820 · Accumulated Deprec. Building | -21,284.27 |
| 1830 · Accumulated Dep Building Imp | -35,149.40 |
| 1870 · Accumulated Deprec Mach & Equip | -11,175,392.89 |
| 1880 · Accumulated Deprec Furn & Fixtu | -77,292.99 |
| 1890 · Accumulated Dep Vehicles | -62,573.38 |
| **Total Fixed Assets** | 2,209,818.01 |
| **Other Assets** | |
| 1902 · Deposit | 67,250.00 |
| 1620 · Prepaid Insurance | 114,849.93 |
| 1640 · Prepaid Property Taxes | 138,039.16 |
| **Total Other Assets** | 320,139.09 |
| **TOTAL ASSETS** | 2,556,780.91 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 20000 · Accounts Payable | 465,005.28 |
| **Total Accounts Payable** | 465,005.28 |
| **Other Current Liabilities** | |
| 2100 · Payroll Liabilities | 11,532.88 |
| 2400 · Accrued Payroll | 35,838.25 |
| **Total Other Current Liabilities** | 47,371.13 |
| **Total Current Liabilities** | 512,376.41 |
| **Long Term Liabilities** | |
| 2725 · Hud Loan | 456,776.01 |
| **Total Long Term Liabilities** | 456,776.01 |
| **Total Liabilities** | 969,152.42 |
| **Equity** | |
| 3010 · Treasury Stock | -500,000.00 |
| **31000 · Total Paid in Capital** | |
| 3102 · Add'l Paid in Capital FY10 | 889,944.00 |
| 3101 · Add'l Paid in Capital FY09 | 4,399,956.10 |
| 3100 · Add Pd in Capital | 36,592,365.97 |
| 3099 · Initial Paid in Capital | 3,735,577.80 |
| **Total 31000 · Total Paid in Capital** | 45,617,843.87 |

# New York Chocolate and Confection Co
## Preliminary Balance Sheet
### As of April 14, 2010

|  | Apr 14, 10 |
|---|---|
| **3900 · Retained Earnings** | -42,069,610.89 |
| **Net Income** | -1,460,604.49 |
| **Total Equity** | 1,587,628.49 |
| **TOTAL LIABILITIES & EQUITY** | 2,556,780.91 |

## SCHEDULE 2

## DEBTOR'S PROPERTY NOT IN DEBTOR'S POSSESSION

| TYPE OF PROPERTY | VALUE OF PROPERTY | PERSON OR ENTITY IN POSSESSION | ADDRESS & TELEPHONE NUMBER |
|---|---|---|---|
| DEPOSIT | $17,250 | National Grid - Electric | National Grid<br>P.O. Box 1303<br>Buffalo, NY 14240<br>Tim Murphy<br>(315) 592-3639 |
| DEPOSIT | $25,000 | National Grid -Gas | National Grid<br>P.O. Box 1303<br>Buffalo, NY 14240<br>Tim Murphy<br>(315) 592-3639 |
| DEPOSITS TOTAL | $42,250 | | |

## SCHEDULE 3

## PREMISES OWNED, LEASED, OR HELD UNDER OTHER ARRANGEMENT FROM WHICH THE DEBTOR OPERATES ITS BUSINESS

### OWNED REAL PROPERTY

The Debtor, The New York Chocolate & Confections Company, owns a 39 acre chocolate production facility located at 555 South Fourth Street in Fulton, New York.

### LEASED REAL PROPERTY

The Debtor, The New York Chocolate & Confections Company, does not lease any property.

## SCHEDULE 4

## LOCATION OF DEBTOR'S ASSETS, BOOKS AND RECORDS

Pursuant to Local Bankruptcy Rule 2015-6(a)(5), the following lists the locations of the Debtor's substantial assets and the location of its books and records.

### Location of Debtor's Substantial Assets

The Debtor's substantial assets are located at 555 South Fourth Street in Fulton, New York.

### Books and Records

The Debtor's books and records are located at 555 South Fourth Street in Fulton, New York.

## SCHEDULE 5

## ESTIMATED AMOUNT OF WEEKLY PAYROLL TO EMPLOYEES EXCLUSIVE OF OFFICERS, DIRECTORS, AND SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE

The following chart reflects amounts due to employees of the Debtor:

| Week | Estimated Payroll |
|------|-------------------|
| April 14 – April 18 | $250 |
| April 19 – April 26 | $500 |
| April 27 – May 2 | $750 |
| May 3 – May 9 | $500 |

**SCHEDULE 6**

**CERTAIN AMOUNTS PROPOSED TO BE PAID BY
THE DEBTOR FOR SERVICES FOR THE 30-DAY
PERIOD FOLLOWING THE PETITION DATE**

1.  Officers - Mike Malash and Patrick Haney - $17,300.00
2.  Chief Restructuring Officer - Richard F. McCormick - $40,000.00

   Total - $57,300.00

**SCHEDULE 7**

**DEBTOR'S ESTIMATED CASH DISBURSEMENTS AND RECEIPTS**
**FOR THE 30-DAY PERIOD FOLLOWING THE COMMENCEMENT DATE**

**NEW YORK CHOCOLATE AND CONFECTIONS COMPANY**
**Schedule 7**
**ESTIMATED CASH DISBURSEMENTS - 30 DAY PERIOD**

| OPERATING EXPENSES | APR 14TH - MAY 14TH |
|---|---|
| **EMPLOYEE EXPENSES** | |
| Hourly Payroll/Employer Taxes/Health Ins. | $ 3,800.00 |
| Salaries/Employer Taxes/Health Ins. | 17,300.00 |
| TOTAL | $ 21,100.00 |
| | |
| **INSURANCE EXPENSE** | |
| Insurance - Commercial | $ 104,000.00 |
| Insurance - Workers Comp. | $ 1,250.000 |
| TOTAL | $ 105,250.00 |
| | |
| **IDA EQIPMENT LOAN - AMORT.** | $ 9,407.66 |
| | |
| **MAINTENANCE & REPAIR SVCES** | $ 5,000.00 |
| | |
| **UTILITIES EXPENSE** | |
| Telephone and Internet | $ 1,200.00 |
| Utilities: National Grid Electric | 30,000.00 |
| Estimated Utility Deposits | 75,000.00 |
| TOTAL | $ 106,200.00 |
| | |
| **OTHER EXPENSES** | |
| Petty Cash | $ 1,350.00 |
| Office Supplies and Postage | 750.00 |
| Travel and Meetings | 1,850.00 |
| Other Miscellaneous | 2,500.00 |
| TOTAL | $ 6,450.00 |
| Contingency Reserve Expense | $ 40,000.00 |
| **TOTAL MONTHLY EXPENSES** | $ 293,407.66 |

**PROFESSIONAL SERVICES - ESTIMATED**

| | |
|---|---|
| CRO - McCormick | 40,000.00 |
| Palker & Lyon - Accounting Services | 5,000.00 |
| Chapter 11 Filing Fee - Due Upon Filing | 1,050.00 |
| US Trustee Quareterly Fee | 8,750.00 |
| | |
| TOTAL PROFESSIONAL & OTHER EXPENSES | $ 54,800.00 |

| **TOTAL ESTIMATED CASH DISBURSEMENTS** | $ 348,207.66 |
|---|---|