**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**(SYRACUSE DIVISION)**

------------------------------------------------------------x

In re:                                :

                                     :

THE NEW YORK CHOCOLATE      :     Case No.  10-30963 - (MCR)
& CONFECTIONS COMPANY       :     Chapter 11 Case

                                     :

Debtor.                            :

------------------------------------------------------------x

### DEBTOR'S MOTION (A) TO (i) ESTABLISH BID AND SALE PROCEDURES, UNDER 11 U.S.C. §§ 105(a) 363(b), (f) and (m), 365, 1146(a), AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 6006, FOR THE SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS; (ii) SCHEDULE A HEARING ON THE APPROVAL OF THE SALE; (iii) APPROVE THE FORM AND MANNER OF NOTICE OF THE SALE, AND (B) TO AUTHORIZE THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED CONTRACTS

The New York Chocolate & Confections Company, as debtor and debtor in possession (the "Debtor"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), moves this Court for entry of an order (the "Procedures Order") authorizing an auction process, approving bid procedures, and setting a final hearing (the "Sale Hearing") for the disposition of substantially all of the Debtor's assets and contracts and related relief (the "Motion"). In support of its Motion, the Debtor respectfully represents as follows:

### SUMMARY OF RELIEF REQUESTED

The Debtor is in the process of marketing substantially all of its assets for sale and seeks to establish procedures for a bid and sale process. The Debtor's goal is to conduct a fair and transparent process designed to determine the highest and best bid for the assets under current market conditions. The Debtor believes that a sale of the Debtor's assets to an interested party

will maximize the value of the Debtor's estate and will represent the best possible outcome for this case.

## BACKGROUND

1.      On April 14, 2010 (the "Petition Date"), the Debtor commenced its reorganization case by filing voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtor is authorized to continue to operate its business and manage its properties as debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## JURISDICTION

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

## GENERAL BACKGROUND

**A.      Formation of New York Chocolate**

4.      The Debtor, The New York Chocolate & Confections Company ("New York Chocolate"), is a Delaware corporation with its principal place of business in Fulton, New York. New York Chocolate's primary asset is its 39 acre chocolate production facility located at 555 South Fourth Street in Fulton (the "Chocolate Plant").  The Comité de Gestion de la Filière Café-Cacao (the "Comité"), a quasi governmental agency, is the 100% shareholder of the Debtor.  The Comité was formed by the President of the Republic of Côte d'Ivoire in September 2008 to, among other things, succeed to the shareholder interests of the then sole shareholder of New

York Chocolate – Fonds de Régulation et de Controle Café-Cacao (the "FRC") – after certain of the FRC's members were accused of mismanagement, among other allegations.

5.      Côte d'Ivoire is a West African nation that is the world's leading producer and exporter of the cocoa beans used in the manufacture of chocolate. In general, West Africa collectively supplies nearly 70% of the world's cocoa crop, with Côte d'Ivoire leading production at 1.3 million tons. Historically, large chocolate producers such as Cadbury, Hershey's and Nestlé buy Ivorian cocoa futures and options through Euronext where world prices for cocoa beans are set.

6.      The description of New York Chocolate's corporate history and the ownership of the Chocolate Plant reflects the difficulties encountered by the Debtor since its creation, but is integral to understanding the Debtor's decision to enter Chapter 11. The Chocolate Plant was initially owned and operated by Nestlé USA, Inc. ("Nestlé"); it was Nestlé's first United States chocolate production facility and was built in the late 1800's. In March 2003, Nestlé made the decision to close the Chocolate Plant. Jean Claude Amon ("Amon"), a special advisor to the President of the Republic of the Côte d'Ivoire, learned of the planned closing and commissioned Lion Capital Management, LLC ("LCM"), with the aid of its President and Chief Executive Officer, Hausmann-Alain Banet ("Banet"), to conduct an economic analysis on the feasibility of acquiring the Chocolate Plant. Amon and other representatives of the Côte d'Ivoire toured the Chocolate Plant and later met with LCM, through Banet, to discuss the economic study and the possible acquisition of the Chocolate Plant.

7.      Despite at least one offer to purchase the Chocolate Plant, Nestlé ultimately decided against selling the Chocolate Plant, but rather, decided to auction the equipment located at the Chocolate Plant (the "Equipment") and donated the factory and land to the County of

Oswego Industrial Development Agency (the "IDA"). In September and October 2003, LCM purchased substantially all of the Equipment at the auction or, subsequently, from other successful bidders after the auction. To purchase the Equipment, LCM used funds provided by the FRC and some of its own funds, which were later reimbursed by the FRC. In December, 2003, New York Chocolate acquired the factory and land from the IDA.

8.     LCM incorporated New York Chocolate on October 30, 2003, and thereafter transferred the Equipment to it. LCM was the initial sole shareholder until November 17, 2003, when it transferred 80% of the shares in New York Chocolate to the FRC. The FRC was a quasi governmental agency formed under the laws of the Côte d'Ivoire and represented the interests of a collection of farmers' cooperatives in the Côte d'Ivoire that grew cacao. The goal of the FRC was to operate the Chocolate Plant so as to provide the farmers' cooperatives with an outlet for their cacao production. An initial board of directors was selected, which included Banet.

**B.     The County Loan**

9.     On April 21, 2005, New York Chocolate and Operation Oswego County, Inc., as subrecipient of Oswego County (the "County"), entered into a loan agreement (the "County Loan"). The County Loan was in the principal amount of $850,000 and was to be used to purchase certain equipment for the Chocolate Plant. Pursuant to the County Loan, New York Chocolate granted the County a security interest in certain of its equipment. The Debtor is obligated to make payments on the County Loan on a monthly basis of $8,207.66 through April 1, 2015.[1]

---

[1]     In connection with the County Loan, New York Chocolate and the County also entered into a Loan Servicing Agreement dated April 21, 2005, pursuant to which New York Chocolate agreed to pay servicing fees to Operation Oswego County, Inc. in the amount of one-half of one percent of the outstanding principal balance due under the County Loan in two semi-annual installments.

10.    On or about February 9, 2006, the County loaned the Debtor an additional $40,000, which was secured by certain items of office equipment.  On or about March 2006, the County loaned the Debtor an additional $35,000.  On or about March 27, 2006, the County was granted a lien on certain equipment and a blanket lien on all the Debtor's personal property.  As of the Petition Date, only the County Loan remains outstanding.

## C.    Litigation Involving New York Chocolate

### (i).    The FCA Action

11.    Fulton Cogeneration Associates, LP ("FCA"), which was owned and operated indirectly by Banet since September 2004, provided steam to New York Chocolate through June 2005.  New York Chocolate fell behind in making its payments to FCA and, in July 2005, FCA sued New York Chocolate in New York state court for payments and other obligations owed.  FCA won partial summary judgment against New York Chocolate in the amount of $1,332,874.40 plus interest (the "FCA Judgment").  The remainder of the claims asserted by FCA were dismissed with prejudice.  In April 2009, the FCA Judgment was satisfied by New York Chocolate making a payment to the IDA, which had attached the FCA Judgment.  The United States District Court for the Northern District of New York approved the settlement with the IDA and entered an order extinguishing the FCA Judgment.

### (ii).    The FRC Action

12.    In 2005, a dispute arose between the FRC and LMC over the ownership of New York Chocolate.  In July 2005, the FRC filed an action in the Court of Chancery of the State of Delaware (the "Court of Chancery") seeking a declaration as to the respective equity ownership interests of the FRC and LCM (the "FRC Action").  On January 22, 2007, the Court of Chancery

issued an opinion in which it found that the FRC owned 800 of the 1,000 issued then-outstanding shares of New York Chocolate, and LCM owned the remaining 200 shares.

(iii).    The California Superior Court Action

13.    In 2006, New York Chocolate filed an action in the Superior Court of California for the County of San Francisco (the "California Superior Court") against Banet and LCM, alleging that Banet and LCM had converted a tax refund check belonging to New York Chocolate.  On September 17, 2007, judgment was entered in the California Superior Court in favor of New York Chocolate and against both LCM and Banet in the amount of $606,299.00 (the "Tax Judgment").  After domesticating the Tax Judgment in Delaware, on May 23, 2008, the 200 shares of New York Chocolate stock owned by LCM were sold to New York Chocolate at a sheriff's sale in partial satisfaction of the Tax Judgment against LCM.  As a result, the FRC became the 100% shareholder of New York Chocolate.

(iv).    The Banet Action

14.    On May 6, 2008, Banet filed a lawsuit in the Court of Chancery (the "Banet Action") in his capacity as an alleged stockholder and an alleged director of New York Chocolate against the FRC, the current and former directors and officers of New York Chocolate, and against New York Chocolate (collectively, the "Defendants").  New York Chocolate was named only as a nominal defendant.  On October 19, 2008, Banet filed an amended complaint that added FCA and LCM as plaintiffs (collectively, the "Plaintiffs"), asserting claims in their capacity as creditors and LCM as an alleged former shareholder.  The Banet Action alleged seven counts, including the following: a request for appointment of a receiver or custodian for New York Chocolate; breach of fiduciary duties, both derivative and direct; a demand for inspection of books and records; and requests to compel the holding of an

annual meeting of stockholders and a meeting of the board of directors on New York Chocolate. On November 26, 2008, Plaintiffs filed a motion for judgment on the pleadings, or, in the alternative, for summary judgment on their request for a receiver, which was denied. New York Chocolate subsequently filed a counterclaim seeking declarations that neither FCA nor LCM were creditors of New York Chocolate (Banet did not claim to be a creditor) and that neither LCM nor Banet was a stockholder of New York Chocolate. In August 2009, New York Chocolate filed a motion for summary judgment on the counterclaim.

15.     On March 12, 2010, the Court of Chancery granted New York Chocolate's motion for summary judgment and found that (1) LCM is not a stockholder of New York Chocolate; (2) Banet is not a stockholder of New York Chocolate; (3) Banet is not a director of New York Chocolate; (4) FCA is not a creditor of New York Chocolate; and (5) LCM is not a creditor of New York Chocolate.

**D.     Current Ownership and Management**

16.     On September 19, 2008, the Comité replaced the FRC as the 100% shareholder of New York Chocolate by Ordinance No. 2008-259 and Decrees Nos. 2008-260 and 2008-261 of the President of the Côte d'Ivoire. On November 20, 2008, the Comité acted by written consent to remove all members of the board of directors of New York Chocolate. By separate written consent of the same date, the Comité elected the following new directors of New York Chocolate: Illa Ginette Donwahi, Léa Claudine Yapobi, N'Guessan Célestin and Atsé Kouassi Propser. At a meeting of the new board of directors on November 24, 2008, all officers of New York Chocolate were removed from office and Mike Malash was appointed President and Patrick Haney was appointed Secretary and Treasurer of New York Chocolate.

E.      **Events Leading to Chapter 11 Filing**

17.     The litigations against New York Chocolate, and the allegations against certain members of its prior board and management, saddled New York Chocolate with a significant financial burden right from the start.  Partly because of such difficulties, the Debtor has not produced any products at the Chocolate Plant in over four years.  Since the Comité took over for the FRC, it has funded all of New York Chocolate's expenses.  After careful consideration and study of the realistic market opportunities for an independent manufacturer of chocolate products, projected capital requirements to restart New York Chocolate's operations, and faced with the accumulation of certain debts and other obligations, and the financial drain related to the numerous litigations, New York Chocolate determined that the most efficient way to preserve value for the creditors and other stakeholders was to commence an orderly wind down of its business under the protection of Chapter 11.

18.     The Debtor is intent on working cooperatively with the Debtor's creditors, the City of Fulton and County officials to ensure an efficient and orderly Chapter 11 process.

19.     On April 23, 2010, this Court entered an order allowing the Debtor to obtain debtor-in-possession financing (the "DIP Facility") on an interim basis in the amount of $219,500.  The total available amount under the DIP Facility is $1.54 million and a hearing to consider the approval of the DIP Facility on a final basis is scheduled for May 6, 2010.  The DIP Facility, if approved, can be used by the Debtor in accordance with a budget for a period starting on the Petition Date and ending on August 14, 2010.

20.     Simultaneously with this Motion, the Debtor is filing a motion pursuant to sections 105 and 363 of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules seeking entry of an order authorizing the Debtor to sell certain non-core *de minimis* assets.

## SALE AND AUCTION PROCEDURES

21.     Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006, the Debtor seeks approval of procedures for the submission of bids and the sale of the Chocolate Plant and related assets and assumption and assignment of associated executory contracts.   The Debtor, in the exercise of its business judgment, after consulting with the Comité, the post-petition lender in this case, has determined to sell substantially all of the Debtor's assets in a manner that will maximize the value of the Debtor's assets and the potential for the return of an operating business to Fulton, New York.   Following the Petition Date, Richard F. McCormick, the Debtor's chief restructuring officer ("CRO") has received several unsolicited inquiries for the purchase of both the Debtor's equipment and business as a whole.   Each of those parties have signed a confidentiality agreement with the Debtor (the "Confidentiality Agreement"), have received preliminary due diligence materials and have inspected the Chocolate Plant and its assets. Going forward, the CRO will expand its marketing efforts and, in cooperation with the IDA and the City of Fulton, will directly solicit interest from potentially interested strategic buyers. Any interested parties will then be required to execute a Confidentiality Agreement, in order to be given access to data that will assist them in formulating their bids.   In an effort to get the best possible result for this case and maximize value, the sale process has been and will be spearheaded by the CRO and controlled by the Debtor, in consultation with the United States Trustee.

22.     The Debtor proposes that a hearing to consider approval of the Bid Procedures be held on May 20, 2010 and a Sale Hearing to take place on June 24, 2010. The proposed time frame will give interested parties approximately 8 weeks from the filing of this Motion to conduct due diligence and submit bids, which the Debtor believes to be adequate time.

23.     In order to facilitate an orderly sale process, the Debtor has prepared a "form" Asset Purchase Agreement (the "Agreement") providing for the purchase and sale of the Purchased Assets (defined below), in a form attached to this Motion as <u>Exhibit A</u>. The use of a uniform agreement will enable the Debtor to more easily compare and contrast the differing terms of any bids that may be received on or prior to the deadline for the submission of the bids. The Agreement contains the Debtor's preferred transaction terms and transaction structure, but interested bidders may mark-up the Agreement in connection with their bids, subject to review and acceptance of any changes by the Debtor.

24.     The Debtor has not currently selected a "stalking horse" bidder and, as a result, all potential purchasers will compete on a level playing field in connection with their efforts to acquire the Chocolate Plant and the Debtor's other assets.[2] The Agreement contemplates a sale of the Debtor's assets, free and clear of liens, claims, encumbrances and other interests with all such interests to attach to the proceeds of the sale in the order of priority and with the same validity, force and effect that such interest has against the assets. The Agreement contains the following material terms:

a.      Purchased Assets -- The Chocolate Plant, and all related additions, fixtures, equipment and machinery owned by the Debtor (the "Purchased Assets");

b.      Assumed Contracts -- each bidder is entitled to select the executory contracts and unexpired leases, if any, that the bidder desires to acquire;

c.      Purchase Price -- paid in immediately available funds at closing;

d.      Assumed Liabilities -- include "cure" payments under assumed contracts, post-closing liabilities under assumed contracts, and section 1146(a)

---

[2]     It is possible that during the bidding process a qualified bidder may request stalking horse designation and protection notwithstanding the procedures set forth above. As such, the Debtor reserves the right to file supplemental pleadings (on shortened notice) and only if necessary and appropriate to accomplish the same within the time frame set forth in this Motion.

claims that may arise from the sale, certain employee-related liabilities and post-closing liabilities related to or arising from the Purchased Assets or the Business;

e.     Required Cash Deposit -- 10% of the Initial Bid (as defined below); and

f.     Postclosing Indemnification by Debtor -- none.

g.     Excluded Assets -- include, without limitation, all cash, accounts receivable, and Chapter 5 causes of action.

25.     The Agreement will be "shopped" in the marketplace using the sale process described below so as to ensure that the estate realizes the maximum value for the Purchased Assets. The Debtor's proposed process for marketing the Purchased Assets for sale (the "Proposed Sale Process") is intended to ensure that all interested parties can compete on a level playing field in an open and fair process. Parties must submit bids in accordance with the procedures described herein or as otherwise approved by the Court. Accordingly, the Debtor requests that this Court approve the Proposed Sale Process, including the following suggested bid procedures (the "Bid Procedures"):

a.     <u>Initial Bid</u>. Any third party that is interested in acquiring any or all the Purchased Assets must submit an "Initial Bid" in conformance with the Bid Procedures by not later than 5:00 p.m. (EST) on June 18, 2010 (the "Bid Deadline"). Any such Initial Bid must:

i.     Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the form Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement; (ii) containing terms and conditions no less favorable to the Debtor's estate than the terms and conditions in the Agreement (provided that no Initial Bid shall provide for the payment to the bidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) the Agreement should not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency related to the approval of the bidder's board of directors or other internal approvals or consents, (4) material adverse change clause, or (5) any conditions precedent to the bidder's obligation to purchase the Purchased Assets other than

those in the Agreement; (iv) a written statement by the bidder stating that it agrees to be bound by the terms and conditions of the form of Agreement and close on the sale within 5 days of entry of the Court's order approving a sale; (v) designating the executory contracts and unexpired leases as to which the bidder seeks assumption by the Debtor and assignment to the bidder, if any, and any other assets of the Debtor that are subject to the bid; (vi) be subject to acceptance by the Debtor solely by its execution of the bid and approval of the bid by the Court; (vii) be accompanied by the deposit described below; (viii) be received at or prior to the Bid Deadline; and (ix) provide for the payment of an all-cash purchase price.

ii.  Include a cashiers' or certified check payable to the order of The New York Chocolate & Confections Company, Debtor in Possession, representing a deposit equal to 10% of the Initial Bid (the "Deposit") (it being understood that Deposits may also be sent by wire transfer of immediately available funds);[3]

iii. Be accompanied by current audited financial statements of the potential bidder, provided however, if the potential bidder is an entity formed for the purpose of submitting the Initial Bid, (a) current audited financial statements of the equity holder(s) of the potential bidder or such other financial disclosure acceptable to the Debtor, demonstrating such potential bidder's ability to close on the transaction and (b) a written guarantee, letter of credit or other form of credit enhancement acceptable to the Debtor pursuant to which the equity holder(s) of the potential bidder are responsible for such bidder's obligations in connection with the sale.

iv.  Fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

v.   To the extent not previously provided to the Debtor, be accompanied by evidence satisfactory to the Debtor in its reasonable discretion that the bidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) and within the timeframe contemplated under the Agreement in the

---

[3] If a bidder submits a bid that is selected as the Prevailing Bid (as defined below) and such bidder subsequently defaults or breaches, then the deposit submitted by such bidder shall be deemed forfeited and shall be retained by the Debtor. Deposits of other bidders will be returned to such bidders promptly upon the Court's entry of an order approving the Prevailing Bid (defined below), except for the deposit of the Next Highest Bidder, which shall be returned to the Next Highest Bidder promptly upon the closing of the sale to the Prevailing Bidder.

NYK 1302313-5.085280.0011

event that it submits the Prevailing Bid at the Auction (as defined below);

vi.     Remain open and irrevocable until thirty (30) days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Purchased Assets; and

vii.    Be submitted to (i) The New York Chocolate & Confections Company, 555 South Fourth Street, Fulton, New York 13069, Attn: Richard F. McCormick, Chief Restructuring Officer (Fax no.: (315) 598-1246), (ii) counsel to the Debtor, McDermott Will & Emery LLP, 340 Madison Avenue, New York, New York 10173-1922, Attn: Geoffrey T. Raicht and Nava Hazan (Fax no.: (212) 547-5444), and (iii) the Office of the United States Trustee, 10 Broad Street, Room 105, Utica, New York 13501, Attn: Guy A. Van Baalen (Fax no: (315) 793-8133), in each case so as to be received not later than the Bid Deadline. The Debtor may extend the Bid Deadline without further notice and for one or more bidders, but shall not be obligated to do so. The Debtor has been and will continue to provide due diligence information to potential bidders; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline or to any person that the Debtor determine is not reasonably likely to be a Qualified Bidder. The Debtor will provide non-public due diligence information only to those parties who have entered into appropriate confidentiality arrangements with the Debtor.

b.      <u>Auction</u>. In the event that the Debtor timely receives two or more conforming Initial Bids from prospective purchasers as described above (each, a "Qualified Bidder"), then the Debtor, in consultation with the United States Trustee, may conduct an auction with respect to the sale of the Purchased Assets on June 21, 2010, beginning at 12:00 p.m. (EST), at The New York Chocolate & Confections Company, 555 South Fourth Street, Fulton, New York 13069, or at such other location as may be designated by the Debtor, in consultation with the United States Trustee (the "Auction"). Based upon the terms of the qualified bids received, the level of interest expressed as to particular assets, and such other information as the Debtor determines is relevant, the Debtor may adopt rules and conduct the Auction in the manner the Debtor determines, in consultation with the United States Trustee, will promote the goals of the Auction and achieve the maximum realizable value for the Purchased Assets. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Bid that is timely and that complies in all respects with the Procedures Order. At the Auction, Qualified Bidders may submit successive bids in increments of at least $100,000 greater than the prior bid for the purchase of all of the Purchased Assets. Qualified Bidders may

also submit bids for one or more of the assets that compromise the Purchased Assets. Immediately prior to concluding the Auction, the Debtor, in consultation with the United States Trustee, shall determine which bid or bids is the highest or best offer, subject to Bankruptcy Court approval (the "Prevailing Bid") and the next highest or otherwise best offer after the Prevailing Bid (the "Next Highest Bid"). Qualified Bidders shall also be permitted to make other modifications to their bids at the Auction in order to make their bids more favorable to the estate. All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. All bids shall be made on an open basis, participating Qualified Bidders shall be entitled to be present for all bidding; and the principals of each participating Qualified Bidder shall be fully disclosed to all other participating Qualified Bidders throughout the entire Auction. All bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale of the Purchased Assets and the construction and enforcement of the Prevailing Bid or the Next Highest Bid.

c.    Credit Bid. The County (including any nominee or designee of the County) will have the right to Credit Bid at the Auction in accordance with section 363(k) of the Bankruptcy Code up to the total amount outstanding under the County Loan, provided however, that the County will satisfy any cure obligations associated with the assumption and assignment of an executory contract or unexpired lease, if any, with cash. For the avoidance of all doubt, the County shall be deemed "Qualified Bidder" without the necessity of complying with paragraphs (a)(i)-(iii) in the Bidding Procedures.

d.    Highest and/or Best Bid. At all times during the Proposed Sale Process, the Debtor, in consultation with the United States Trustee, retains the right to determine which bid constitutes the highest or otherwise best offer for the purchase of the Purchased Assets, and which bid should be selected as the Prevailing Bid and the Next Highest Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. When evaluating the bids, the Debtor, in consultation with the United States Trustee, shall consider the financial and contractual terms of each bid and factors affecting the speed and certainty of closing each bid. For the avoidance of doubt, a material consideration in determining the highest and/or best bid will be the potential likelihood that the prevailing bid will result in a positive outcome for the community. Without limiting the generality of the foregoing, the Debtor may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid that, after consultation with the United States Trustee, is determined to be (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Proposed Sale Process, or (iii) contrary to the best interests of the estate or its creditors. Prior to the Sale

Hearing, the Debtor reserves the right to file with the Court additional pleadings in support of the sale to the winning bidder, together with a copy of the Prevailing Bid.

e.  Sale Hearing. The Sale Hearing will be conducted at [11:30] a.m. (EST), on June 24, 2010, at the United States Bankruptcy Court, Northern District of New York, Syracuse Office, James M. Hanley Federal Building and Courthouse, 100 South Clinton Street, Syracuse, New York 13261, before the Honorable Margaret Cangilos-Ruiz, United States Bankruptcy Judge, at which time the Debtor intends to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m) and 365 of the Bankruptcy Code. The Debtor shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a sale of the Purchased Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Prevailing Bid, such bidder shall be deemed to have forfeited its Deposit in partial satisfaction of the damages incurred by the estate and the Next Highest Bid, as disclosed at the Sale Hearing, shall be deemed the Prevailing Bid without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by such Next Highest Bid. The Sale Hearing may be adjourned by the Debtor, in consultation with the United States Trustee, or by the Court at any time.

f.  Sale Implementation. Following the approval of the Prevailing Bid at the Sale Hearing, the Debtor will be authorized to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of a sale order.

g.  Conflict. Any conflict between the terms and conditions of the Procedures Order and any purchase agreement executed by the Debtor and any of the bidders shall be resolved in favor of the Procedures Order.

26.  The Debtor believes that the Proposed Sale Process offers the best opportunity for the Debtor to maximize the value of the Purchased Assets for the benefit of its estate given the current circumstances and lending environment available to the Debtor. The Debtor submits that implementation of the Proposed Sale Process is in the best interests of its estate and creditors and should be approved.

## PROPOSED NOTICE OF AUCTION AND SALE HEARING

27.     Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide its creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in the sale Motion. The Debtor proposes that the deadline for objecting to approval of the proposed Sale be set for 4:00 p.m. (EST) on June 23, 2010.

28.     Within two business days after entry of the Procedures Order, the Debtor will serve a notice (the "Auction and Hearing Notice") by first-class mail, postage prepaid upon the following parties: (a) the Office of the U.S. Trustee for the Northern District of New York; (b) the creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, as identified in the Debtor's chapter 11 petition; (c) counsel to the Comité and counsel to the County; (d) all other known parties with liens of record on assets of the Debtor as of the Petition Date; (e) all other known potential creditors in this chapter 11 case; (f) the parties listed on the Master Mailing Matrix, (g) all parties that have filed notices of appearance requesting service in this case; (h) the local office for the Internal Revenue Service (the "Notice Parties"). The Auction and Hearing Notice is attached to this Motion as Exhibit B and indicates that the Motion and the Agreement can be obtained without charge from counsel for the Debtor. In addition, the Debtor will serve the Sale Motion, including a copy of the Agreement, on those persons in categories (a) through (f), above. Further, within two business days after entry of the Procedures Order, or as soon as practicable thereafter, the Seller will place a publication version of the Auction and Hearing Notice for one day in the *Syracuse, NY The Post Standard* and *The New York Times* in order to enhance the prospects for a sale of the Debtor's assets.

29.     The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the Sale once they are set by the Court, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtor submits that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Debtor's assets. Therefore, the Debtor respectfully requests that this Court approve the notice procedures proposed above.

### PROPOSED PROCEDURES FOR AND NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

30.     Additionally, the Debtor, as part of the sale, is prepared to assume and assign certain executory contracts and unexpired leases to the bidder submitting the Prevailing Bid (the "Successful Bidder") to the extent that such bidder desires certain contracts or leases as part of the Prevailing Bid. As soon as practicable, but no later than seven (7) days after the entry of the Procedures Order, the Debtor will file a schedule of cure obligations (the "Cure Schedule") for the contracts and leases that may be assumed and assigned (the "Assumed and Assigned Agreements"). The Cure Schedule will include a description of each Assumed and Assigned Agreement potentially to be assumed and assigned under the Agreement or other agreement with the Successful Bidder and the amount, if any, the Debtor believes is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts"). A copy of the Cure Schedule, together with a notice (the "Assumption and Assignment Notice"), will be served on each of the nondebtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court.[4] Any objections to the assumption and assignment

---

[4] The designation of a contract on the Cure Schedule is without prejudice to the Debtor's rights and shall not constitute an admission that such contracts are executory contracts the subject of Section 365 protections.

of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Amounts set forth on such schedule, must be in writing, filed with the Court, and be actually received on or before June 23, 2010 at 4:00 p.m. by The New York Chocolate & Confections Company, 555 South Fourth Street, Fulton, New York 13069, Attn: Richard F. McCormick, Chief Restructuring Officer, with copies to (i) counsel to the Debtor, McDermott Will & Emery LLP, 340 Madison Avenue, New York, New York 10173-1922, Attn: Geoffrey T. Raicht and Nava Hazan, and (ii) the Office of the United States Trustee, 10 Broad Street, Room 105, Utica, New York 13501, Attn: Guy A. Van Baalen. Any objection to the Cure Amounts shall set forth the specific default or defaults in any Assumed and Assigned Agreements and set forth the specific monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Schedule.

31.    If no objections are received, then the Cure Amounts set forth in the Cure Schedule will be binding upon the nondebtor parties to the Assumed and Assigned Agreements for all purposes in this chapter 11 case and otherwise, and will constitute a final determination of the total Cure Amounts required to be paid by the Debtor in connection with the assumption and assignment of the Assumed and Assigned Agreements. In addition, all counterparties to the Assumed and Assigned Agreements will (a) be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtor and the Successful Bidder will be entitled to rely solely upon the Cure Amounts set forth in the Cure Schedule, (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtor or the successful bidder that any additional amounts are due or other

defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

32.     Where a nondebtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent to such resolution, the Debtor shall promptly provide the United States Trustee, and other parties in interest notice and an opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing (or at such other date and time as may be fixed by this Court). At the election of the Debtor, the executory contract the subject of a Disputed Cure Amount may nonetheless be assigned to the Successful Bidder at Closing free and clear of the objection so long as the amount relating to the Disputed Cure Amount is escrowed by the Debtor. The Debtor intends to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences in a particular cure amount.

33.     The Debtor requests that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtor requests that each such party be deemed to consent to the

assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. *See* 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## **RELIEF REQUESTED**

34.     By this Motion, the Debtor requests that the Court grant the following relief:

a.      Following the Procedures Hearing, enter the Procedures Order in a form attached to this Motion as <u>Exhibit C</u> approving the (i) Proposed Sale Process and the Bid Procedures, including the procedures for submitting Initial Bids, conducting the Auction and identifying the Prevailing Bid and the Next Highest Bid, (ii) the Proposed Notice of Auction and Sale Hearing, and (iii) the Proposed Procedures and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases; and

b.      Following the Sale Hearing, enter an order approving the sale of the Purchased Assets in accordance with the Proposed Sale Process and making the following determinations, among others, with respect to such sale or sales:

i.      that such sale has been agreed upon, and will be made and completed, in good faith, for purposes of the provisions of Section 363(m) of the Bankruptcy Code;

ii.     that such sale shall be made, and the Purchased Assets shall be delivered to the Successful Bidder, free and clear of any and all liens, claims, encumbrances and interests (other than as specified in the definitive agreement) with any liens, claims, encumbrances and interests to attach to the sale proceeds in the same manner and priority as existed on the Petition Date;

iii.    that the party who submitted the Prevailing Bid shall receive good, valid and marketable title to the Purchased Assets (including the executory contracts and unexpired leases included within each Prevailing Bid that is approved by the Court);

iv.     that the Debtor has the authority at the Closing to assume and assign to the Successful Bidder all executory contracts designated by the Successful Bidder in the Agreement free and clear of liens, claims and encumbrances, and to find that the Cure Amounts are in full satisfaction of all amounts due and owing to cure the same; and

v. that the fourteen (14) day stay period provided for in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure shall not be in effect with respect to the Sale Order and the Sale Order shall be effective and enforceable immediately upon its entry.

## LEGAL ARGUMENTS IN SUPPORT OF REQUESTED RELIEF

**A.     The Proposed Sale Of Purchased Assets Is Within The Sound Business Judgment Of The Debtor And The Proposed Bid Procedures Are Appropriate And Reasonable.**

35.     Section 363 of the Bankruptcy Code provides that debtors in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate ...." 11 U.S.C. § 363(b)(1); *see also* Bankruptcy Rule 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction").

36.     The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor. *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. I983); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy) (citation omitted).

37.     Courts generally show great deference to a debtor in possession's decisions when applying the business judgment standard. *See In re Global Crossing, Ltd.*, 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference

is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985); *In re Integrated Res., Inc.*, 147 B.R. at 656 (there is a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company") (citation omitted).

38.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Polvay v. B.O. Acquisitions (In re Betty Owens Sch.)*, Case No. 96-3576, 1997 U.S. Dist. Lexis 5877, at *12 (S.D.N.Y. Apr. 16, 1997); *accord In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749 at *3-5 (Bankr. D. Del, May 20, 2002). The business judgment standard has been met here.

39.     The Chocolate Plant has not been operating for four years and the Debtor is attempting to sell its assets for the benefit of its estate and creditors in an orderly manner. The Debtor does not have an independent source of revenue except for the funds made available by the Comité under the post-petition loan. As part of the Sale Process, the Debtor seeks to generate cash proceeds for the benefit of the Debtor's estate and creditors. For all of the reasons that follow, the proposed sale of the Debtor's assets and the assumption and assignment of the Debtor's executory contracts (if any) in connection with the Bid Procedures satisfies the business judgment standard and the Bid Procedures are abundantly reasonable and appropriate and allow for a significant period of time for interested bidders to submit bids for the Purchased Assets.

40.     First, the timeline for submitting bids under the proposed Bid Procedures is necessary to obtain the maximum value for the Debtor's assets and to preserve the value of the Chocolate Plant under the circumstances. This suggested timeframe provides parties with ample opportunity to object, appear and be heard with respect to all dispositions contemplated by the auction process. *See In re US Airways Group, Inc.*, 287 B.R. 643, 646-47 (Bankr. E.D. Va. 2002) (approving "fast track" authority to renegotiate or reject executory contracts where rights of interested parties are preserved).

41.     Second, subject to this Court's approval, the Debtor will provide notice of the auction to interested parties by serving the Auction and Sale Notice which will clearly identify (i) the deadline fixed for filing objections to any sale of the Debtor's assets and assumption and assignment of the executory contracts, (ii) the date of the Auction, and (iii) the date of the Sale Hearing. Service of the Auction and Sale Notice upon the Notice Parties identified herein complies with the Bankruptcy Rules.

42.     Third, the Bid Procedures contemplate a fully negotiated arm's-length transaction between the Debtor and the potential buyer. A purchaser's good faith may be satisfied where a sale is the product of arm's-length negotiations between parties. *See WBQ P'ship v. Virginia Dep't of Med. Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (stating that "[a] negotiation conducted at arm's length helps to ensure that the agreed price ultimately will be fair and reasonable."); *In re Apex Oil Co.*, 92 B.R. 847, 870 (Bankr. E.D. Mo. 1988). Alternatively, lack of good faith is typically determined by actions that involve fraudulent conduct, collusion or an attempt to take unfair advantage of other bidders during the sale proceedings. *See Willemain v. Kivilz (In re Willemain)*, 764 F.2d 1019, 1023 (4th Cir. 1985).

NYK 1302313-5.085280.0011

43.     Fourth, the Bid Procedures will ensure that that any price obtained for the assets will be fair and reasonable under the circumstances. The competitive bidding process should enable the Debtor to capture value from the assets for the benefit of the Debtor's estate and creditors by taking full advantage of the potential buyer pool which will be marketed extensively. The financial information required of eligible bidders will also permit the Debtor to analyze each bid with respect to the potential purchaser's ability to satisfy the financial obligations assumed thereby. Moreover, the open auction will also provide transparency to the bidding process and make reasonably certain that any successful bid is the highest or otherwise best bid for such asset, all under the direction of the Debtor, in consultation with the United States Trustee.

44.     Finally, the marketing efforts the Debtor intends to undertake prior to the auction will help ensure that any successful bids represent a fair value for the assets in question under the circumstances. *See In re W.A. Mallory Co.*, 214 B.R. 834, 837-38 (Bankr. E.D. Va. 1997). The flexibility provided by the Bid Procedures is consistent with the discretion typically afforded procedures governing the disposition of assets under section 363(b) of the Bankruptcy Code. *See id.* at 838 (stating that "[e]stablishing an arbitrary percentage which a proposed purchase price needs to meet before a sale is consummated does not serve the purposes of the Bankruptcy Code..."). If a party raises legitimate concerns about the extent to which the Bid Procedures will ensure fair value for the Debtor's assets, the Debtor intends to present evidence at the Sale Hearing confirming that such a price is reasonable under the circumstances.

45.     In sum, the sale of the Debtor's assets and the Bid Procedures contemplated herein reflect a sound business purpose, are a valid exercise of the Debtor's business judgment, and are abundantly fair and reasonable.

**B.  The Auction Will Satisfy The Requirements  
Of Section 363(f) For A Sale Free And Clear.**

46.  In the interest of attracting the best offers, the sale of the Debtor's assets should be free and clear of any and all liens, claims, encumbrances, and interests in accordance with section 363(f) of the Bankruptcy Code, with such liens, claims, encumbrances, and interests attaching to the proceeds of the sale. Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate free and clear of all interests (including liens, claims and encumbrances) if

(a)  applicable nonbankruptcy law permits the sale of such property free and clear of such interest,

(b)  the entity with the interest consents,

(c)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property,

(d)  such interest is in bona fide dispute, or

(e)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.

*See* 11 U.S.C. § 363(f). Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Satisfaction of any one of the factors set forth in section 363(f) of the Bankruptcy Code allows a sale, including the dispositions contemplated herein, and the transfer of assets of the estate free and clear of all interests.

47.  With respect to any party asserting a lien, claim, or encumbrance against the Assets, the Debtor believes that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code. In particular, the Debtor believes that any lienholder will be adequately protected by having their interest, if any, attached to all proceeds ultimately attributable to the Assets in which such creditor alleges an interest, in the same order

- 25 -

of priority and with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Debtor and its estate may have with respect thereto.

48.     Finally, the Debtor believes that creditors with any interest in the assets and/or executory contracts (if any) will consent to a proposed sale free and clear of liens, claims, encumbrances and interests, if applicable. *See* 11 U.S.C. § 363(f)(2).  To the extent such creditors do not consent explicitly or implicitly, the Debtor believes that the sale will satisfy one or more of the factors in section 363(f) of the Bankruptcy Code.

**C.      The Successful Bidder At The Auction Will Be Entitled
To The Protections Afforded To Good Faith Purchasers.**

49.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code provides "finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making offers and bids." *In re Chateaugay Corp.*, Case No. 92-7054, 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (citation omitted); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) ... provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew the pendency of the appeal."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith

purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.") (citation omitted).

50.     The selection of the successful bidder will be the product of arm's-length, good-faith negotiations in an anticipated competitive purchasing process through which the Debtor will seek to maximize the value available for its assets. The Debtor intends to request at the Sale Hearing a finding that the successful bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code. The Debtor believes that providing the successful bidder with such protection will ensure that the maximum price will be received by the Debtor for the assets and allow for a prompt closing of the sale.

**D.      Assumption And Assignment Of The Debtor's Executory Contracts And Unexpired Leases In Accordance With The Proposed Assumption Procedures Is Appropriate And In The Best Interests Of The Estate.**

51.     A debtor in possession may assume an executory contract where assumption is a reasonable exercise of its business judgment. *See* 11 U.S.C. § 365(a); *see e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984); *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484 (Bankr. S.D. Ohio 1982); *see also In re Extraction Techs. of Va., L.L.C.*, 296 B.R. 393, 399 (Bankr. E.D. Va. 2001); *Richmond Metal Finishers*, 756 F.2d at 1046-47. This requirement is satisfied where a debtor in possession determines in good faith that assumption of an executory contract will benefit the estate. *See In re Gucci*, 193 B.R. 411, 414-15 (S.D.N.Y. 1996).

52.     Further, a debtor in possession may assume and assign an executory contract only where the trustee has cured all existing defaults under that executory contract. *See* 11 U.S.C. § 365(b)(1), (f)(2); *see In re Shangra-La. Inc.*, 167 F.3d 843, 849 (4th Cir. 1999). In addition, a debtor in possession must provide adequate assurance of future performance under the assumed executory contract if the debtor has defaulted. *See* 11 U.S.C. § 365(b)(1), (f)(2); *see e.g., In re*

NYK 1302313-5.085280.0011

*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that tenant will thrive and pay rent); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 172 (Bankr. E.D. Va. 1993). The requirements of "adequate assurance" depend on the facts and circumstances of each case. *See*, *e.g., In re Martin Paint Stores*, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996).

53.    In the event the Prevailing Bid includes a proposed assumption and assignment of an executory contract or unexpired lease, the Debtor will introduce evidence at the Sale Hearing demonstrating that the successful bidder can satisfy the requirements of adequate assurance as contemplated by section 365 of the Bankruptcy Code. The sale price obtained in connection with a party's bid will be sufficient to cure any defaults applicable to assumed executory contracts. The Bid Procedures require each potential assignee to provide assurances to satisfy the standards set forth in the Bankruptcy Code. *See In re Ames Dep't Stores*, 287 B.R. 112 (Bankr. S.D.N.Y. 2002). Indeed, in order to qualify as a Qualified Bidder, each bidder must provide financial information regarding the bidder's ability to fulfill its financial obligations. *See In re Bygraph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it a strong likelihood of succeeding.) *See In re GlycoGenesys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (stating that "it is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee."). Upon conclusion of the Auction and selection of the successful bidder, the Debtor will file a notice identifying the successful bidder and serve such notice together with evidence of "adequate assurance" upon all counterparties to executory contracts.

NYK 1302313-5.085280.0011

54. The Debtor respectfully submits that the Assumption and Assignment Notice and Cure Schedule described above are appropriate and reasonably tailored to provide all counterparties to executory contracts with adequate notice of the proposed assumption and assignment of the applicable contract. Ample time is provided for contract parties to object to the Assumption and Assignment Notice and Cure Schedule. It is anticipated that any objections that may be filed will be heard at the Sale Hearing.

55. Accordingly, the Debtor submits that implementation of the proposed procedures for addressing assumption and assignment of executory contracts and unexpired leases procedures is appropriate in this case. As a result, the Court therefore should have a sufficient basis to authorize the Debtor to assume and assign executory contracts and unexpired leases which may form a part of the Prevailing Bid.

### E. The Court Should Waive The Fourteen Day Stay Imposed By Bankruptcy Rules 6004(h) And 6006(b)

56. The Debtor requests that, upon entry of the Sale Order, the Court waive the fourteen-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). The waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is a condition of the Agreement to be entered into with the successful bidder. The Debtor respectfully submits that the Court waive the fourteen-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

### Notice

57. No trustee or examiner has been appointed in this chapter 11 case. Notice of this Motion has been provided to: (a) the Office of the U.S. Trustee for the Northern District of New York; (b) counsel to the Comité; (c) counsel to the County; (d) all known unsecured creditors in this chapter 11 case, (e) all other known parties with liens of record on assets of the Debtor as of

the Petition Date; (f) all parties that have filed notices of appearance requesting service in this case; (g) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001, or 9014 or requesting to receive notice prior to the date hereof; and (h) the parties listed on the Master Mailing Matrix. The Debtor submits that no other or further notice need be provided.

### **No Prior Request**

58.     No prior request for the relief sought in this Motion has been made to this or any other court in connection with this chapter 11 case.

NYK 1302313-5.085280.0011

WHEREFORE, the Debtor respectfully requests that the Court (I) enter an order (a) establishing the bid and sale procedures described herein (b) approving the form and notice of the sale, (c) approving the procedures and contemplated notice of assumption and assignment of executory contracts and unexpired leases, and (II) enter an order approving the sale to a successful bidder, and grant such other and further relief to the Debtor as the Court may deem proper.

Dated: New York, New York
      April 26, 2010

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

By:   /s/    Geoffrey T. Raicht
       Geoffrey T. Raicht
       Bar No. 2916203
       Nava Hazan
       Bar No. 3064409
       340 Madison Avenue
       New York, New York 10173-1922
       Telephone:  (212) 547-5400
       Facsimile:  (212) 547-5444

*Proposed Counsel for the Debtor and Debtor in Possession*