**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**(SYRACUSE DIVISION)**

```
--------------------------------------------------------------x
In re:                              :
                                    :
THE NEW YORK CHOCOLATE              :     Case No.  10-30963 - (MCR)
& CONFECTIONS COMPANY               :     Chapter 11 Case
                                    :
Debtor.                             :
--------------------------------------------------------------x
```

### DISCLOSURE STATEMENT FOR THE DEBTOR'S PLAN OF
### LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

*McDERMOTT WILL & EMERY LLP*
*340 Madison Avenue*
*New York, New York 10173-1922*
*Telephone: (212) 547-5400*
*Facsimile: (212) 547-5444*
*Counsel for the Debtor and Debtor in Possession*

Dated:     New York, New York
           July 6, 2010

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY ..................................................................3
      A.   Disclosure Statement Enclosures ...............................................................3
      B.   Only Impaired Classes Vote ......................................................................4
      C.   Confirmation Hearing .................................................................................5

II.   OVERVIEW OF THE PLAN .........................................................................5
      A.   Introduction ................................................................................................5
      B.   Summary of Distributions ..........................................................................5

III.  OVERVIEW OF CHAPTER 11 .....................................................................6

IV.   DESCRIPTION OF THE DEBTOR'S HISTORY AND BUSINESS ...........7
      A.   The Debtor ...................................................................................................7
      B.   The County Loan Agreement .....................................................................8
      C.   Litigation Involving New York Chocolate ................................................8
      D.   Current Ownership and Management .........................................................9
      E.   Events Leading to The Chapter 11 Case ...................................................10

V.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ..................10
      A.   Significant "First Day" Motions ...............................................................10
      B.   Operation As A Small Business Debtor Without a Creditors' Committee ..........12
      C.   Retention of Debtor's Professionals .........................................................12
      D.   Claims Process ..........................................................................................13
      E.   Tax Motion ................................................................................................14
      F.   Sales Of Substantially All of New York Chocolate's Assets.....................14

VI.   SUMMARY OF PLAN PROVISIONS............................................................15
      A.   Introduction ...............................................................................................15
      B.   Method of Classification of Claims and Interests and General Provisions..........15
      C.   Unclassified Administrative Claims, Priority Tax Claims, Fee Claims, and
           DIP Loan Claims ......................................................................................16
      D.   Classification and Treatment of Claims and Interests ..............................17
      E.   Means For Implementation Of The Plan ..................................................18
      F.   Provisions Governing Distributions..........................................................19
      G.   Procedures for Treating Disputed Claims Under the Plan ........................22
      H.   Treatment Of Executory Contracts And Unexpired Leases......................23
      I.   Conditions Precedent to Confirmation .....................................................24
      J.   Effect of Confirmation of the Plan............................................................24
      K.   Preservation of Avoidance Actions ..........................................................25
      L.   Releases and Exculpation .........................................................................25
      M.   Retention of Jurisdiction ...........................................................................26
      N.   Miscellaneous Provisions ..........................................................................26

## TABLE OF CONTENTS
(continued)

VII.   CERTAIN RISK FACTORS TO BE CONSIDERED .................................................27

    A.    Taxation..........................................................................................................28
    B.    Distributions to Holders of Claims and Interest ...............................................28
    C.    Objections to Classification..............................................................................28
    D.    Certain Bankruptcy Law Considerations ..........................................................29

VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN.........................................................................................................................29

    A.    Liquidation Under Chapter 7............................................................................29
    B.    Alternative Plan of Liquidation ........................................................................29

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............30

    A.    Federal Income Tax Consequences in General ..................................................30
    B.    Federal Income Tax Consequences to the Debtor ..............................................31
    C.    Federal Income Tax Consequences to Holders of Allowed Claims ....................32
    D.    Federal Income Tax Consequences to Holders of Allowed Equity Interests.......33
    E.    Withholdings ...................................................................................................33
    F.    Importance of Obtaining Professional Tax Assistance .......................................33

X.     CONCLUSION .........................................................................................................34

ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING THE TREATMENT OF THEIR CLAIMS OR INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALL CREDITORS AND INTEREST HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. SEE "CERTAIN RISK FACTORS TO BE CONSIDERED," ARTICLE VII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR, ITS BUSINESS, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE, HAS BEEN PREPARED AND OBTAINED BY THE DEBTOR AND ITS PROFESSIONALS FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTOR. NEITHER THE DEBTOR NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, OR OTHERWISE HAVE ANY PRECLUSIVE EFFECT, BUT RATHER SHALL CONSTITUTE AND BE CONSTRUED AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE FINANCIAL PROJECTIONS ATTACHED HERETO WERE PREPARED BY THE DEBTOR AND ITS PROFESSIONALS BASED ON INFORMATION AVAILABLE TO THE DEBTOR AND NUMEROUS ASSUMPTIONS THAT ARE AN INTEGRAL PART OF THE FINANCIAL PROJECTIONS, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR AND SOME OR ALL OF WHICH MAY NOT MATERIALIZE. THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO

2

DATE AND MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, LITIGATION, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY, IF NOT ALL, OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR OR ANY OTHER PERSON THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS.

## I.  INTRODUCTION AND SUMMARY

The New York Chocolate & Confections Company ("New York Chocolate" or the "Debtor") submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Equity Interests in the Debtor in connection with (i) the solicitation of acceptances of the Debtor's Plan of Liquidation dated July 6, 2010 [Docket No. ____], as such plan may be amended from time to time (the "Plan"), filed by the Debtor with the Bankruptcy Court, and (ii) the Confirmation Hearing scheduled for September 2, 2010 at 11:00 a.m. (ET).  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The following introduction and summary are qualified in their entirety by, and should be read in conjunction with, the more detailed information and notes thereto appearing elsewhere in this Disclosure Statement, together with any relevant exhibits and appendices.

Concurrently with the filing of this Disclosure Statement, the Debtor filed the Plan which sets forth how Claims against and Equity Interests in the Debtor will be treated in this Chapter 11 Case.  This Disclosure Statement describes certain aspects of the Plan, the Debtor's prior operations, significant events occurring in the Debtor's Chapter 11 Case and other related matters.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

### A.  *Disclosure Statement Enclosures*

Attached as exhibits to this Disclosure Statement are copies of the following:

- Liquidation Analysis (Schedule 1);

- The Plan (Exhibit A);

- The Order of the Bankruptcy Court (without exhibits), which, among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or to reject the Plan (the "Solicitation Procedures Order") (Exhibit B).

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement and has been provided to the holders of Impaired Claims or Equity Interests that the Debtor believes are entitled to vote to accept or reject the Plan.

On July [___] 2010, after notice and a hearing, the Bankruptcy Court entered the Solicitation Procedures Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors and equity holders to make an informed judgment as to whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Solicitation Procedures Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of an Impaired Claim or Equity Interest entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Solicitation Procedures Order and the instructions accompanying the Ballot before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code and the Solicitation Procedures Order.

## B.    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims and equity interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of claims in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. The Bankruptcy Code further defines "acceptance" of a plan by a class of equity interests as acceptance by holders of equity interests in that class that hold at least two-thirds in dollar amount of the equity interests holders that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if (i) at least one class of impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

In addition, if any Impaired Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite majorities provided in sections 1126(c) and 1126(d) of the Bankruptcy Code, the Debtor reserves its right (a) to seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or (b) to amend the Plan as necessary to obtain entry of the Confirmation Order.

Under the Plan, Claims in Class 3 and Equity Interests in Class 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Claims in Classes 1 and 2 for the Debtor are unimpaired, and the holders of Classes 1 and 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 AND HOLDERS OF EQUITY INTERESTS IN CLASS 4 of the Debtor.

For a summary of the treatment of each Class of Claims and Equity Interests, see "Overview of the Plan" below.

## C.     *Confirmation Hearing*

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing is scheduled for September 2, 2010 at 11:00 a.m. (ET) at the Bankruptcy Court, located at 100 South Clinton Street, Syracuse, New York 13261. Objections, if any, to confirmation of the Plan must be served and filed on or before August 26, 2010 at 4:00 p.m. (ET) in the manner described in the Solicitation Procedures Order. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.

## II.     <u>OVERVIEW OF THE PLAN</u>

### A.     *Introduction*

The following is a brief overview of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan. The Plan is the product of the effort by the Debtor's management and the Debtor's professional advisors to develop a plan that will enable creditors and equity interest holders to receive the maximum recovery possible in this Chapter 11 Case. The Plan provides for an orderly wind down of the Debtor's business and liquidation of the Debtor's remaining assets, if any, with distributions of the proceeds to the Debtor's creditors and equity interest holders.

THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE THE DEBTOR TO MAXIMIZE THE RECOVERY TO ITS CREDITORS AND EQUITY INTEREST HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND EQUITY INTEREST HOLDERS. THE DEBTOR THEREFORE URGES THOSE PARTIES ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

### B.     *Summary of Distributions*

Under the Plan, Claims against and Equity Interests in the Debtor are divided into Classes and will receive the distributions and recoveries (if any) described in the table below. The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan. The summary also identifies which Classes are entitled to vote on the

Plan. The Summary set forth herein is qualified in its entirety by reference to the full text of the Plan. The ranges of the "Estimated Amount of Allowed Claims" set forth in the following table reflect the amounts listed in the Debtor's Schedules and the official claims' register maintained by the Bankruptcy Court which may include duplicate, amended and late filed claims. The Debtor has not completed the analysis or reconciliation of the Claims.

| Class | Type of Claim or Equity Interest | Estimated Amount of Allowed Claims | Right to Vote | Estimated Recovery |
|---|---|---|---|---|
| Unclassified | Administrative Claims | $0 | No | 100% |
| Unclassified | Fee Claims | $174,000.00 | No | 100% |
| Unclassified | Priority Tax Claims | $5,000.00 | No | 100% |
| Unclassified | DIP Loan Claim | $1,080,000.00 | No | 100% |
| Class 1 | Secured Claims | $421,867.20 | No | 100% |
| Class 2 | Priority Non-Tax Claims | $4,500.00 | No | 100% |
| Class 3 | General Unsecured Claims | $310,000.00 | Yes | 100% |
| Class 4 | Equity Interests | -- | Yes | Undetermined |

ALTHOUGH THE DEBTOR BELIEVES THAT THE ESTIMATED PERCENTAGE RECOVERIES ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERY, THERE IS NO ASSURANCE THAT THE FINAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE AMOUNTS SHOWN IN THE TABLE ABOVE AND THEREFORE POSSIBLY DEPLETE THE ESTIMATED PERCENTAGE RECOVERY. The actual recoveries under the Plan by the Debtor's creditors and equity holders will be dependent upon a variety of factors including, but not limited to, the amount of proceeds generated by the Sale of the Debtor's assets and the amount of proceeds generated by the liquidation of the Debtor's remaining assets, if any. Accordingly, no representation can be or is being made with respect to whether each estimated recovery shown in the table above will be realized by the holder of an Allowed Claim or Equity Interest.

## III.    OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and equity interest holders. A goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon, among others, the

NYK 1308057-6.085280.0011

debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of the debtor.

After a plan of reorganization or liquidation has been filed, certain holders of claims against or interests in the debtor are permitted to vote to accept or reject the Plan. Before soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.

The Debtor is submitting this Disclosure Statement and notice of this Disclosure Statement to holders of Claims or Equity Interests to satisfy the requirement of section 1125 of the Bankruptcy Code.

## IV. DESCRIPTION OF THE DEBTOR'S HISTORY AND BUSINESS

### A. *The Debtor*

New York Chocolate is a Delaware corporation with its principal place of business in Fulton, New York. New York Chocolate's primary asset is its 39 acre chocolate production facility located at 555 South Fourth Street in Fulton (the "Chocolate Plant"). The Comité, a quasi governmental agency formed under the laws of the Republic of Côte d'Ivoire, is the 100% shareholder of New York Chocolate. The Comité was formed by the President of the Republic of Côte d'Ivoire in September 2008 to, among other things, succeed to the shareholder interests of the then sole shareholder of New York Chocolate – Fonds de Régulation et de Controle Café-Cacao (the "FRC") – after certain of the FRC's members were accused of mismanagement, among other allegations.

The Chocolate Plant was initially owned and operated by Nestlé USA, Inc. ("Nestlé"); it was Nestlé's first United States chocolate production facility and was built in the late 1800's. In March 2003, Nestlé made the decision to close the Chocolate Plant. Jean Claude Amon ("Amon"), a special advisor to the President of the Republic of the Côte d'Ivoire, learned of the planned closing and commissioned Lion Capital Management, LLC ("LCM"), with the aid of its President and Chief Executive Officer, Hausmann-Alain Banet ("Banet"), to conduct an economic analysis on the feasibility of acquiring the Chocolate Plant. Amon and other representatives of the Côte d'Ivoire toured the Chocolate Plant and later met with LCM, through Banet, to discuss the economic study and the possible acquisition of the Chocolate Plant.

Nestlé ultimately decided against selling the Chocolate Plant and decided to auction the equipment located at the Chocolate Plant (the "Equipment") and donated the factory and land to the County of Oswego Industrial Development Agency (the "IDA"). In September and October 2003, LCM purchased substantially all of the Equipment at the auction or, subsequently, from other successful bidders after the auction. To purchase the Equipment, LCM used funds provided by the FRC and some of its own funds, which were later reimbursed by the FRC. In December, 2003, New York Chocolate acquired the factory and land from the IDA.

LCM incorporated New York Chocolate on October 30, 2003, and thereafter transferred the Equipment to it. LCM was the initial sole shareholder until November 17, 2003, when it

NYK 1308057-6.085280.0011

transferred 80% of the shares in New York Chocolate to the FRC. The FRC was a quasi governmental agency formed under the laws of the Côte d'Ivoire and represented the interests of a collection of farmers' cooperatives in the Côte d'Ivoire that grew cacao. The goal of the FRC was to operate the Chocolate Plant so as to provide the farmers' cooperatives with an outlet for their cacao production. An initial board of directors was selected, which included Banet.

## B. The County Loan Agreement

On April 21, 2005, New York Chocolate and OOCI, as subrecipient of the County, entered into the County Loan Agreement. Pursuant to the County Loan Agreement, the County granted New York Chocolate a loan in the principal amount of $850,000 for the purchase of certain equipment for the Chocolate Plant. Under the County Loan Agreement, New York Chocolate granted the County a security interest in certain of its equipment. The Debtor is obligated to make payments under the County Loan Agreement on a monthly basis of $8,207.66 through April 1, 2015. In connection with the County Loan Agreement, New York Chocolate and the County also entered into a Loan Servicing Agreement dated April 21, 2005, pursuant to which New York Chocolate agreed to pay servicing fees to OOCI in the amount of one-half of one percent of the outstanding principal balance due under the County Loan Agreement in two semi-annual installments.

On or about February 9, 2006, the County loaned the Debtor an additional $40,000, which was secured by certain items of office equipment. On or about March 2006, the County loaned the Debtor an additional $35,000. On or about March 27, 2006, the County was granted a lien on certain equipment and a blanket lien on all the Debtor's personal property (the "County Lien"). As of the Petition Date, only obligations under the County Loan Agreement remain outstanding.

## C. Litigation Involving New York Chocolate

### 1. The FCA Action

Fulton Cogeneration Associates, LP ("FCA"), which was owned and operated indirectly by Banet since September 2004, provided steam to New York Chocolate through June 2005. New York Chocolate fell behind in making its payments to FCA and, in July 2005, FCA sued New York Chocolate in New York state court for payments and other obligations owed. FCA won partial summary judgment against New York Chocolate in the amount of $1,332,874.40 plus interest (the "FCA Judgment"). The remainder of the claims asserted by FCA were dismissed with prejudice. In April 2009, the FCA Judgment was satisfied by New York Chocolate making a payment to the IDA, which had attached the FCA Judgment. The United States District Court for the Northern District of New York approved the settlement with the IDA and entered an order extinguishing the FCA Judgment.

### 2. The FRC Action

In 2005, a dispute arose between the FRC and LMC over the ownership of New York Chocolate. In July 2005, the FRC filed an action in the Court of Chancery of the State of Delaware (the "Court of Chancery") seeking a declaration as to the respective equity ownership interests of the FRC and LCM (the "FRC Action"). On January 22, 2007, the Court of Chancery

issued an opinion in which it found that the FRC owned 800 of the 1,000 issued then-outstanding shares of New York Chocolate, and LCM owned the remaining 200 shares.

3.      <u>The California Superior Court Action</u>

In 2006, New York Chocolate filed an action in the Superior Court of California for the County of San Francisco (the "California Superior Court") against Banet and LCM, alleging that Banet and LCM had converted a tax refund check belonging to New York Chocolate. On September 17, 2007, judgment was entered in the California Superior Court in favor of New York Chocolate and against both LCM and Banet in the amount of $606,299.00 (the "Tax Judgment"). After domesticating the Tax Judgment in Delaware, on May 23, 2008, the 200 shares of New York Chocolate stock owned by LCM were sold to New York Chocolate at a sheriff's sale in partial satisfaction of the Tax Judgment against LCM. As a result, the FRC became the 100% shareholder of New York Chocolate.

4.      <u>The Banet Action</u>

On May 6, 2008, Banet filed a lawsuit in the Court of Chancery (the "Banet Action") in his capacity as an alleged stockholder and an alleged director of New York Chocolate against the FRC, the current and former directors and officers of New York Chocolate, and against New York Chocolate (collectively, the "Defendants"). New York Chocolate was named only as a nominal defendant. On October 19, 2008, Banet filed an amended complaint that added FCA and LCM as plaintiffs (collectively, the "Plaintiffs"), asserting claims in their capacity as creditors and LCM as an alleged former shareholder. The Banet Action alleged seven counts, including: a request for appointment of a receiver or custodian for New York Chocolate; breach of fiduciary duties, both derivative and direct; a demand for inspection of books and records; and requests to compel the holding of an annual meeting of stockholders and a meeting of the board of directors of New York Chocolate. On November 26, 2008, the Plaintiffs filed a motion for judgment on the pleadings, or, in the alternative, for summary judgment on their request for a receiver, which was denied. New York Chocolate subsequently filed a counterclaim seeking declarations that neither FCA nor LCM were creditors of New York Chocolate (Banet did not claim to be a creditor) and that neither LCM nor Banet was a stockholder of New York Chocolate. In August 2009, New York Chocolate filed a motion for summary judgment on the counterclaim.

On March 12, 2010, the Court of Chancery granted New York Chocolate's motion for summary judgment and found that (1) LCM is not a stockholder of New York Chocolate; (2) Banet is not a stockholder of New York Chocolate; (3) Banet is not a director of New York Chocolate; (4) FCA is not a creditor of New York Chocolate; and (5) LCM is not a creditor of New York Chocolate.

## D.    *Current Ownership and Management*

On September 19, 2008, the Comité replaced the FRC as the 100% shareholder of New York Chocolate by Ordinance No. 2008-259 and Decrees Nos. 2008-260 and 2008-261 of the President of the Côte d'Ivoire. On November 20, 2008, the Comité acted by written consent to remove all members of the board of directors of New York Chocolate. By separate written

consent of the same date, the Comité elected the following new directors of New York Chocolate: Illa Ginette Donwahi, Léa Claudine Yapobi, N'Guessan Célestin and Atsé Kouassi Propser. At a meeting of the new board of directors on November 24, 2008, all officers of New York Chocolate were removed from office and Mike Malash was appointed President and Patrick Haney was appointed Secretary and Treasurer of New York Chocolate. On January 1, 2010, Richard F. McCormick was employed as New York Chocolate's chief restructuring officer.

### E.    Events Leading to The Chapter 11 Case

The litigations against New York Chocolate, and the allegations against certain members of its prior board and management, saddled New York Chocolate with a significant financial burden right from the start. Partly because of such difficulties, the Debtor has not produced any products at the Chocolate Plant since March 2006. Since the Comité took over for the FRC, it has funded all of New York Chocolate's expenses. After careful consideration and study of the realistic market opportunities for an independent manufacturer of chocolate products, projected capital requirements to restart New York Chocolate's operations, and faced with the accumulation of certain debts and other obligations, and the financial drain related to the numerous litigations, New York Chocolate determined that the most efficient way to preserve value for the creditors and other stakeholders was to commence an orderly wind down of its business under the protection of Chapter 11.

## V.    <u>SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE</u>

On April 14, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has remained in possession of its property pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A.    Significant "First Day" Motions

Immediately after the filing of its chapter 11 petition, the Debtor filed several "first day" motions seeking various orders from the Bankruptcy Court. These orders were requested to ease the strain on the Debtor's relationships with its utilities, employees and other parties as a consequence of the filing. In particular, the Debtor obtained orders approving the following motions and applications:

- Emergency Motion For Order Pursuant To 11 U.S.C. §§ 105, 364(c)(1), (2) And (3), And 364(e), Fed. R. Bank. P. 2002, 4001 And 9014, And Local Rule 4001-3 (I) Authorizing Debtor To Obtain Postpetition Financing On Superpriority And Secured Basis, (II) Granting Interim Relief, And (III) Scheduling A Final Hearing Under Fed. R. Bankr. P. 4001(c) (the "DIP Motion") [Docket No. 8], and Orders [Docket Nos. 35, 67];

- Motion Pursuant to Sections 105(a) And 366 Of The Bankruptcy Code For Entry Of An Order (I) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Service; (II) Deeming Utility Providers Adequately Assured Of Future Payment; And (III) Establishing Procedures For Determining Adequate

Assurance Of Payment (the "Utility Motion") [Docket No. 5], and Orders [Docket Nos. 68, 81];

- Motion Pursuant To Sections 105(a), 363(b), 507(a)(4) And 507(a)(5) Of The Bankruptcy Code For Entry Of An Order Authorizing Payment Of Wages, Compensation And Employee Benefits (the "Wages Motion") [Docket No. 7], and Order [Docket No. 66];

- Motion Pursuant To Sections 105(A), 363, 1107 And 1108 Of The Bankruptcy Code For Entry Of An Order (I) Authorizing, But Not Directing, Debtor To Continue To Administer Insurance Coverage And (II) Authorizing Financial Institutions To Honor All Related Checks And Electronic Payment Requests (the "Insurance Motion") [Docket No. 6]; and Order [Docket No. 65].

1.    *The DIP Motion*

The filing for bankruptcy relief created an immediate need for the Debtor to obtain postpetition debtor in possession financing in order to reorganize successfully. As of the Petition Date, the Debtor had a very limited amount of cash and therefore needed immediate access to funding. Among other things, the Debtor needed to fund payroll for its employees as well as other obligations as approved by the Bankruptcy Court. In addition, the Debtor needed to continue to pay essential costs to preserve its estate, including its utilities to ensure that all the equipment at the Chocolate Plant remained in the same condition. Failure to fund such critical expenses would have resulted in substantial, irreparable harm to the Debtor's estate and its creditors. The Comité, as DIP Lender, was the only available source for postpetition financing.

On May 13, 2010, the Bankruptcy Court entered the Final DIP Order. The Final DIP Order authorized the Debtor (i) to obtain secured postpetition financing up to an aggregate principal amount not to exceed $1,440,000, from the Comité, as DIP Lender, pursuant to a certain Debtor in Possession Loan and Security Agreement; and (ii) to grant the Lender, in order to secure the Debtor's obligations under the financing (A) priority in payment with respect to such obligations over any and all administrative expenses subject to the Carve-Out (as such term is defined in the Final DIP Order), (B) a fully perfected first priority lien on the Collateral consisting of property that was unencumbered by any lien as of the Petition Date, and (C) a fully perfected junior lien on the Collateral consisting of property that was subject to valid, perfected and unavoidable liens as of the Petition Date.

On July [__], 2010, the Debtor filed a Stipulation and Order, pursuant to which the Comité consented to extend the maturity date under the Debtor in Possession Loan and Security Agreement from August 14, 2010 to September 17, 2010. The Bankruptcy Court approved the Stipulation and Order on July [__], 2010 [Docket No. __].

2.    *The Utility Motion*

In connection with the management of the Chocolate Plant and to preserve the value of its assets, the Debtor obtained electricity, natural gas, sewage, water, telephone, internet and/or other similar services (collectively, the "Utility Services"), from various utility companies (the

"Utility Providers"). Uninterrupted Utility Services was essential to the success of the Debtor's Chapter 11 Case. Had any Utility Provider refused or discontinued service, even for a brief period, the integrity of Chocolate Plant and all property and equipment located therein would likely have been jeopardized, thereby diminishing the overall value of the estate. It was therefore critical that Utility Services continue uninterrupted. On May 26, 2010, the Bankruptcy Court entered a final order approving the Utility Motion preventing the Utility Providers from discontinuing the Utility Services and allowing the Debtor to pay certain agreed upon deposits to the Utility Providers.

3. *The Wages Motion*

By the Wages Motion, the Debtor sought authorization to pay certain employee wages, benefits, and other obligations owed to employees. The goal of the Wages Motion was to minimize the personal hardship that the Debtor's employees would suffer if pre-petition employee-related obligations had not been paid when due or as expected, and to maintain the morale of the Debtor's employees during the Chapter 11 Case. On May 13, 2010, the Bankruptcy Court entered an Order granting the relief sought in the Wages Motion.

4. *The Insurance Motion*

In connection with the maintenance of the Chocolate Plant, the Debtor maintains certain insurance policies that provide coverage related to, among other things, property and commercial liability, general liability and automobile liability. The annual premiums for the Debtor's policies, together with the associated taxes and fees total approximately $238,000. The insurance programs are essential to the preservation of the value of the Debtor's property, equipment and assets.

As of the Petition Date, the Debtor owed $104,000 with respect to its property and commercial insurance policy. By the Insurance Motion, the Debtor sought entry of an order authorizing it (a) to pay the prepetition insurance premium obligations necessary or appropriate to maintain its insurance coverage in current effect, including the premium due for its property and commercial insurance policy and, (b) at its sole discretion, to amend, extend, renew or terminate insurance coverage in current effect if and when necessary. On May 13, 2010, the Bankruptcy Court entered an Order granting the relief sought in the Insurance Motion.

**B.    Operation As A Small Business Debtor Without a Creditors' Committee**

Pursuant to section 1116 of the Bankruptcy Code, the Debtor has operated as a small business debtor. On April 28, 2010, the U.S. Trustee filed a Notice of Inability to Appoint a Committee of Unsecured Creditors [Docket No. 45]. The Debtor has consulted with the U.S. Trustee throughout the Chapter 11 Case.

**C.    Retention of Debtor's Professionals**

On May 26, 2010, the Bankruptcy Court approved the Debtor's retention of McDermott Will & Emery LLP as the Debtor's bankruptcy and general corporate counsel [Docket No. 85]. No fee application has been filed to date by McDermott Will & Emery LLP. On June 16, 2010, the Bankruptcy Court approved the Debtor's retention of Piaker & Lyons LP as the Debtor's Tax

Advisors [Docket No. 94]. Piaker & Lyons LP will be paid by the Debtor based on an hourly rate of $150 up to a maximum amount of $8,500 to, among other things, file the Debtor's 2009 and 2010 tax returns.

**D.      Claims Process**

1.      *Schedules and Statements*.

On April 29, 2010, the Debtor filed its schedules of assets and liabilities (the "Schedules" and statement of financial affairs ("Statement of Financial Affairs") [Docket No. 49]. The Debtor reserves its right to further amend its Schedules and Statement of Financial Affairs, if necessary.

2.      *Last Date to File Proofs of Claim Related To Non-Government Claims*.

On April 22, 2010, the Bankruptcy Court entered an Amended Order Setting Claims Bar Date (the "Bar Date Order") [Docket No. 30] establishing the General Bar Date. Pursuant to the Bar Date Order, the deadline for any Person holding or asserting a Claim, excluding Government Claims, against the Debtor to file a written proof of claim with the Clerk of the Bankruptcy Court is July 26, 2010. As a result of the Bar Date Order, the Bankruptcy Code and Bankruptcy Rules, any Person or entity that fails to timely file a proof of claim will be forever barred, estopped and enjoined from (a) asserting a timely filed claim against the Debtor that the entity has that (i) is in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated (if no amount is identified therein for that entity then the entity shall be forever barred, estopped and enjoined from asserting any claim at all against the Debtor) or (ii) is of a different nature or a different classification than any claim identified in the Schedules on behalf of such entity; or (b) voting upon, or receiving distributions under the Plan.

3.      *Last Date to File Proofs of Claim Related To Government Claims*

The Bar Date Order also established the Governmental Unit Bar Date. Pursuant to the Bar Date Order, the deadline for governmental units, as defined in Section 101(27) of the Bankruptcy Code, holding or asserting a Claim against the Debtor to file a written proof of claim with the Clerk of the Bankruptcy Court is October 12, 2010. As a result of the Bar Date Order, the Bankruptcy Code and Bankruptcy Rules, any governmental unit that fails to timely file a proof of claim will be forever barred, estopped and enjoined from (a) asserting a timely filed claim against the Debtor that the entity has that (i) is in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated (if no amount is identified therein for that entity then the entity shall be forever barred, estopped and enjoined from asserting any claim at all against the Debtor) or (ii) is of a different nature or a different classification than any claim identified in the Schedules on behalf of such entity; or (b) voting upon, or receiving distributions under the Plan.

4.      *Last Date to File Administrative Proofs of Claim*.

The Debtor intends to file a motion in the Bankruptcy Court to establish September 16, 2010 as the Administrative Claim Bar Date. The Administrative Claims Bar Date is the final

date for the filing of requests for payment of Administrative Claims. If a party fails to file an Administrative Claim prior to the Administrative Claim Bar Date then such party will be forever barred, estopped and enjoined from asserting an Administrative Claim against the Debtor. Moreover, the failure to file an Administrative Claim by the Administrative Claim Bar Date will release the Debtor's estate from any and all liabilities with respect to the Administrative Claims. Further, the failure to file an Administrative Claim by the Administrative Claim Bar Date precludes such party from objecting to confirmation of the Plan and participating in a distribution on account of its Administrative Claim.

## E.      *Tax Motion*

Prior to the Petition Date, the Debtor incurred, but did not pay, school taxes to the Fulton City School District in the approximate amount of $70,000 (the "School Tax"). School taxes are generally levied for the period from July 1st through June 30th, and are paid in semi-annual installments. The Debtor's payment with respect to the school taxes was due on April 9, 2010 in the amount of $65,602.35. By the Motion Pursuant to Sections 105(a), 363(b), and 507(a)(8) of Title 11 of the United States Code, for Entry of an Order Authorizing the Debtor to Pay Certain Pre-Petition Tax Claims with a Priority Status (the "Tax Motion"), the Debtor sought authority to pay approximately $70,000 to the Fulton City School District on account of school taxes, which amount includes certain late fees and penalties in the approximate amount of $4,000. On May 20, 2010, the Bankruptcy Court entered an order granting the relief sought in the Tax Motion [Docket No. 73] and shortly thereafter, the Debtor paid the school taxes to the Fulton City School District.

## F.      *Sales Of Substantially All of New York Chocolate's Assets*

Starting on the Petition Date, the Debtor commenced a sale process to sell substantially all of its assets in an effort to generate the maximum recoveries for the estate and its creditors. In furtherance thereof, on April 26, 2010, the Debtor filed the Sale Motion seeking authorization to sell substantially all of its assets, including the Chocolate plant and any equipment, machinery, and furniture (the "Business Assets"), and establish certain bidding procedures in connection with such sale. On May 26, 2010, the Court entered an order approving the Debtor's proposed bidding procedures (the "Bidding Procedures Order") [Docket No. 83].

In furtherance of the Bidding Procedures Order, the Debtor's management, with the assistance of its professionals, sent teasers to numerous potentially interested parties and provided interested parties who signed a confidentiality agreement with due diligence information relevant to potential bids, which due diligence was updated throughout the sale process. The Debtor's creditors and parties in interest were notified of the Sale. Also, on June 1, 2010 and June 7, 2010, the Debtor published a notice of the Sale in *The New York Times* and *the Syracuse Post-Standard* to advertise the Sale of the Debtor's assets. The Debtor also updated its website to provide information about the sale process and posted the real property for sale on various websites.

The Bidding Procedures Order required that competing bids for the Debtor's assets be made by June 28, 2010 at 5:00 p.m. with an auction scheduled for June 30, 2010 and a sale hearing to approve the highest and best bid scheduled for June 30, 2010. On June 28, 2010, five

bids were received by the Debtor, including an offer to purchase all the Debtor's assets by a consortium of five bidders lead by GoIndustry DoveBid for a total purchase price of $2,500,000. The Debtor also received a bid from Operation Oswego County, Inc. for all of the Debtor's assets for a purchase price of $500,000 (later increased to $1,000,000). The Debtor further received three additional bids for all its equipment, machinery and furniture and for various discrete pieces of equipment. After the sale hearing, the consortium of bidders lead by GoIndustry DoveBid was deemed to be the highest and best bid for the Debtor's assets and Operation Oswego County, Inc.'s bid was deemed to be the backup bid. The Sale is anticipated to close within five days after entry of the sale order.

On April 26, 2010, the Debtor also filed a motion seeking authority to sell assets worth less than $50,000 (the "De Minimis Sale Motion"). On May 26, 2010, the Court entered an order approving the De Minimis Sale Motion [Docket No. 82]. No assets have been sold pursuant to the De Minimis Sale Motion.

## VI.     SUMMARY OF PLAN PROVISIONS

### A.   Introduction

The Plan is the product of diligent efforts by the Debtor to formulate a plan that provides for a fair allocation of the Debtor's assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law.

The Debtor believes that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtor's creditors and equity interest holders. The Debtor believes, and will demonstrate to the Bankruptcy Court, that the Debtor's creditors and equity interest holders will receive significantly more value under the Plan than under any available alternative.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

### B.   Method of Classification of Claims and Interests and General Provisions

1.   *General Rules of Classification*.

Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes. Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally defined Class, it shall be included in the more specifically defined Class.

2.   *Administrative Claims, Fee Claims and Priority Tax Claims*.

Administrative Claims, Fee Claims and Priority Tax Claims, have not been classified and are excluded from the Classes set forth in Article III of the Plan in accordance with section 1123(a)(1) of the Bankruptcy Code.

3.     *DIP Loan Claim*.

The DIP Loan Claim is a superpriority administrative expense claim superior in priority to all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out, and has not been classified and is excluded from the Classes set forth in Article III of the Plan in accordance with section 1123(a)(1) of the Bankruptcy Code.

## C.     *Unclassified Administrative Claims, Priority Tax Claims, Fee Claims, and DIP Loan Claims*

Administrative Claims, Priority Tax Claims, Fee Claims and DIP Loan Claim are not classified in the Plan.  The treatment of and consideration to be received by holders of Allowed Administrative Claims, Priority Tax Claims, Fee Claims and DIP Loan Claim shall be in full and complete satisfaction, settlement, release and discharge of such Claims.  The Debtor's obligations in respect of such Allowed Administrative Claims, Priority Tax Claims, Fee Claims and DIP Loan Claim shall be satisfied in accordance with the terms of the Plan.

1.     *Administrative Claims*.

Administrative Claims are Claims constituting a cost or expense of administration of the Chapter 11 Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such Claims include all actual and necessary costs and expenses of preserving the estate of the Debtor, all actual and necessary costs and expenses of operating the business of the Debtor, any indebtedness or obligations incurred in connection with the conduct of its business, all cure amounts owed in respect of leases and contracts assumed and assigned by the Debtor, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code.

On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Administrative Expense Claim against the Debtor agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Claim out of the Distributable Proceeds.  Except for expenditures specifically listed in the budget in connection with the Final DIP Order, any requests for payment of Administrative Claims that are not properly filed and served by the Administrative Claim Bar Date shall be automatically disallowed without the need for any objection from the Debtor or any action by the Bankruptcy Court.  The Debtor estimates that Allowed Administrative Claims payable on the Effective Date, exclusive of Fee Claims, will be approximately $0.

2.     *Priority Tax Claims*.

Priority Tax Claims are Claims of governmental units for taxes entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.  The Debtor estimates that the amount of Allowed Priority Tax Claims that have not previously been paid pursuant to an order of the Bankruptcy Court will aggregate approximately less than $5,000.

Pursuant to the Plan, except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim will be paid on the Effective Date, or as soon thereafter as is reasonably practicable, in full, in Cash, an amount equal to such Allowed Priority Tax Claim out of the Distributable Proceeds.

3.    *Fees and Expenses of Professionals.*

Professionals or other entities asserting Fee Claims shall file and serve on the Debtor and such other entities that are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, applications for final allowance of such Fee Claims no later than 20 days after the Effective Date. Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications within the time period set forth in this Section shall be forever barred from asserting such Claims against the Debtor's estate and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claim shall be filed and served on the Debtor and the party requesting payment of a Fee Claim on a date to be specified in the notice of hearing for approval of final fee applications. To the extent necessary, entry of the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, regarding the payment of Allowed Fee Claims. The Debtor estimates that Allowed Fee Claims that will remain unpaid as of the Effective Date equal approximately $174,000.

4.    *DIP Loan Claim*.

DIP Loan Claim means the administrative and secured Claims of the Comité arising under the debtor-in-possession financing facility the Comité provided to the Debtor pursuant to the Final DIP Order. The Debtor estimates that the amount of the DIP Loan Claim as of the Effective Date will aggregate approximately less than $1,080,000.

Pursuant to the Plan, on the Effective Date, or as soon thereafter as is reasonable practicable, except to the extent that the holder of the DIP Loan Claim against the Debtor agrees to a different treatment, the holder of the DIP Loan Claim shall receive Cash in an amount equal to such Claim out of the Distributable Proceeds.

**D.    Classification and Treatment of Claims and Interests**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a description of classes of Claims and Equity Interests in the Debtor.

1.    *Class 1*. This Class consists of all Secured Claims against the Debtor. The Debtor estimates that, as of the Confirmation Date, the aggregate amount of the estimated Allowed Claims in this Class will be approximately $421,867.20, inclusive of all interest, fees, and expenses. For the avoidance of doubt, the Allowed County Secured Claim is included in Class 1. Pursuant to the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Secured Claim in this Class shall receive, in full satisfaction of such Claim, Cash in an amount equal to the sum of the Allowed Secured Claim out of the Distributable Proceeds. Upon receipt of such monies, the holders of an Allowed

Secured Claim in Class 1 will be deemed to have released their Liens on the Distributable Proceeds and additional Cash.

2. _Class 2_. This Class consists of all Priority Non-Tax Claims against the Debtor. The Debtor estimates that, as of the Confirmation Date, the aggregate amount of the estimated Allowed Claims in this Class will be less than $4,500. Pursuant to the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, unless otherwise agreed to by the holder of an Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim in this Class shall receive, in full satisfaction of such Claim, Cash, in an amount equal to the sum of the Allowed Priority Non-Tax Claim out of the Distributable Proceeds.

3. _Class 3_. This Class consists of Allowed General Unsecured Claims against the Debtor. The Debtor estimates that the Allowed Claims in this Class aggregate approximately $310,000. Pursuant to the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, unless agreed to by a holder of an Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim in this Class will receive a distribution on its ratable proportion of the Net Distributable Proceeds up to the Allowed amount of such creditor's Claim.

4. _Class 4_. This Class consists of Allowed Equity Interests in the Debtor. Pursuant to the Plan, on the Effective Date, or as soon thereafter as is reasonably practicable, unless agreed to by a holder of an Allowed Equity Interests, each holder of an Allowed Equity Interests in this Class will receive a distribution on its ratable proportion of the Net Distributable Proceeds remaining after payment of the Allowed Class 3 Claims.

## E.     _Means For Implementation Of The Plan_

1. _Continued Existence of Debtor_

After the Effective Date, the Plan provides that the Debtor shall remain in existence and shall be directed by Pat Haney, the Responsible Person of the Debtor. Further, the Debtor will consult with the U.S. Trustee on various post-Effective Date issues including: (i) the wind down of the Debtor's affairs, (ii) the liquidation of the Debtor's remaining assets, if any, (iii) enforcing and prosecuting claims, Avoidance Actions, and other rights of the Debtor's estate, (iv) resolving Disputed Claims, (v) the administration of the Plan, and (vi) the filing of the Debtor's 2009 and 2010 tax returns. The Responsible Person will have the responsibility and power to take all steps necessary to execute the Plan and will consult with the Disbursing Agent with respect to distributions to be made under the Plan. Upon distribution of all of the Debtor's assets and when the Plan is fully administered, the Debtor shall be deemed dissolved.

2. _Reserve Accounts For Disputed Claims_

On and after the Effective Date, the Debtor, in consultation with the U.S. Trustee, shall allocate to the Disputed Claims Reserves: (i) Cash in an aggregate amount sufficient to pay to each holder of a Disputed General Unsecured Claim, Disputed Priority Claim, and Disputed Administrative Claim the amount that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date or any Subsequent Distribution Date, (ii) net earnings on such Cash and (iii) any other property distributed in respect of such beneficial interests in the Debtor. All Cash and Cash equivalents and earnings

thereon shall be used to satisfy any expenses incurred in connection with the maintenance of the Disputed Claims Reserve. For additional information on Disputed Claims, see Section VI.G herein

3.      *Post-Confirmation Expenses*

Upon the Effective Date, the Debtor's estate will be funded with the Cash generated from the Sale and the Cash generated by the liquidation of the Debtor's remaining assets, if any. The Debtor shall make appropriate reserves to allow for the payment of the Responsible Person after the Effective Date.

4.      *Administration Of Taxes*

After the Effective Date, the Debtor shall exercise all powers regarding the Debtor's tax matters, including filing tax returns. The Debtor shall be solely responsible to (i) complete and file the Debtor's federal, state and local tax returns, (ii) request, if necessary, an expedited determination of any unpaid tax liability of the Debtor under section 505(b) of the Bankruptcy Code for all tax periods of the Debtor ending after the Petition Date through the liquidation of the Debtor as determined under applicable tax laws, and (iii) represent the interest and account of the Debtor before any taxing authority in all matters including, but not limited to, any action, suit, proceeding or audit.

5.      *Corporate Action*

Upon the Effective Date, the Debtor shall perform each of the actions and affect each of the transfers required by the terms of the Plan, in the time period allocated therefor.

6.      *Effectuating Documents And Further Transactions*

The Responsible Person is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

7.      *Closing Of The Chapter 11 Case*

When the Debtor's estate has been fully administered and the Plan has been substantially consummated, the Debtor may seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**F.      Provisions Governing Distributions**

1.      *Method of Distribution under the Plan*

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan. In general, an "allowed" claim or "allowed" equity interest simply means

that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or interest, and the amount thereof, is in fact a valid obligation of the debtor.

Any Claim which is not a Disputed Claim and does not thereafter become the subject of a timely objection and for which a proof of claim has been timely filed is an Allowed Claim. Any Claim that has been listed by the Debtor in its Schedules, as may be amended from time to time, as liquidated in amount and not disputed or contingent is an Allowed Claim in the amount listed in the Schedules unless an objection to such Claim has been filed. If the holder of such Claim files a proof of claim in an amount different than the amount set forth on the Debtor's Schedules or incorrectly classifies such Claim, the whole Claim is a Disputed Claim. Any claim that has been listed in the Debtor's Schedules as disputed, contingent or unliquidated and for which a proof of claim has been filed is a Disputed Claim. Any Claim for which an objection has been timely interposed is a Disputed Claim. Finally, any Claim, a proof of which was not filed in accordance with the Bar Date Order or the Administrative Bar Date Order is a Disputed Claim. Any Claim, a proof of which was not filed in accordance with the Bar Date Order is a Disputed Claim. For an explanation of how Disputed Claims will be determined, see Section VI.G of this Disclosure Statement.

The Debtor, in consultation with the U.S. Trustee, will oversee the objections to any Claims. An objection to any Claim may be interposed by the Debtor within 10 days after the Effective Date or such later date as may be fixed by the Bankruptcy Court. Any claim for which an objection has been interposed will be an Allowed Claim only to the extent the objection is determined in favor of the holder of the Claim, or upon agreement by the parties.

2.    *Disbursing Agent*

The Debtor (or such other entity designated by the Debtor) will act as the Disbursing Agent for the Debtor's estate. The main responsibility of the Disbursing Agent is to distribute all Cash and other property in the Debtor's estate to the holders of Claims in accordance with the provisions of the Plan. The Disbursing Agent will be entitled to compensation for his or her fees and expenses incurred on or after the Effective Date (including without limitation, taxes and reasonable attorney fees and expenses).

3.    *Timing of Distributions*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims or on account of Equity Interests that are Allowed Equity Interests as of the Effective Date shall be made by the Disbursing Agent on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

After the Effective Date, to the extent Cash is available from (i) the Disputed Claims Reserves following the disallowance or reduction of any Disputed Administrative, Priority, Secured or General Unsecured Claim, as applicable, or (ii) undeliverable, time-barred or

unclaimed distributions to holders of Allowed Administrative, Priority, Secured and General Unsecured Claims, as applicable, the Disbursing Agent shall, on each Subsequent Distribution Date, allocate on a *pro rata* basis such Cash among the holders of Allowed General Unsecured Claims that were Allowed on the Effective Date or subsequently have become Allowed on or before such Subsequent Distribution Date up to the Allowed amount of such Claims and, thereafter, among the holders of Allowed Equity Interests that were Allowed on the Effective Date or subsequently have become Allowed on or before such Subsequent Distribution Date.

The Cash and other property allocated to pending Disputed Claims retained in the Disputed Claims Reserves shall be administered in accordance with Article VIII of the Plan. In no event shall the Disbursing Agent be obligated to make a distribution if, in the reasonable business judgment of the Disbursing Agent, the amount then on hand and the ultimate distribution to be made would not be justified, taking into account all of the attendant costs of such distribution. In such case, any undistributed amount may be held over to the next Subsequent Distribution Date.

4.  *Undeliverable Distributions*

Distributions to holders of the Allowed County Secured Claim shall be made to the Loan Servicing Agent for distribution to the County under the terms of the County Loan Agreement and the Loan Servicing Agreement. Distributions to holders of all other Allowed Claims or Equity Interests shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by a new address as set forth (a) on a proof of claim filed by a holder of an Allowed Claim, or (b) in another writing notifying the Disbursing Agent (at the address set forth in the Plan) of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified of such holder's then-current address within forty-five (45) days of such distribution. After the forty-five (45) days period described in the preceding sentence, such Claim holder's rights to such distribution shall be forfeited and expunged. All claims to the undeliverable distributions shall be made on or before the earlier of (i) with respect to the initial distributions made on or after the Effective Date, forty-five (45) days after the date such initial undeliverable distribution was made, or (ii) with respect to the distributions made on a Subsequent Distribution Date, forty-five (45) days after the date such undeliverable distribution was made. If a distribution cannot be made to the holder of an Allowed Administrative, Priority, Secured or General Unsecured Claim, as applicable, as described above, any such holder's Claim shall be expunged and such undelivered Distributions shall be paid on a *pro rata* basis to holders of Allowed General Unsecured Claims up to the Allowed amount of such Claims and, thereafter, to the holders of Allowed Equity Interests.

5.  *Certain Limitations Related to Distributions*

Checks issued by the Disbursing Agent in respect of Allowed Claims and Equity Interests shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof and the Debtor's obligations related to such funds shall be deemed satisfied and discharged after such sixty (60) day period. According to the Plan, distributions relating to the voided checks payable to holders of Allowed Administrative, Priority, Secured or General Unsecured Claims, as applicable, shall be paid on a *pro rata* basis to holders of the Allowed General Unsecured

Claims up to the Allowed amount of such Claims and, thereafter, to the holders of Allowed Equity Interests.

If a distribution to be made to or on behalf of a holder of a Claim or Equity Interest on or after the Effective Date or any Subsequent Distribution Date would be $25 or less in the aggregate, notwithstanding any contrary provision of the Plan, no such distribution will be made to or on behalf of such holder.

## G. Procedures for Treating Disputed Claims Under the Plan

### 1. Disputed Claims

A Disputed Claim is a Claim that has not been allowed or disallowed pursuant to an agreement by the parties or an order of the Bankruptcy Court. A claim for which a proof of claim has been filed but that is listed on the Debtor's Schedules as unliquidated, disputed or contingent, and which has not yet been resolved by the parties or by the Bankruptcy Court, is a Disputed Claim. If a holder of a Claim has filed a proof of claim that is inconsistent with the claim as listed on the Debtor's Schedules, such Claim is a Disputed Claim. Any claim for which the Debtor or any party in interest have interposed (or will interpose) a timely objection is a Disputed Claim.

### 2. No Distribution Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Until such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall hold such property in the appropriate Disputed Claims Reserve in accordance with Article VIII of the Plan. If any Disputed Claims are disallowed, the Cash held in the Disputed Claims Reserve shall be released as and to the extent the Debtor determines such property is no longer necessary to fund unresolved Disputed Claims, and such Cash shall be distributed in accordance with Article VI of the Plan.

### 3. Resolution of Disputed Claims

The Debtor, by and through its counsel, shall have the right, to the exclusion of all others to make and file objections to Claims and shall serve a copy of each Objection upon the holder of the claim to which the Objection is made and on the U.S. Trustee as soon as practicable, but in no event later than 30 days after the Effective Date. All objections shall be litigated to a Final Order except to the extent the Debtor elects to withdraw any such objection or the Debtor and the claimant elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim. Any such settlement resulting in an Allowed Claim against the Debtor in excess of $10,000 shall require approval of the Bankruptcy Court. The U.S. Trustee shall be given three business days notice of any proposed settlement of a Claim. If the U.S. Trustee does not object in writing by the close of business of the third business day after receipt of the notice of proposed settlement, the settlement may be finalized. If an objection is received, and if the parties cannot resolve their differences within a

reasonable amount of time, any such settlement, including those for $10,000 or less, shall require approval of the Bankruptcy Court.

4.  *Assistance with Resolution of Disputed Claims*

The Debtor's representatives, including the Responsible Person, for so long has he is engaged by the Debtor, shall assist the Debtor with the process of resolving the Disputed Claims filed against the Debtor's estate.

5.  *Estimation*

The Debtor may request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims that have been estimated may be compromised, settled, withdrawn or otherwise resolved subsequently, without further order of the Bankruptcy Court.

6.  *Allowance of Disputed Claims*

If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall, on the Subsequent Distribution Date following the date on which the Claim becomes an Allowed Claim, distribute from the appropriate Disputed Claims Reserve to the holder of such Allowed Claim (i) Cash in an aggregate amount sufficient to pay to each holder of a Disputed Claim the amount that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date or any Subsequent Distribution Date, reduced by (ii) a Cash amount equal to such Claim's proportionate share of all expenses of the Disputed Claims Reserve, including without limitation, any taxes imposed by any governmental unit with respect to income generated by or attributable to property held in the Disputed Claims Reserve (including any outstanding tax advances) and reasonable reserves.

## H.  *Treatment Of Executory Contracts And Unexpired Leases*

1.  *Contracts and Leases Not Expressly Assumed Are Rejected*.

To the extent any executory contacts and unexpired leases remain in the Debtor's estate, such executory contracts and unexpired leases are rejected pursuant to the Plan on the Effective Date, with such rejection effective as of the Confirmation Date.

2. *Claims For Damages Associated With Rejection*

Notwithstanding the prior orders establishing the deadlines for filing Claims against the Debtor, Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan shall be filed and served on the Debtor or the Disbursing Agent, pursuant to the procedures specified in the Confirmation Order, no later than 20 days after the entry of the Confirmation Order. Any Claims not filed within such time will be forever barred from assertion against the Debtor, its estate, successors or properties. All Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan. Objections to any such Claims shall be filed no later than 30 days after such Claim is filed and served, and the Bankruptcy Court shall determine any such objections. If the Bankruptcy Court overrules any timely objection to such Claim, then that Claim, to the extent Allowed, shall be classified as an Allowed General Unsecured Claim and paid in accordance with the provisions of the Plan on the later of (i) the next Subsequent Distribution Date and (ii) ten business days after the Claim has been Allowed by a Final Order.

**I.     Conditions Precedent to Confirmation**

The Plan will not become effective unless and until the following conditions have been satisfied pursuant to Article X of the Plan: (a) the Clerk of the Bankruptcy Court shall have entered the Confirmation Order and there shall be no stay of the Confirmation Order in effect and (b) all other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan, including without limitation, the documents comprising the Plan Supplement that are necessary for the effectuation of the Plan, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived. The Debtor retains the right to waive the occurrence of any of the foregoing conditions precedent to effectiveness of the Plan.

**J.     Effect of Confirmation of the Plan**

1. *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

2. *Term of Injunctions or Stays*. Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

3. *Rights of Action*. Except as otherwise provided elsewhere in the Plan, on and after the Effective Date, the Responsible Person will have the exclusive right to enforce any and all present or future rights, claims or causes of action of the Debtor against any Person and rights of the Debtor that arose before or after the Effective Date, including, but not limited to, the Avoidance Actions. See Section VI.K for more information related to Avoidance Actions. In

consultation with the U.S. Trustee, the Responsible Person may pursue, abandon, settle or release any or all such rights of action, as it deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court. The Responsible Person may, in consultation with the U.S. Trustee, offset any such claim held against a person against any payment due such person under the Plan.

4.     *Injunction*. On and after the Confirmation Date, all Persons are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right or cause of action of the Debtor for which the Responsible Person, after the Effective Date, retains sole and exclusive authority to pursue in accordance with the Plan. Notwithstanding anything contained in this section, on or after the Effective Date, the Debtor retains the rights to object to Claims as provided in Sections 8.02 and 8.04 of the Plan and pursue Rights of Action as outlined in Section 11.03 of the Plan.

## K.     *Preservation of Avoidance Actions*

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the transferee not received the payment and had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period. These types of transfers are included in the definition of Avoidance Actions in the Plan.

The Debtor estimates that it made payments of over $496,927.72 to various creditors within the ninety-day period preceding the Petition Date. The Debtor has not yet fully analyzed whether any of these payments are preferences (within the meaning of the Bankruptcy Code) or whether the recipients of such payments would have a defense to a preference action, if commenced. The Responsible Person is charged with pursuing any such Avoidance Actions. The deadline to pursue the Avoidance Actions is two years from the Petition Date.

## L.     *Releases and Exculpation*

1.     *Releases*

Each of the Releasees shall be deemed released by the Debtor from any and all claims, debts, obligations, rights, suits, damages, judgments, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, or otherwise (except for (i) willful misconduct and (ii) gross negligence) that the Debtor would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest or other person or entity would have been able to assert on behalf of the Debtor, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence, related to the Debtor, taking place on or before the Effective Date.

25

In consideration for the distributions received under the Plan all holders of Claims or Equity Interests, and any other claimant who has asserted claims against any of the Releasees and/or the Debtor on or before the Effective Date shall be deemed to have released, remised and forever discharged: (a) the Debtor and its current agents or employees, attorneys, advisors, successors and assigns of the foregoing; and (b) the Releasees, and any person or entity claimed to be liable derivatively through any of the foregoing (such parties described in the preceding clauses (a) and (b) above, collectively, the "Released Parties") of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, promises, damages, claims and liabilities whatsoever, known or unknown, arising from a Claim or based upon the same subject matter as a Claim or Equity Interest and existing on the Petition Date or which thereafter could arise based on any fact, transaction, cause, matter or thing which occurred prior to the Petition Date. Subject to sections 524 and 1141 of the Bankruptcy Code, the releases described herein shall not preclude, police, federal tax, or regulatory agencies from fulfilling their statutory duties. Except as provided above, any person accepting any distribution pursuant to the Plan shall be presumed conclusively to have released the Released Parties from any cause of action arising from or based on the same subject matter as the Claim or Equity Interest. The release described in the preceding sentence shall be enforceable as a matter of contract. The releases described herein are in addition to, and not in lieu of, any other release separately given, conditionally or unconditionally, by the Debtor to any other person or entity.

2. *Exculpation*

The Debtor and the Comité and, where applicable, their respective current officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons) shall have no liability to any holder of any Claim or Equity Interest or any other Person for any act or omission in connection with, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence as determined by a final court order and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## M. Retention of Jurisdiction

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Plan, and the Debtor's assets to the fullest extent permitted by law pursuant to, and for the purposes of Section 105(a) and Section 1142 of the Bankruptcy Code and for the other purposes described in Article XIII of the Plan.

## N. Miscellaneous Provisions

1. *Modifications/Amendments To The Plan*

The Debtor reserves the right, in accordance with the Bankruptcy Code and Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtor may, upon order of the Bankruptcy Court,

amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of an Allowed Claim that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 2. *Withdrawal or Revocation of the Plan*

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, then the Plan shall be deemed null and void.

### 3. *Payment of Statutory Fee*

All fees payable pursuant to Section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due).

### 4. *Successors and Assigns*

The Plan shall be binding on and inure to the benefit of the Debtor, the holders of Claims and Equity Interests and their respective successors and assigns.

### 5. *Exemption From Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held, to be a stamp tax or other similar tax by applicable law.

## VII.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The Disclosure Statement and the material incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934. All statements other

than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Debtor's financial position, and plans and objectives, including, but not limited to, statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements.

## A.    *Taxation*

Pursuant to the Plan, each Holder of an Allowed Claim receiving cash or property under the Plan will recognize gain or loss equal to the difference between the amount of any cash and the fair market value of any other property received by such holder and the tax basis which the holder has in such Allowed Claim.  The character of any recognized gain or loss will depend upon the status of the holder, the nature of the Claim and the period for which the Claim was held by the holder.  The basis of a holder in any property received under the Plan will be the fair market value of such property on the Effective Date of the Plan, and the holding period in such property received will begin on the Effective Date.

The federal, state and local tax consequences of the Plan are complex and, in some cases, uncertain.  In addition, the foregoing summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim or Equity Interest in light of its particular circumstances and income tax situation.  Accordingly, each holder of an Allowed Claim or Equity Interest is strongly urged to consult with its own tax advisor regarding the federal, state, and local tax consequences of the Plan.  For additional information concerning tax consequences of the Plan, see Section IX of this Disclosure Statement.

## B.    *Distributions to Holders of Claims and Interest*

The Plan is based on making distributions as provided under the priority scheme set forth in the Bankruptcy Code.  To this end, the Plan provides that all Allowed Administrative Claims, Fee Claims, Priority Claims and DIP Loan Claim will be paid or satisfied in full prior to the making of distributions to holders of Allowed Secured Claims, Allowed General Unsecured Claims and Equity Interests.

The amount of Cash available for distribution to holders of Allowed General Unsecured Claims and Equity Interests will depend upon a number of factors, including, but not limited to, the proceeds generated from the Sale.  The Debtor is unable at this time to estimate with any certainty the ultimate resolution of such factors, and thus, the amount of available cash that ultimately will be available for distribution to holders of Allowed General Unsecured Claims against, and holders of Equity Interest in, the Debtor.

## C.    *Objections to Classification*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.  The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

### D. Certain Bankruptcy Law Considerations

#### 1. *Risk of Non-Confirmation of the Plan*

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

#### 2. *Risk of Non-Occurrence of the Effective Date*

Even if all Classes of Claims and Equity Interests that are entitled to vote accept the Plan, the Plan may not become effective. The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied.

#### 3. *Appeal of the Confirmation Order*

The Confirmation Order maybe the subject of an appeal. If the Confirmation Order is vacated on appeal (assuming an appeal could be taken and such appeal would not be rendered moot due to substantial consummation of the Plan prior to prosecution), the Plan would fail.

## VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code or (ii) an alternative plan of liquidation.

### A. Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's property for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code. The Debtor believes that liquidation under Chapter 7 will result in smaller distributions being made to creditors than those provided for in the Plan because (i) additional administrative expenses would be incurred, (ii) there would be a delay in making distributions, and (iii) the DIP Lender or the County, who maintains liens on the Debtor's assets, may exercise their rights, further depleting any recovery to holders of Allowed General Unsecured Claims. A liquidation analysis is attached hereto as Schedule 1.

### B. Alternative Plan of Liquidation

If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan. The Debtor believes that the Plan, as described herein, enables creditors and equity interest holders to realize the highest and best value under the circumstances. The Debtor believes that any alternative form of Chapter 11 plan is a much less attractive alternative to creditors and equity interest holders than the Plan because of the far greater returns and certainty provided by the

Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Debtor believes that its Plan provides the best recovery to its creditors by providing them with a distribution of cash in the foreseeable future.

## IX.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    *Federal Income Tax Consequences in General*

The following summary addresses certain material federal income tax consequences of the implementation of the Plan to holders of Allowed Claims and holders of Equity Interests. The summary is based upon the Debtor's interpretation of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all of which are subject to change, possibly with retroactive effect. Due to the complexity of certain aspects of the Plan and differences in the nature of the Claims and Equity Interests of the various holders thereof, their taxpayer status, residence and methods of accounting and prior actions taken by such holders with respect to their Claims and Equity Interests, the tax consequences described below are general in nature and are subject to significant considerations applicable to each holder of an Allowed Claim or Equity Interest.

The federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtor's interpretation of the federal income tax consequences set forth herein are not binding on the IRS, and the Debtor has not requested, and does not intend to request, an administrative ruling from the IRS with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be acceptable to the IRS. No opinion of counsel has either been sought or obtained with respect to the federal, state, local or foreign tax aspects of the Plan. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Additionally, changes in the facts or circumstances relating to the consummation or operation of the Plan could likewise affect the tax consequences to such parties.

This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all of the federal income tax consequences of the Plan. This summary also does not purport to address the federal income tax consequences of the Plan to taxpayers subject to special treatment under the federal income tax laws, such as banks, governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual finds, regulated investment companies, foreign corporations, and foreign persons.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR EQUITY INTEREST.

FURTHERMORE, ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY PLAN DOCUMENTS, AND ANY EXHIBITS OR ATTACHMENTS TO ANY SUCH DOCUMENTS, WERE NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER

IT IS STRONGLY RECOMMENDED THAT EACH HOLDER OF A CLAIM OR EQUITY INTEREST CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

**B.      *Federal Income Tax Consequences to the Debtor***

In general, the Debtor does not expect to incur any substantial federal income tax liability as a result of implementation of the Plan. However, no assurances can be given in this regard and any tax liabilities arising as a consequence of implementing the Plan could impact the amounts payable to the holders of Allowed Claim or Equity Interest.

1.      *Cancellation of Indebtedness*

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Section 108 of the Tax Code provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the Bankruptcy Court or is pursuant to a plan approved by the Bankruptcy Court (the "Bankruptcy Exception").

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of discharge has been determined. Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

The Debtor expects that any COD income that does arise under the Plan will qualify for the Bankruptcy Exception.

### C. *Federal Income Tax Consequences to Holders of Allowed Claims*

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States. The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

### 1. *Receipt of Cash and Property by Holders of Allowed Claims*

Generally, a holder of an Allowed Claim will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim. In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

### 2. *Receipt of Interest*

Pursuant to the Plan, consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on such Allowed Claims may be treated as receiving taxable interest, to the extent of any consideration they receive under the Plan that is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 3. *Character of Gain or Loss*

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim (*e.g.*, Claims arising in the ordinary course of a trade or business or made for investment purposes may attract differing treatment); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim

has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.

**D.**     ***Federal Income Tax Consequences to Holders of Allowed Equity Interests***

The transactions contemplated by the Plan may cause holders of Allowed Equity Interests in the Debtor to recognize income with some or no corresponding cash distribution.

HOLDERS OF ALLOWED EQUITY INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX TREATMENT RELATED TO THEIR INTERESTS UNDER THE PLAN.

**E.**     ***Withholdings***

All distributions to holders of Allowed Claims and Equity Interests under the Plan are subject to any applicable withholding, including employment tax withholding. In particular, a non-U.S. holder of an Allowed Clam or Equity Interest may be subject to withholding at a 30% rate, which may be reduced or eliminated by an applicable income tax treaty or eliminated altogether if the distribution is treated as income effectively connected with a U.S. business. To claim the benefit of a tax treaty or the exemption for effectively connected income, the non-U.S. payee must certify its status on the appropriate Internal Revenue Service form. Amounts withheld under these rules are creditable against a holder's federal income tax liability.

**F.**     ***Importance of Obtaining Professional Tax Assistance***

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL, THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

NYK 1308057-6.085280.0011

# X.    CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims and Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtor urges holders of impaired Allowed Claims and Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than **4:00 p.m., Eastern Time, on August 30, 2010**.

Dated: New York, New York  
      July 6, 2010

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

By:    <u>/s/ Geoffrey T. Raicht</u>  
        Geoffrey T. Raicht (Bar No. 2916203)  
        Nava Hazan (Bar No. 3064409)  
        340 Madison Avenue  
        New York, New York 10173-1922  
        Telephone:  (212) 547-5400  
        Facsimile:  (212) 547-5444

*Proposed Counsel for the Debtor and Debtor in Possession*

NYK 1308057-6.085280.0011